1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DARK CATT STUDIOS HOLDINGS, INC., a Delaware corporation, and DARK CATT STUDIOS INTERACTIVE LLC, an Illinois limited liability company, *on behalf of themselves and all others similarly situated*,<br><br>              Plaintiffs,<br><br>   v.<br><br>VALVE CORPORATION, a Washington corporation,<br><br>              Defendant. | CASE NO.:  2:21-cv-00872<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) AND WASHINGTON CONSUMER PROTECTION ACT<br><br>JURY DEMAND |

CLASS ACTION COMPLAINT
2:21-cv-00872

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND NATURE OF THE CASE ........................................................ 1

II.   PARTIES ........................................................................................................... 6

III.  JURISDICTION AND VENUE .............................................................................. 7

IV.   ANTITRUST LAWS ............................................................................................ 8

V.    ADDITIONAL FACTUAL ALLEGATIONS .............................................................. 9

VI.   RELEVANT MARKET........................................................................................ 16

    A.    The Relevant Product Market Is PC Game Distribution ...................................... 17

    B.    The Relevant Geographic Market Is Worldwide .............................................. 21

VII.  VALVE'S MONOPOLIZATION SCHEME ............................................................. 22

    A.    Valve Is in a Dominant Position in the Market for PC Game Distribution .......... 22

    B.    Anticompetitive Contracts Imposed on Developers ............................................. 25

        1.    Valve's MFN Provisions Are Anticompetitive.......................................... 25

        2.    Valve's Exclusivity Provision Is Anticompetitive.................................... 26

    C.    Valve's Use of Steam Keys to Control Developers Is Anticompetitive.............. 28

    D.    Valve's Use of Its Review System to Control Developers Is Anticompetitive........................................................................................ 32

    E.    Valve Reaps Rewards from Its Monopoly at Developers' Expense.................... 37

VIII. CLASS ACTION ALLEGATIONS ........................................................................ 39

IX.   CLAIMS FOR RELIEF ...................................................................................... 41

X.    PRAYER FOR RELIEF ...................................................................................... 45

XI.   JURY DEMAND ............................................................................................... 46

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1

## TABLE OF AUTHORITIES

2

3

### CASES

4
*Epic Games, Inc. v. Apple, Inc.*,
No. 4:20-cv-05640-YGR (N.D. Cal.) ...............................................................19

5

6
*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ...........................................................................6

7

### STATUTES

8

15 U.S.C. § 15......................................................................................................7, 8, 45

9

15 U.S.C. § 22.........................................................................................................7, 8

10

15 U.S.C. § 26......................................................................................................7, 8, 45

11

28 U.S.C. § 1331.........................................................................................................7

12

28 U.S.C. § 1337.........................................................................................................7

13

28 U.S.C. § 1367.........................................................................................................7

14

28 U.S.C. §§ 1391(b), (c), and (d) ............................................................................8

15

15 U.S.C. § 2 ....................................................................................................... *passim*

16

Washington Consumer Protection Act (RCW 19.86)......................................... *passim*

17

### RULES

18

19
Federal Rule of Civil Procedure 38(b)......................................................................46

20
Federal Rule of Civil Procedure 23(a). (b)(2), and (b)(3)...............................39, 41, 45

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
2:21-CV-00872

-ii-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

Plaintiffs Dark Catt Studios Holdings, Inc. and Dark Catt Studios Interactive LLC (collectively, "Dark Catt") bring this antitrust action against Defendant Valve Corporation ("Valve" or "Defendant") under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and the Washington Consumer Protection Act, on behalf of themselves and a class of similarly situated personal computer ("PC") video game developers (collectively, "Developers"), and allege as follows on personal knowledge as to themselves and upon information and belief as to all others:

## I.     INTRODUCTION AND NATURE OF THE CASE

1.     Dark Catt is a game developer that set out to make, market, and sell an exciting new PC game.  To reach customers, Dark Catt launched its game on Valve's Steam gaming website. PC game Developers like Dark Catt have no viable choice but to publish and sell through Steam because Valve uses its monopoly power to serve as the gatekeeper to PC game distribution and therefore to PC gaming customers.

2.     Dark Catt was required to pay Valve supracompetitive fees on its game sales (and did so), paying Valve 30% of the sales price on Steam plus other fees.  Dark Catt is not Valve's only victim.  All Developers that publish through Steam are subject to Valve's excessive and anticompetitive revenue share requirement and other monopolistic practices that serve only to prevent competition.

3.     Founded in 1996 and incorporated in 2003, Valve started as a video game developer, publishing popular games such as the Half-Life, Portal, and Counter-Strike franchises. A significant shift in Valve's business came with its launch of Steam as a digital content distribution channel in 2003.[1]  Since then, it has used a playbook of tactics to wrongfully attempt to gain and/or wrongfully maintain a monopoly in PC game distribution, extract anticompetitive rents from Developers, and prevent other game distribution stores from gaining a foothold to compete effectively in the market.

---

[1]     About Us, Valve Corporation, https://www.valvesoftware.com/en/about (last accessed June 25, 2021).

CLASS ACTION COMPLAINT
2:21-CV-00872

-1-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

4.      Steam originally served as a software client for Valve's own games, allowing it to distribute game patches for online games; it also included anti-piracy and anti-cheat measures. Valve released Half-Life 2 in November 2004 and required the Steam client to be installed on the user's PC to play the game, even if the customer purchased a physical copy of the game. Customers could not play the game unless they created a Steam account and installed Steam on their PC. Soon thereafter, Valve began contracting with third parties to digitally distribute their games on Steam. By May 2007, 150 games were available for sale on the Steam store, with Valve taking a cut of developers' revenues in exchange for maintaining the content delivery system. There are now at least 50,000 games available on Steam.[2]

5.      Valve, through Steam, became the world's largest distributor of PC games, holding approximately 75% of the global market. In 2017, Steam generated over $4 billion worth of sales.[3] Last year, Steam recorded 120 million monthly active players.[4]

6.      Valve's success as a company has largely tracked the growth of Steam. In 2005, Forbes estimated that Valve had grossed $70 million. As of 2012, the company was worth over $3 billion. Valve Chief Executive Officer Gabe Newell asserted it was more profitable per employee than Google or Apple.[5] As of 2019, Valve's market capitalization had ballooned to $10 billion. Steam is Valve's largest source of revenue.

7.      In transforming itself from plucky gaming upstart to corporate behemoth, Valve has monopolized and/or attempted to monopolize the PC game distribution industry. Valve has already reaped a substantial reward for its early development of a digital distribution system that

---

[2]      Dustin Bailey, *Steam Just Reached 50,000 Games Listed*, PCGamesN (Feb. 12, 2021), https://www.pcgamesn.com/steam/total-games.

[3]      Arthur Zuckerman, *75 Steam Statistics: 2020/2021 Facts, Market Share & Data Analysis*, Compare Camp (May 15, 2020), https://comparecamp.com/steam-statistics.

[4]      Valve Corporation, *2020 Year in Review* (Jan. 13, 2021), https://store.steampowered.com/news/group/4145017/view/2961646623386540826.

[5]      Oliver Chiang, *The Master of Online Mayhem*, Forbes (Feb. 28, 2011), http://www.forbes.com/forbes/2011/0228/technology-gabe-newell-videogames-valve-online-mayhem.html.

can support third-party applications.  Valve has more than recovered for its business acumen back in 2003.

8.  Valve's monopoly tactics harm hundreds of game Developers and millions of game buyers, all of whom pay monopoly rents to Valve in the form of, among other tributes, (a) inflated revenue sharing on game sales (overcharges Valve imposes on all Developers) or (b) potentially inflated game sales prices (overcharges that may be paid by game buyers as a result of the inflated revenue sharing).  Valve keeps 30% of the sales price for purchases on its site and remits the remaining 70% to the Developer, not including sales taxes and other fees that further lower the Developer's share.  Recently, Valve reduced the percentage to 25% or 20% for the highest selling tiers of games, but the majority of games remain subject to Valve's 30% tax, a percentage Valve has not been forced to lower through competitive pressures for almost twenty years.

9.  Valve executes its scheme to gain and maintain its PC game distribution monopoly in at least three ways.  ***First,*** Valve extends its reach beyond its own Steam store; it controls Developers' activities—including their pricing and marketing, such as minimum pricing and exclusive offerings ("exclusives")[6]—on other, third-party storefronts competing to sell the same games available on Steam.  For example, Valve instructs Developers not to "give Steam customers a worse deal" when Developers publish and sell their games through other stores.  Valve makes clear that if a Developer were to offer a discount elsewhere, it must offer Steam customers a comparable discount within a reasonable time.  Valve enforces these requirements in various ways.

10.  In the absence of Valve's restrictions, Developers would be able to publish, market, and sell their games on *better terms* than they receive from Valve and potentially for *lower prices to consumers* than consumers pay on Steam.  Indeed, Developers could and would make more money from each sale because other storefronts commonly offer lower revenue sharing commitments than those imposed by Steam and may offer financial incentives for temporary exclusive offerings.  Developers would keep a larger percentage of each sale, which may also

---

[6]  Exclusive offerings generally involve (a) limited releases of a game or update, either for a specified time or permanently, to one storefront; or (b) special values for a game, such as bundles where the game is free with the purchase of hardware.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

allow them to offer a lower sales price to consumers without sacrificing profits and/or pour more money into innovation and game upgrades.

11.      Thus, if not for Valve's restrictive terms requiring Developers to offer their best pricing and availability on Steam compared to another store, Developers could offer to sell their games—and enhancements to their games—at lower prices on competing storefronts.  Competing storefronts would be able to gain traction in the industry, and increased competition in PC game distribution would result in greater exposure for Developers' games, more money to Developers, more choices for Developers and consumers, and more innovation and/or potentially lower prices for consumers, among other benefits.

12.      ***Second,*** Valve uses its system of authorization numbers called "Steam keys" to enforce its restrictive pricing and marketing terms and to control Developers.  Steam keys are crucial to the PC gaming industry from pre-commercialization beta testing of new games and media and influencer publicity, to post-release expansion onto third-party stores.

13.      Valve builds and maintains its monopoly by ensuring Steam keys remain the industry standard for distributing authorized, licensed copies of games.  The critical need for access to Steam keys keeps Developers from violating Valve's overly restrictive pricing and marketing terms.

14.      Valve collects Steam key usage and other data concerning Developers' sales through other stores.  Valve uses Steam keys to punish Developers for selling their games at lower prices or offering exclusives on other stores when Steam too is selling the game.  It also uses its control over Steam keys to limit the number of sales Developers can make through other stores.

15.      Indeed, despite Developers' need for Steam keys, access to Steam keys is governed by Valve's secret whim.  Valve retains sole discretion to approve Steam keys for Developers, even the so-called "dev comp" keys that provide Developers access to their own Steam-hosted games. Valve provides no clear, objective, or consistent rules or guidelines as to when key requests may be approved or denied, and Developers have no recourse when their request is denied.  Valve may and sometimes does arbitrarily delay or deny Steam keys to the Developer, as Dark Catt found out.

16.     **Third,** Valve uses its control of the publicity and visibility of games on the Steam store to keep Developers in check and maintain its monopoly power in PC game distribution. Valve's Steam store review system punishes Developers that threaten Steam's power or control.

17.     Via its Steam review system, Valve is willing to ban games or Developers after little or no investigation of reported wrongful behavior, allowing users to attack games without merit.   Steam's loyal and zealous user base will post baseless negative reviews for certain Developers' games on the Steam store, and Valve fails to remove negative reviews for Developers it opaquely determines to have acted against Valve in some way.   When done in large numbers, the succession of negative reviews is called "review bombing."[7]   These negative reviews do not address the quality of the game or its technical performance; they instead reflect users' displeasure with the Developer, often due to the Developer's use of alternative distribution sites.

18.     Although unrelated to the game, the volume of negative reviews can have devastating results for future sales and can bury the game among thousands of others in search results and recommendations.   The reviews can result in lower sales for Developers and even Developers unjustifiably being banned from Steam altogether.

19.     Thus, Valve's use of the Steam review system is a powerful tool in its control over Developers' pricing, publishing, and marketing on other sites.

20.     **Impact:** Valve's anticompetitive practices have exploited the plaintiff class of Developers, who find themselves reliant on Steam's massive user base and locked into publishing and selling their games on Steam.   Valve imposes on Developers abusive contractual provisions and unjustified pricing and marketing restrictions, as well as instilling an unwarranted yet well-grounded fear of retaliation.   Without strict fealty to Valve in the first instance, Developers are unable practicably to pursue and take full advantage of beneficial commercial opportunities

---

[7]     "Review bombing is the practice of flooding a digital review service with negative feedback, to artificially lower an item's overall rating.   It's a practice used frequently in the gaming industry, though it's by no means exclusively there."   Rachel Kaser, *Game review bombs are here to stay – so let's use them for good*, The Next Web (Mar. 4, 2019), https://thenextweb.com/gaming/2019/03/04/game-review-bombing-steam-good-bad/.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

elsewhere.  Developers are forced to pay Valve a supracompetitive fee, in the form of an inflated revenue share, and are blocked from entering more favorable and procompetitive arrangements with other storefronts.

21.    Valve's practices have also harmed others not party to this lawsuit, including Valve's would-be competitors, third-party storefronts like Epic Games Store, Electronic Arts' Origin, Microsoft's store, Tiny Build's store, and Discord's store, which have been consistently unable to make incursions on Steam's market share despite pursuing more efficient business models and offering more favorable opportunities for Developers.

22.    Valve's practices have also harmed PC gaming consumers, who are now inured to Steam, paying supracompetitive prices on games and add-ons purchased, and/or being denied the benefits of the higher quality, higher quantity, and/or cheaper games and more innovative delivery systems that they would receive in a competitive marketplace.

23.    Now a giant company of 25-year vintage, Valve has proven itself incapable of succeeding only on its legitimate merits; it has crossed the line into illegal monopolization.  *See United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).  Its conduct needs to be redressed.

## II.    PARTIES

24.    Plaintiff Dark Catt Studios Holdings, Inc. ("DCS Holdings") is a multimedia production company and development studio with a focus on film, animation, and narrative media forms.  It is incorporated in the State of Delaware with its principal place of business in Illinois.

25.    Plaintiff Dark Catt Studios Interactive LLC ("DCS Interactive") is a wholly owned subsidiary of DCS Holdings and specializes in PC software, gaming, interactive content, and experiences.  It is formed under the laws of the State of Illinois and has its principal place of business in Illinois.

26.    DCS Holdings contracted with Valve under the Steam Distribution Agreement ("SDA") during the Class Period (defined below).  DCS Interactive created a PC game and made it compatible with Steam by incorporating the Steamworks software development kit ("SDK"), subjecting it to the Steamworks Documentation rules.  DCS Interactive, bound by the terms of its

1   parent DCS Holdings' contracts with Valve and the Steamworks Documentation, published its
2   game for sale on Steam, sold its game to consumers on Steam, and paid various sums to Valve,
3   including Valve's mandatory 30% revenue share on game sales on Steam.

4        27.    Defendant Valve Corporation is a game developer, hardware manufacturer, and
5   digital content distributor.  It is the world's largest PC game distributor.  Valve Corporation is
6   incorporated in the State of Washington and has its principal place of business at 10900 NE 4th
7   Street, Suite 500, Bellevue, Washington 98004.  It operates the Steam store, distributes PC games
8   online, and, among other conduct, contracts with PC video game developers through the SDA and
9   Steamworks Documentation.

10              **III.    JURISDICTION AND VENUE**

11       28.    The United States District Court for the Western District of Washington has
12  subject-matter jurisdiction under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) & 26)
13  and 28 U.S.C. § 1331 and 28 U.S.C. § 1337, because this action arises under Section 2 of the
14  Sherman Act (15 U.S.C. § 2).  The Court has supplemental jurisdiction for the Washington state
15  law claim under 28 U.S.C. § 1367.

16       29.    The United States District Court for the Western District of Washington has
17  personal jurisdiction over Defendant under 15 U.S.C. § 22, because Valve Corporation is a resident
18  of the Western District of Washington and, *inter alia*:  (a) transacted business throughout the
19  United States, including in the Western District of Washington; (b) contracted with Developers
20  within the United States, including in the Western District of Washington; (c) had substantial
21  contacts within the United States, including in the Western District of Washington; and/or (d) was
22  engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of
23  causing injury to persons residing in, located in, or doing business throughout the United States,
24  including in the Western District of Washington.

25       30.    Venue is proper in the United States District Court for the Western District of
26  Washington because a substantial part of the events giving rise to Dark Catt's claim occurred in
27  this District and a substantial portion of the affected interstate trade and commerce was carried out

28

CLASS ACTION COMPLAINT                          -7-
2:21-CV-00872

1  in this District, as provided in 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b), (c), and (d).  Further,

2  Valve selected the courts in King County, Washington, as the venue for disputes arising under, in

3  connection with, or incident to the SDA.

4                              **IV.    ANTITRUST LAWS**

5         31.    Section 2 of the Sherman Act (15 U.S.C. § 2) makes it unlawful for any person to

6  "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons,

7  to monopolize any part of the trade or commerce among the several States."

8         32.    Section 2 makes it illegal to acquire or maintain monopoly power through improper

9  means.  The offense of monopolization has two elements:  (1) the possession of monopoly power

10  in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished

11  from growth or development as a consequence of a superior product, business acumen, or historic

12  accident.

13        33.    The offense of attempted monopolization has three elements:  (1) anticompetitive

14  conduct; (2) a specific intent to monopolize; and (3) a dangerous probability of success, *i.e.*,

15  achieving monopoly power.

16        34.    Monopoly power is the power to control prices or exclude competition and can

17  ordinarily be inferred from a dominant share of the relevant market.

18        35.    The monopoly power must be accompanied by some element of exclusionary

19  conduct that harms competition in the relevant market.

20        36.    A specific intent to monopolize entails an intent to destroy competition or build

21  monopoly.

22        37.    The dangerous probability of achieving monopoly power is determined by

23  evaluating the relevant market and the ability to lessen competition in that market.  The defendant

24  is not required to have monopoly power, and the minimum showing of market share required is a

25  lower quantum than the minimum showing required for an actual monopolization claim.

26        38.    Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) authorize any person

27  (including Dark Catt) injured in its business or property by reason of the antitrust law violations

28

1   alleged in this complaint to sue in this Court for damages sustained thereby, and the costs of suit,

2   including a reasonable attorney's fee, as well as for injunctive relief.

3       39.    The Washington Consumer Protection Act (RCW 19.86) prohibits unfair methods

4   of competition and unfair or deceptive practices in the conduct of trade or commerce.  The offense

5   has five elements:  (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce;

6   (3) public interest impact; (4) injury to the plaintiff in his or her business or property; and (5)

7   causation.

8   ### V.    ADDITIONAL FACTUAL ALLEGATIONS

9       40.    This antitrust suit arises from Valve's willful attempted and/or actual acquisition

10   and maintenance of monopoly power in the global market for PC game distribution.  The relevant

11   product and geographic markets are further defined below.

12       41.    Valve dominates the PC game distribution market through the use and control of

13   its digital distribution store, Steam, and associated Steam keys.  Developers contract with Valve

14   to publish their games on Steam.  Consumers can then purchase (from Steam directly or from other

15   stores selling Steam keys), download, and play a given PC game on Steam.

16       42.    Steam is the world's largest distributor of PC video games, holding approximately

17   75% of the global market.  In 2020, Steam reported that it recorded 120 million monthly active

18   players, 25 million peak concurrent users, and 2.6 million new purchases per month.[8]

19       43.    Prior to October 2018, Valve imposed a standard revenue share percentage on all

20   Developers, keeping 30% of the sales price for all purchases on its site for itself and remitting the

21   remaining 70% to the Developer.  Since then, Valve continues to keep 30% of most sales but

22   reduces the percentage to 25% or 20% for the highest selling tiers of games.  Developers also pay

23   other fees to Valve.

24       44.    Valve contracts with Developers to distribute games on Steam through the SDA.

25   Valve also includes extensive rules throughout the Steamworks Documentation that governs the

26

27   _____

28      [8]   *Steam – 2020 Year in Review*, *supra* note 4.

use of Steamworks, which is Steam's SDK that Developers must use to make their game compatible with Steam.

45.    Since at least April 27, 2017 and continuing through the present until the effects of its scheme are eliminated ("Class Period"), Valve has illegally attempted and/or actually acquired and maintained its monopoly through the SDA, Steamworks Documentation, and other acts. Indeed, Valve uses the SDA and terms of the Steamworks Documentation to maintain its monopoly in the PC game distribution market.

46.    The SDA suppresses competition by, among other tactics, requiring Developers to make their games (and any updated version) available on Steam at the same time they become commercially available through any other source.

47.    Developers are therefore unable to offer a new game, update, or add-on through a third-party store before delivering that application to Steam.  This prohibits Developers from entering exclusive offerings with other storefronts.  Valve suppresses competition by ensuring Steam has access to the newest inventory, on its terms, instead of having to negotiate for the newest releases in a competitive market.

48.    Without Valve's undue restraints, Developers could and would contract with other storefronts to offer exclusives, which are valuable promotional tools for both stores and Developers to attract customers and increase game sales.  In response, Valve would have to compete with other stores in negotiations with Developers—including, for example, in terms of price, revenue share, minimum sales guarantees, and marketing support—to get an exclusive offering on Steam, or simultaneous release rather than an exclusive on a competing marketplace.

49.    Competition for exclusives would result in procompetitive benefits for Developers and consumers, for example, upfront payments that Developers invest in additional development resources, increasing the quality, innovation, and number of games offered to consumers.  Instead, Steam requires delivery by right of contract and artificially keeps prices high.

50.    The SDA also suppresses competition through its restrictions on downloadable content ("DLC"), which is digital content a consumer can add onto a complete video game.  It is

CLASS ACTION COMPLAINT
2:21-CV-00872

-10-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

related to a game, but available separately from the base game.  DLC may consist of cosmetic changes such as new character "skins" or new stories, modes, or missions that provide hours of additional playing time.  Under the SDA, DLC also includes any game-related services provided for an additional payment.

51.    DLC can be a significant source of revenue to Developers.  In a 2019 survey, 87% of gamers reported that they purchased DLC.  Each player of the decade-old game League of Legends spent an average of $92 on DLC for the game in 2019.  Valve's game Counter-Strike saw an average $70 spend per player.[9]

52.    Indie developers also benefit from DLC, particularly to drive sales later in the lifecycle of a release.  As examples, EXOR Studios shared the lifetime sales of its game X-Morph: Defense, released in 2017.  It had sold about 80,500 copies of the base game and 73,300 total units of its three DLC offerings.  Its bundled "complete version," including the game and DLC, accounted for almost half its sales.  The studio Fellow Traveler reported that one-third of its revenues for its game Hacknet have been from DLC.  And studio No More Robots offers a $20 game and a $10 story DLC, with between one-fourth and one-third of customers (depending on a non-sale or sale period, respectively) also purchasing the DLC.[10]

53.    Valve, through the SDA, requires Developers to offer their DLC to Steam customers at the best price and earliest availability for which it is available on any other marketplace.  If a Developer distributes a game available on Steam through another store also, and is going to distribute DLC for that game through the other store, the Developer must provide comparable DLC to Steam users at the same time the DLC becomes available on the other store.  Further, the Developer must provide the DLC at the same price on Steam and the other storefront.

---

[9]    Statistica, *Share of gamers who purchase downloadable content in the United States in 2019* (Mar. 3, 2021), https://www.statista.com/statistics/274130/purchased-virtual-gaming-items-and-content-in-the-us/; Statistica, *Average annual spend on downloadable content (DLC) in selected video games in the United States in 2019* (Mar. 3, 2021), https://www.statista.com/statistics/1104745/video-gaming-dlc-spend-game/.

[10]   Simon Carless, *The surprising way that paid DLC works*, Gamasutra (July 13, 2020), https://www.gamasutra.com/blogs/SimonCarless/20200713/366297/The_surprising_way_that_paid_DLC_works.php.

54. Valve's restrictions on DLC as well as other terms imposed on Developers are, in practice and effect, a type of Most Favored Nation ("MFN") provision preventing price competition between storefronts. The MFN also keeps Developers on Steam because they may not monetize their DLC at a better rate on another store or use DLC exclusives to attract customers to another store.

55. Likewise, the Steamworks Documentation prohibits Developers from offering a game at a lower price on another storefront, imposing a corresponding MFN on the base game.

56. Steamworks is the SDK used to add various tools and features to a game that will run on Steam. One component, called SteamPipe, is required to upload content to Steam, making use of Steamworks mandatory for a Developer to publish its game on Steam.[11]

57. All Developers therefore must become "Steamworks partners" to publish their games on Steam, and in turn must comply with the rules and guidelines in the Steamworks Documentation.

58. Developers who want to run a beta test, provide free access to media, or distribute their Steam-hosted game on third-party stores must use Steam keys. Steam keys are alphanumeric codes that provide a way to authenticate users and grant a game license to valid purchasers.

59. The Steamworks Documentation on Steam Keys requires Developers to offer games on Steam at the best available price. The Rules and Guidelines section states, for example:

- "We ask you to treat Steam customers no worse than customers buying Steam keys outside of Steam."

- "You should use keys to sell your game on other stores in a similar way to how you sell your game on Steam. It is important that you don't give Steam customers a worse deal."

- "It's OK to run a discount on different stores at different times as long as you plan to give a comparable offer to Steam customers within a reasonable amount of time."

---

[11] Valve Corporation, *Steamworks SDK*, https://partner.steamgames.com/doc/sdk (last accessed June 25, 2021); Valve Corporation, *Uploading to Steam*, https://partner.steamgames.com/doc/sdk/uploading (last accessed June 25, 2021). Other features in the SDK are optional but frequently incorporated into games to provide features such as game notifications, player statistics, and "matchmaking" to find other users who want to play a multiplayer game.

- "Keep in mind that the perceived price in the bundle/subscription should be a price you are willing to run the game at a standalone price or discount on Steam. . . . **We want to avoid a situation where customers get a worse offer on the Steam store, so feel free to reach out to us via the Developer Support tool if you want to talk through a specific scenario**." (emphasis in original)

- "We reserve the right to deny requests for keys or revoke key requesting privileges for partners that are abusing them or disadvantaging Steam customers."

- "If we detect that you have requested an extreme number of keys and you aren't offering Steam customers a good value, we may deny your request."

- "We reserve the right to remove key requesting privileges from any partner whose sole business is selling Steam keys and not providing value or a fair deal to Steam customers."

(collectively, "Steam Key Rules").[12]

60.    Although Valve specifically avoids using the word "price" in most of the above statements, it is well understood by industry participants that "deal," "offer," and "value" mean price, consistent with those terms' common usage. This understanding comes in part from Valve's enforcement of the terms as requiring price parity across stores, *i.e.*, an MFN.

61.    Epic CEO Tim Sweeney explained how this affects prices on his company's store, even though it does not sell Steam keys:

> Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then:
>
> 1) Valve can simply say 'no'
> 2) Pricing disparity would likely anger Steam users, leading to review bombing, etc.[13]

62.    The Steam Key Rules and DLC restrictions together act as an MFN controlling PC gaming prices throughout the industry, requiring that Steam receive the lowest prices for base

---

[12]   Valve Corporation, *Steam Keys*, https://partner.steamgames.com/doc/features/keys (last accessed June 25, 2021).

[13]   https://twitter.com/TimSweeneyEpic/status/1090663312814157824 (Jan. 30, 2019); *see also* Kyle Orland, *Epic CEO: "You're Going to See Lower Prices" on Epic Games Store*, Ars Technica (Mar. 20, 2019), https://arstechnica.com/gaming/2019/03/epic-ceo-youre-going-to-see-lower-prices-on-epic-games-store/ ("The Epic Games Store's much-ballyhooed 88-percent revenue share has been great news for developers who are no longer forced to accept Steam's de facto 70-percent standard. But this new behind-the-scenes monetary split hasn't resulted in savings for gamers, who thus far have seen the same price tags for games on Epic's storefront as on Steam (when titles are available on both).").

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

games and any add-on content.  These terms allow Valve to maintain its monopoly in the PC game distribution market by unilaterally controlling the price floor of all Steam-based PC games regardless of where else they are sold.  Other PC gaming stores have had great difficulty in effectively gaining market share and contesting Valve's monopoly because Valve's conduct as alleged in this complaint prevents them from competing on price.

63.     While Epic is trying to succeed with its own distribution site, other developers and publishers, even giant companies such as Electronic Arts ("EA"), Ubisoft, and Microsoft, are unable to take similar actions to challenge Valve's monopoly.  Other developers or publishers cannot sustain the losses that Epic has in trying to compete with Valve; Epic reportedly lost $181 million on the Epic Games Store in 2019, $273 million in 2020 (projected), and expects to lose $139 million in 2021.[14]

64.     Epic launched its store by offering the already highly popular Fortnite game.  In addition to its lower revenue sharing percentage for sales on its store, Epic waived the royalty for developers using its popular Unreal Engine game engine for their game (typically 5% of gross revenue after a revenue threshold is reached).  It has also spent hundreds of millions of dollars attracting developers through minimum revenue guarantees, committing $444 million to exclusivity deals in 2020.[15]  Its sales of third-party games in 2020 were $265 million, by comparison.[16]

65.     Epic spends heavily to attract customers as well.  In 2020 alone, it gave away 103 games worth a total of $2,407, with customers claiming a total of 749 million copies of the free games.[17]

---

[14]   Tyler Wilde, *Epic will lose over $300M on Epic Games Store exclusive, is fine with that*, PC Gamer (Apr. 10, 2021), https://www.pcgamer.com/epic-games-store-exclusives-apple-lawsuit/.

[15]   *Id.*

[16]   Epic Games, Inc., *Epic Games Store 2020 Year in Review* (Jan. 28, 2021), https://www.epicgames.com/store/en-US/news/epic-games-store-2020-year-in-review.

[17]   *Id.*

66.   Smaller game stores do not have the financial resources to offer these benefits to developers and consumers and sustain the losses in an attempt to challenge Valve's exclusionary exercise of monopoly power.

67.   Even other billion-dollar companies with popular PC games, similar to Epic, have been unable to compete with Steam in the market for PC game distribution.

68.   EA created its Origin store and game launcher in 2011, allowing users to buy, download, and play games directly from EA.  It stopped releasing its games on Steam at that time. Despite the draw of its popular franchises such as FIFA, the Sims, and Battlefield, EA was unable to break through Valve's anticompetitive tactics in the PC game distribution market and returned its games to Steam in 2020 to "be where the players are."[18]

69.   Microsoft also attempted to challenge Valve's monopoly using its popular games and Windows operating system to attract users to its store.  But it was likewise unable to make inroads into Steam's market dominance and began selling its PC games on Steam in 2019.[19]

70.   Ubisoft, publisher of blockbuster franchises such as Assassin's Creed, Tom Clancy's Rainbow Six Siege, and Anno, launched its Uplay gaming client and online store in 2009. Though it has the ability to publish and sell games fully independently of Steam and Valve, Ubisoft continues to sell its games on Steam because of Valve's monopolistic hold on the market.

71.   Discord, a communication service popular among gamers, attempted to enter the PC game distribution market in late 2018.  It had an existing user base of millions of active PC gamers and offered more favorable terms for developers.  Within a year, Discord shut down both the store and its monthly subscription service for PC games.

72.   Absent the Steam Key Rules, DLC restrictions, marketing limitations, and Valve's other conduct, Developers could and would contract with other stores to offer their games and

---

[18] Chaim Gartenberg, *EA games are returning to Steam along with the EA Access subscription service*, The Verge (Oct. 29, 2019), https://www.theverge.com/2019/10/29/20937055/ea-games-steam-access-subscription-service-pc-storefront-jedi-fallen-order-sales.

[19] Nick Statt, *Microsoft will distribute more Xbox titles through Steam and finally support Win32 games*, The Verge (May 30, 2019), https://www.theverge.com/2019/5/30/18645250/microsoft-xbox-game-studios-publishing-valve-steam-32-bit-windows.

CLASS ACTION COMPLAINT                    -15-
2:21-CV-00872

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

DLC with exclusive offers and potentially at lower prices than the prices offered for the same games on Steam.  This would attract additional customers to purchase games on the other stores, driving market share away from Steam and onto other PC game distributor stores.  Further, this would allow Developers to reach a broader consumer base and increase revenues even if they offer a lower retail price to game buyers.

73.     With competition for distribution of PC games, Valve would be pushed to offer better revenue sharing agreements with Developers, allowing Developers to keep more of the sales revenues from their products.  In other words, the 30% revenue share Valve imposes on the majority of Developers would be (and should have been) reduced.

74.     Dark Catt contracted with Valve under the SDA and the rules governing use of Steamworks.  During that time, Valve prohibited Dark Catt from entering into agreements with other publishers or stores to sell its game or DLC at lower prices than those offered through the Steam store or engage in exclusives.

75.     As a direct consequence of Valve's anticompetitive conduct, Dark Catt and Developers:  (a) paid Valve a supracompetitive revenue share; (b) could not take advantage of better revenue share agreements offered on other stores; and (c) could not engage in exclusives on other stores, thereby depriving Dark Catt and Developers of additional game sales and better marketing support.  Thus, Dark Catt and Developers suffered antitrust injury.

76.     Dark Catt brings this action on behalf of itself and a putative Class of Developers in the public interest and to redress Valve's abuse of its market power to attempt to monopolize and maintain its illegal monopoly in the PC game distribution market through the SDA and Steamworks Documentation terms, as well as the other anticompetitive practices described herein, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) and the Washington Consumer Protection Act.

## VI.     RELEVANT MARKET

77.     The relevant product market is the PC game distribution market.  The market is worldwide in geographic scope.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

A.      **The Relevant Product Market Is PC Game Distribution**

78.    At all relevant times, Valve had substantial market power in the PC game distribution market.  Valve had the power to profitably maintain the prices offered on Steam at supracompetitive levels without losing sales to other stores that offer the same games.  It similarly had the power to exclude potential competitors from the PC game distribution market, harming Developers and potentially PC gaming customers.

79.    As an initial matter, PC games are not reasonably interchangeable with console games or mobile games.  PC games are only playable on personal computers and are not compatible with game consoles (*e.g.*, Microsoft Xbox, Sony PlayStation) or mobile devices.  The differences between the platforms inform the distinct distribution markets for PC games, console games, and mobile apps.

80.    The cross-elasticity of demand between PC games and console games is low, and consumers will not respond to a small but significant price change for a PC game by purchasing a console game instead.

81.    There are thousands more games available for PC than game consoles, and they retail at lower average prices than console games.  Steam has over 50,000 games available, while Xbox One, PlayStation 4, and Nintendo Switch each have around 3,000 games.[20]  The pricing difference is compounded by the frequent sales on digital distribution sites for PC games (and the need to purchase the required gaming console).

82.    The cross-elasticity of demand between PC games and mobile games is even lower as most mobile games are free to play (and supported by ads or in-game purchases).  When they do have a retail price, these prices are generally lower than PC games.  According to a market researcher, of the 2.6 billion mobile gamers in 2020, about 38% paid for games, and 98% of mobile gaming revenues were from in-game transactions rather than a purchase price.[21]

---

[20]  Xbox One has the fewest at about 2,700, while Switch has the most at almost 3,300.

[21]  Tom Wijman, *The World's 2.7 Billion Gamers Will Spend $159.3 Billion on Games in 2020; The Market Will Surpass $200 Billion by 2023*, Newzoo (May 8, 2020), https://newzoo.com/insights/articles/newzoo-games-market-numbers-revenues-and-audience-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

83.     Consumers generally will not switch to a free-to-play mobile game designed to be played in shorter intervals and "on the go" in response to a price increase of a PC game.  Likewise, PC game consumers will not switch to mobile games in response to output decreases of PC games.

84.     Games made for consoles or mobile apps are not economic substitutes for games made for PCs.  Other factors drive consumers' preferences.  PC, console, and mobile offer different user experiences and game functionality, which are significant considerations for a consumer deciding to purchase PC games.

85.     For example, a PC version can support richer graphics and greater memory requirements.  Mobile devices in particular present processing limitations for games, making the complex animation, code, color/lighting, and audio files featured in most PC games impossible to match.  PC games also offer more reactive controls using a keyboard and/or mouse rather than a controller or smartphone screen, creating a different playing experience.

86.     Customers view these three different ways to play games as economic complements, rather than substitutes, because they have different use cases.

87.     Given the differences in the games themselves, PC game distribution also differs from distribution models used for console and mobile games.  PC games moved to digital distribution earlier than console games, which still have a significant physical distribution component.[22]  Mobile games are solely digitally distributed and are available on mobile app stores accessible from and optimized for a mobile device.

88.     Mobile app stores do not sell PC games, and PC game stores do not sell mobile apps.  Similarly, consoles have their own digital storefronts specific to the brand (*e.g.*, PlayStation or Xbox) that do not sell PC games, and vice versa.  Because the applications are downloaded on the device after purchase, they must be accessed by the compatible device—PC, console, or phone.

---

2020-2023/.  There are approximately 1.3 billion PC gamers, or half the number of mobile gamers, according to the study.

[22]     Riordan Zentler, *Digital vs. physical: How the video game industry learned from Microsoft's missteps*, The Spokesman-Review (Apr. 30, 2020), https://www.spokesman.com/stories/2020/apr/30/digital-vs-physical-how-the-video-game-industry-le/.

A Developer cannot sell its PC game on the PlayStation Store or the Apple App Store in response to Valve's supracompetitive revenue sharing requirement.

89.    Valve itself recognizes that PC games do not compete with mobile games.[23]  For example, Valve has stated, "Valve does not make or sell phones, tablets, or video games for mobile devices, or otherwise compete in the mobile market.  Valve also operates Steam, an online platform that lets users purchase and play PC games on their laptops and desktops.  Steam users cannot buy or use mobile apps on Steam."[24]  Valve adds that it "does not compete in the mobile market or sell 'apps.'"[25]

90.    Additionally, the size of game files helps explain why games on different platforms (PC, console, and mobile) are complements rather than substitutes, and why their distribution channels also are not reasonably interchangeable.

91.    Factors that affect playability and the user experience include rich graphics and textures, audio, and maps; these add significant data volume.  The average size of an iOS mobile game in 2020 was 465 MB, while in 2016 it was only 264 MB.[26]  Even the most basic PC game is generally larger than that.  In fact, with games primarily distributed digitally, high-end PC games now often exceed the data capacity of a DVD or Blu-Ray disc.[27]

92.    Console games are more likely to remain limited by the capacity of a disc because of the continued importance of physical distribution, although digital purchases of console games have increased over the Class Period.[28]

---

[23]  *See, e.g.*, February 18, 2021 Joint Letter Brief Regarding Apple's Subpoena to Non-Party Valve Corporation, *Epic Games, Inc. v. Apple, Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal.), ECF No. 346.

[24]  *Id.* at 5.

[25]  *Id.* at 7.

[26]  Craig Chapple, *The Average Size of the U.S. App Store's Top Games Has Grown 76% in Five Years*, Sensor Tower (Mar. 9, 2021), https://sensortower.com/blog/ios-game-size-growth-2020.

[27]  Jarred Walton, *Why are game install sizes getting so big?*, PC Gamer (Oct. 31, 2019), https://www.pcgamer.com/why-are-game-install-sizes-getting-so-big/.

[28]  Kyle Orland, *Despite 100GB video games, average download times are decreasing*, Ars

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

93.     And, on the supply side, PC game developers also view PC games as distinct from console and mobile games.  While some game developers design the same game for both PC and console, they must design a different version of the game to be played on a console as the PC version is not compatible, and vice versa.  The same is true for a PC game and a mobile version of the game.

94.     Game files created for a PC cannot be used on a console; the same is true for mobile games.  Developers must expend significant time and resources to recode the game to be compatible with the different platform.  Mobile games for iOS require a different programming language from games built for Android.  And these differ from the languages most commonly used for PC games and console games.

95.     Further, the developer must account for the differences between PC game distribution, console game distribution, and mobile game distribution.  The developer will have to incorporate the SDKs for the appropriate hardware device or site, such as Xbox or Steam.

96.     The SDKs for Xbox and PlayStation are not publicly available to developers—developers must be approved by Microsoft and Sony, respectively, prior to developing a version of their game for those consoles.  This makes it more difficult for Developers to switch to a console game as a substitute for a PC game due to PC game distribution restrictions or prices.  Development on some consoles also requires specialized developer hardware units that can cost several thousand dollars and be difficult to obtain, increasing the barriers to entry into the console market.

97.     Further preventing substitutability, these hardware systems look to Steam sales and reviews as an indicator of market viability when evaluating PC games to port over to their systems.  Consoles therefore cannot be used by a Developer to substitute away from distribution through Steam.

98.     PC games have different monetization strategies than console games and mobile games, which affect their design and distribution strategies.  Strategies for marketing and gaining

Technica (June 9, 2020), https://arstechnica.com/gaming/2020/06/ars-analysis-were-spending-less-time-downloading-games-on-average/.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

visibility on distribution methods also differ as stores offer different ways to highlight products through, for example, sales, reviews, and advertising.

99.     Accordingly, PC Developers cannot simply substitute to development of mobile or console games in response to Valve's supracompetitive revenue share percentage on PC games. They likewise cannot substitute to distribution channels for console or mobile games to sell their PC games.

100.     PC game Developers are not competing with console developers or mobile developers for distribution access or customers.

101.     Industry participants and analysts also recognize PC games, console games, and mobile games as separate categories and track and report metrics for each category.

102.     In sum, the PC game distribution market is different from, and does not include, console and mobile game distribution.

**B.     The Relevant Geographic Market Is Worldwide**

103.     The relevant geographic market for PC game distribution is worldwide.  Valve distributes games for sale over the internet, and Steam is available anywhere in the world to a user with an internet connection.

104.     According to Valve, Steam store sales revenues are approximately evenly divided between North America (34%), Western Europe (29%), and the rest of the world (37%) as consumers can purchase games on Steam worldwide.

105.     As Valve explains: "Steam is a global platform with official support for 26 languages across many platform features.  Supporting as many languages, currencies and payment methods as possible enables Steam to provide the best experience possible to customers around the world.  Over 60% of Steam users use it in a language other than English, so tailoring your experience for those users is important."[29]

---

[29]  Valve Corporation, *Localization and Languages*, https://partner.steamgames.com/ doc/store/localization (last accessed June 25, 2021).

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

106.    Developers can localize their store page and game so the content will be available in multiple languages, and they can set prices in all supported currencies.

107.    Steam hosts games from developers all over the world, and the Steam Workshop, a community content marketplace, includes contributors from 75 countries.  More than 30 million users of its 95 million monthly active user base are in China.

108.    The majority of PC game distribution through other channels besides Steam is likewise digital and lacks any geographic constraints.  For example, Epic claims its Creators represent 235 countries and territory.[30] EA's Origin includes 33 country-specific stores, with users in any other country defaulting to the closest store.

109.    Because PC gamers are limited in their demand for products only by the language spoken, there is little physical distribution of PC games on discs, and developers anywhere in the world seek to access as broad a market as possible, the market for PC game distribution is worldwide in scope.

## VII.    VALVE'S MONOPOLIZATION SCHEME

### A.    Valve Is in a Dominant Position in the Market for PC Game Distribution

110.    Valve owns and operates Steam for the distribution of PC games.  Since it was launched in 2003, Steam has become the dominant distributor of PC games.  Steam has millions of active users worldwide (approximately 120 million monthly active users in 2020) and over one billion user accounts.

111.    Through Steam, Valve sells and distributes its own games, as well as third-party games.

112.    For third-party games, Valve collects a percentage of every sales transaction amount.  Valve is the payment processor for all transactions, and it remits monthly sales revenues minus its revenue share (and other fees or holdbacks) to Developers.

113.    Before October 1, 2018, Valve's revenue share for all sales on Steam was 30%, meaning Valve received 30% of the purchase price for any sale of a PC game on Steam.  Effective

---

[30]   *Epic Games Store 2020 Year in Review*, *supra* note 16.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

October 1, 2018, Valve modified the revenue share agreement to three tiers as follows:  Valve takes 30% on all of a game's earnings under $10 million; 25% on all of a game's earnings between $10 million and $50 million; and 20% on all of a game's earnings over $50 million.

114.    Though Valve lowered its revenue share for games earning over $10 million, its share for all three tiers is above the revenue share that would be offered in a competitive market. The lowered fees for the highest selling games are an admission that the 30% rate was supracompetitive, and it remains supracompetitive for even the highest selling games.

115.    Valve charges additional fees for transactions in a community market or workshop, on top of the revenue shares.

116.    Valve generates billions of dollars each year from Steam, reportedly earning approximately $4.3 billion in game sales in 2017, not including DLC and micro-transactions.

117.    Developers seek access to consumers and to publish and sell their PC games on storefronts such as Steam.  Almost all game developers lack the resources to establish and maintain their own digital storefront, including the ability to combat credit card fraud that is rampant in the industry.  It takes even more resources to establish the content delivery network and digital rights management ("DRM") tools necessary to fully host a Developer's game(s).

118.    For example, after Tiny Build began investing in games in addition to its internal development of games, it attempted to run its own store to avoid Steam's pricing restrictions and revenue share.  It closed down after just a few months due to crippling credit card chargebacks.

119.    Even if they could overcome the financial barriers to entry, it would be almost impossible to attract a user base due to Valve's monopoly power and anticompetitive conduct to prevent new entry.  Industry behemoths like EA have been unable to gain market share because of Valve's conduct.

120.    This is the same problem facing any seller without its own retail stores or digital store, regardless of industry.  In the past, game developers sold, and may still sell, physical copies of PC games through big-box stores like Best Buy, Target, and Wal-Mart, and specialty stores like

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

GameStop.  PC games are now primarily purchased online and Developers must be able to sell games online to reach consumers.[31]

121.    Valve uses its restrictive SDA, Steam Key Rules, and other tactics to foreclose competition in the market for PC game distribution, ensuring that the vast majority of PC game sales go through Steam and accordingly are subject to Valve's revenue sharing agreements.

122.    Other PC gaming stores, both digital and physical, operating throughout the Class Period were or are reselling access to Steam-based games.  These stores do not provide Developers a PC game distribution channel independent of Steam and outside of Steam's control.

123.    The few stores that offer their own gaming client and content delivery system are not options for many Developers because (a) they only host and sell their own games; (b) they only take high-profile games or games with a proven sales record as a business strategy to draw gamers from Steam; or (c) they offer only DRM-free games, meaning Developers do not have any anti-piracy protections.

124.    Due to Steam's market dominance and exclusion of potential rivals, Developers must have their game on Steam to have sufficient access to the market and an opportunity to generate revenue.

125.    Developers also need to have their game on Steam to have access to Steam keys, which have become the industry standard for distributing licensed copies of the game.  The important role of Steam keys in Valve's scheme is explained further below.

126.    Other entities in the PC game distribution market do not provide a sufficient competitive constraint on Steam.  Valve has entrenched its position as a monopolist in PC game distribution and foreclosed rivals so successfully that virtually all Developers have no feasible path to market without going through Steam.

127.    Valve engages in a scheme to maintain its dominance in the PC game distribution market through multiple tactics, including: (a) contract provisions and rules imposed on

---

[31]  Consistent with the shift to digital, physical retailers sell product boxes that contain digital download codes rather than a disc.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

Developers; (b) the Steam key authorization system; and (c) Steam store reviews, the game recommendation algorithm, and other enforcement mechanisms.

**B.      Anticompetitive Contracts Imposed on Developers**

**1.      Valve's MFN Provisions Are Anticompetitive**

128.    Valve contracts with Developers through the SDA and Steamworks Documentation.  Valve requires that Developers offer the best price for their game and DLC on Steam, imposing an MFN on Developers' retail pricing for all products.  Developers may not offer their game or DLC at better prices on other storefronts.

129.    Most favored nation provisions can be procompetitive.  The MFN imposed by Valve is not.  Instead, it has two principal anticompetitive effects that outweigh any supposed procompetitive benefit (and there are substantially less restrictive ways to achieve any such benefit):  it keeps revenue sharing percentages (and potentially game prices) artificially high and discourages new market entry.

130.    ***First,*** because Developers cannot offer their games for lower prices on other storefronts willing to charge lower revenue shares, the market lacks a mechanism to force Valve to whittle down the revenue sharing percentages it imposes on Developers distributing their games on Steam.  The MFN discourages "selective discounting" because if the Developer offers a lower price elsewhere, it must extend that lower price to its sales on Steam due to Valve's MFN price parity protection.  This penalizes a Developer for discounting.  A Developer is required to reduce prices on Steam if it wants to reduce its prices to any portion of its customers.  With Valve's high revenue share, the Developer has an incentive not to reduce its prices to anyone, even temporarily.

131.    The actual or potential effect is higher prices for consumers, lower revenues for Developers, and reduced flexibility in pricing and promoting games.

132.    ***Second,*** the MFN imposed on Developers erects a barrier to entry by preventing Developers from benefiting from more efficient distribution stores.  For example, new entrants may attempt to offer their services at lower prices, which they can do profitably by working out more favorable terms with Developers or otherwise innovating to create efficiencies.  The MFN

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

prevents these stores from benefiting from their efficiencies and using lower prices (combined with lower revenue sharing percentages) to gain a foothold in the market by forcing Developers to offer their games for the same prices on Steam. Valve's MFN thereby erects an artificial barrier to entry against potential competitors and stifles competition from other storefronts that would benefit Developers and potentially consumers.

133.     Developers have reduced incentive to lower retail prices to try to gain customers because they have to correspondingly lower their price on Steam. The Developer must be able to make enough sales on the other storefront to offset the lost revenue from sales on Steam at the new lower price. Because of Steam's dominant position as a PC game distributor and the supracompetitive revenue share Valve extracts, this is highly unlikely to occur. Given the price match, customers will continue to buy on Steam, and Developers will make less money on each sale.

134.     Even if the other storefront offers Developers a more favorable revenue share, they cannot encourage consumers to switch storefronts through lower pricing. The other storefront's offer becomes less meaningful in application and the Developers remain reliant on Steam and Valve.

135.     By removing price competition across the market and charging Developers a supracompetitive revenue share, Valve also suppresses quantity and quality of PC games by limiting Developers' distribution options and ways to earn a return on their investment.

### 2.     Valve's Exclusivity Provision Is Anticompetitive

136.     Valve also prohibits exclusives through the terms it imposes on Developers. An exclusive occurs when a Developer offers a promotional deal on only one storefront. The promotional deal can be in terms of a discount, special content, and/or an earlier release date. The storefront of choice tends to market and promote the exclusive heavily, thereby generating customer attention and potentially significant revenue for the Developer (and the other storefront trying to build its market presence).

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

137.     Under the SDA, Valve insists that it must receive a copy of game updates and localized versions no later than when they are made available to any other third party for commercial release.

138.     Valve's restrictions remove exclusives from the market, and therefore competition for exclusives, ensuring that Steam always has the latest game versions and newest releases.

139.     In a competitive market permitting exclusives, Valve would have to compete with other storefronts on price, revenue sharing rates, promotional activity, and/or other benefits for Developers to win exclusives.  Instead, Valve forgoes doing so to the detriment of Developers, rival storefronts, and gaming customers.

140.     For example, Epic Games Store solicits timed exclusives from Developers with benefits including a lower revenue share rate of 12%, minimum revenue guarantees, and upfront payments.  These deals also benefit consumers because Developers can sell the game at a lower price due to the lower revenue share or improve the quality of the game using the guaranteed funding and greater financial security.

141.     Instead, Valve does not pass on any procompetitive benefits to Developers and consumers.  Valve keeps the price of games artificially high on Steam and competing storefronts, and it alone receives the benefit of the higher prices and reduced output.

142.     By prohibiting exclusives on other storefronts, Valve has exercised undue control in the marketplace and deprived Developers of higher sales and more favorable revenue share agreements that they otherwise could have received through a promotional exclusive on another store.

143.     The Steam Key Rules, DLC restrictions, and marketing limitations are anticompetitive because they prevent rival stores from competing with Steam on price and offerings.  This restricts competition from rival stores that would allow broader distribution and more revenues for Developers.

CLASS ACTION COMPLAINT
2:21-CV-00872                                        -27-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

C.      **Valve's Use of Steam Keys to Control Developers Is Anticompetitive**

144.    Valve uses Steam keys to control access to games available on Steam, including Developers' attempts to sell their games on other storefronts.  Steam keys also allow it to control the quantity of Steam-hosted games sold on third-party stores and implement an output restraint to gain and protect its monopoly.

145.    A Steam key is simply a product authorization code Valve generates.

146.    Under the SDA and Steamworks Documentation, a Developer must request and obtain Steam keys from Valve to distribute copies of its game on a third-party store.  The Developer provides the Steam keys to a store.  The store then sells the Steam keys to the customer, who must authenticate the key with Steam to access the game through Steam.

147.    Steam keys provide a way to help ensure lawful access to games.  Valve developed a large-scale digital authentication system to replace the previously standard practice of including serial numbers in the box with a physical copy of the game.  The Steam key system and Steam infrastructure allowed game studios to distribute and sell online in addition to physical copies sold in stores.

148.    But Valve is now protecting the position of Steam keys as the standardized authentication system in the PC gaming industry—relied on by Developers, publishers, distributors, gamers, and the media—through abusive use of its market power and restrictive contract provisions.

149.    Maintenance of Steam keys as the industry standard helps build and maintain Valve's monopoly in PC game distribution by allowing Valve to collect data on, among other information, Developers' sales on other stores and keeping Developers reliant on access to Steam keys, with access determined at Valve's discretion, to participate in the broader PC gaming ecosystem.

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

150.    Developers can obtain keys from Steam to sell their games on third-party stores like Green Man Gaming and Humble Bundle, which are authorized retailers of Steam keys.  In fact, 28% of Steam's game sales in 2020 were on these third-party stores.[32]

151.    There are also unauthorized and unlicensed Steam key resellers (*e.g.*, G2A, Kinguin) operating in a gray market by selling both legitimate and improperly obtained keys.  The sources of these keys vary, including an individual who (a) bought a legitimate bundle but did not want one of the included games; (b) purchased in bulk during a Steam sale to then resell at profit once the sale concluded (a violation of Steam's terms of service); (c) purchased Steam keys illegally with stolen credit card information; or (d) posed as a member of the press to obtain a free promotional demonstration key.

152.    Prior to August 2017, Valve allowed Developers to generate keys for their games without Valve's oversight.[33]

153.    Valve now grants Developers access to Steam keys at Valve's discretion and without defined guidelines.  The Steam Key Rules provide that Valve can refuse or revoke keys to Developers "that are abusing them," that requested "an extreme number of keys," or are "not providing value" to Steam customers.  These Rules are intentionally vague to give Valve broad discretion in administering them.

154.    Valve's denial of Steam key requests for amounts of keys it deems too large prevents Developers from selling more copies of their games on third-party stores than they sell on Steam.  This control, which has minimal or no procompetitive reason, cements Steam's market dominance by allowing Valve to cap a Developer's sales of the Developer's own game on other stores.  By limiting the inventory of game copies available on third party stores, Valve ensures Steam remains the dominant PC game distributor and ensures that Valve extracts its supracompetitive revenue share from most sales of PC games.

---

[32]    *75 Steam Statistics*, *supra* note 3.

[33]    Rishi Alwan, *Valve Doesn't Want You to Buy Steam Games Outside of Steam*, Gadgets 360 (Aug. 18, 2017), https://gadgets.ndtv.com/games/news/steam-key-developer-restrictions-bundle-valve-1739145.

155.    Valve, with the sole ability to generate Steam keys, has made itself the de facto gatekeeper to the PC gaming ecosystem.  Steam keys permeate the gaming ecosystem and keep Developers dependent on Valve for access, which also keeps them from challenging Valve's anticompetitive conduct.

156.    Valve's control of Steam keys is yet another reason why Developers must have their games on Steam.  Most other third-party stores are simply retailing or reselling Steam keys.

157.    As the industry standard, PC distributors and publishers require Steam keys to evaluate a game for possible funding, marketing support, or distribution, and industry media require Developers to provide Steam keys to trial games.  These entities will accept only Steam keys, rather than, for example, an .exe file, to protect themselves from alleged violations of nondisclosure agreements or intellectual property protections.  Developers can obtain keys prior to the commercial launch of their game.

158.    Valve uses its sole ability to generate Steam keys to keep Developers loyal to it and punish behavior seen as contrary to its position as gatekeeper to the PC gaming ecosystem, including countering or speaking out against its anticompetitive scheme.

159.    For example, Valve views exclusive offerings and temporary sales on other stores as a threat to its monopoly in PC game distribution.  When Developers enter into exclusives with other stores or publishers, Valve may delay approval of or cut off Developers' access to Steam keys to cripple their sales and ability to run further promotions.  It may also remove them from the Steam storefront.

160.    Valve substantially delayed granting Dark Catt's request for Steam keys it planned to sell on Humble Bundle.

161.    Without Steam keys, Developers cannot offer their games for sale on most rival stores.  They also cannot provide access to publishers and media who might help them gain access to distribution channels not reliant on Steam.

CLASS ACTION COMPLAINT                                    -30-
2:21-CV-00872

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

162.   Dark Catt has had multiple requests for Steam keys from interested publishers wanting to trial its game that it cannot fulfill because Valve, without reasonable explanation, cut off its access and will not authorize Steam keys.

163.   Dark Catt and other Developers have been victimized by Valve through its control of Steam keys for taking action Valve perceived as against its interests.  For example:

164.   Developer Ys Net raised funds for Shenmue 3, the third installment in its popular series, via Kickstarter.  Ys Net anticipated being able to provide a Steam key at release to backers who wanted a PC version of the game.  Ys Net created a Steam page well in advance of release to generate user interest.  On or about June 11, 2019, Ys Net and its publisher Deep Silver announced that the game would be a timed exclusive on Epic Games Store and therefore not available on Steam until after the year-long exclusivity period.  Because of this exclusivity, Valve would not authorize Steam keys for Ys Net to provide its backers as anticipated.[34]  Gamers also review bombed Steam-hosted predecessors Shenmue 1 and 2 in retaliation for the Epic Games Store exclusive.[35]

165.   Studio Wildcard offered its game Ark: Survival Evolved, originally released in 2017, as a free giveaway for one week in June 2020 on Epic Games Store and participated in Humble Bundle's end-of-summer sale in 2020.  It was temporarily unable to fulfill the orders it received on Humble Bundle because Valve delayed approving additional Steam keys in retaliation for the promotions on other sites.  Ark was removed from the Humble Bundle store because of the supply shortage.[36]

---

[34]   Ys Net, *Update on PC Version Rewards*, Kickstarter (July 2, 2019), https://www.kickstarter.com/projects/ysnet/shenmue-3/posts/2553891.

[35]   Robert Purchese, *Clarification amid backlash: Shenmue 3 will come to Steam*, Eurogamer (June 11, 2019), https://www.eurogamer.net/articles/2019-06-11-clarification-amid-backlash-shenmue-3-will-come-to-steam; Nick Statt, *Epic Games will cover refunds of Shenmue III to protect developer after backlash*, The Verge (July 2, 2019), https://www.theverge.com/2019/7/2/20680121/epic-game-store-shenmue-3-kickstarter-refunds-policy-controversy.

[36]   Press Release, *Ark: Survival Evolved Available Now For Free on the Epic Game Store*, Studio Wildcard (June 11, 2020), https://www.gamasutra.com/view/pressreleases/364606/; Steam Community Discussions, ARK: Survival Evolved, *Steam keys for Humble Bundle ARK buyers*

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

166.    In an unexplained purge in November 2019, Valve banned approximately 1,000 games from Steam in a single day for allegedly abusing "some Steamworks tools."  These games included the entire 48-game library of one publisher, and legitimate games from other developers that had thousands of purchases and reviews.  Some games were soon restored to Steam, a rare admission of Valve's errors.[37]

167.    Others were less fortunate: indie studio Idalgame was accused of using Steamworks tools to sell bundles to customers, but denied wrongdoing.  Idalgame's games were nonetheless pulled and its access to the Steamworks backend was revoked, preventing it from accessing its own games, activity, and Steam Support (to try to resolve the error).[38]

**D.    Valve's Use of Its Review System to Control Developers Is Anticompetitive**

168.    In addition to using Steam keys to control and punish Developers, Valve encourages and/or allows its users to improperly attack Developers using Steam reviews and community discussions, and does not timely remove such inappropriate reviews, if at all.

169.    For example, when Developers offer exclusives on other stores, Valve may use social media channels to notify its followers of the Developers' action, resulting in an attack on the Developer on social media or by "review bombing" on the Steam store.

---

(Sept. 9, 2020), https://steamcommunity.com/app/346110/discussions/0/2950376844043274493; Humble Bundle, *Facebook post* (Sept. 22, 2020), https://www.facebook.com/humblebundle/posts/keys-for-ark-survival-evolved-have-been-restocked-please-head-to-your-download-p/3441295855913694/.

[37]   Alex McHugh, *1000 games removed from Steam due to Steamworks 'abuse'*, Green Man Gaming (Nov. 26, 2019), https://www.greenmangaming.com/newsroom/2019/11/26/1000-games-removed-from-steam-due-to-steamworks-abuse; Reddit, *Steam is removing hundreds of games from the store atm* (Nov. 25, 2019), https://www.reddit.com/r/Steam/comments/e1obe3/steam_is_removing_ hundreds_of_games_from_the/.

[38]   Nathan Grayson, *Valve Removes 1,000 Games From Steam As Punishment For Abusing Tools*, Kotaku (Nov. 26, 2019), https://kotaku.com/valve-removes-1-000-games-from-steam-as-punishment-for-1840054771 ("First-person adventure game Electric Highways, for example, had been on Steam since 2015 and had over 1,300 positive reviews.  In other words, this round of bans didn't just impact dodgy developers whose games probably shouldn't have made it onto Steam in the first place.  These games' chances of making it back onto Steam do not seem good, though.").

170. When the online community learns of an exclusive on another store, they will quickly begin leaving negative reviews on that game or Developer page on Steam, and will do so in volume.

171. If a game does not have a Steam page, the Steam community will instead use the pages for other games by the Developer or community discussion boards to voice their discontent.

172. For example, 4A Games and Deep Silver faced review bombing for entering a temporary exclusive with Epic Games Store for the new release Metro Exodus. Metro Exodus had been available for pre-sale on Steam before announcing, on or about January 28, 2019, the one-year exclusive with Epic. Valve issued a statement criticizing the exclusive, calling the decision "unfair to Steam customers," and posted the statement on Metro Exodus's Steam store page. "This led to a bunch of negative review spamming on the previous Metro games, Metro 2033 Redux and Metro Last Light Redux" on Steam.[39] The "hefty review-bombing" featured reviews mentioning Epic Games Store rather than negative comments on the games themselves.[40]

173. The game would be available on Steam after the exclusivity period. Those who had purchased the game through the Steam pre-sale would still have access to the game through Steam on the release date, the content would be the same, and future updates and free or premium DLC would be released simultaneously for both the Epic and Steam versions.[41]

174. The game was $10 cheaper on Epic Games Store than on the Steam pre-sale.

---

[39] Jake Tucker, *People are review-bombing Metro Exodus, but this time: it's positive*, Trusted Reviews (Feb. 25, 2019), https://www.trustedreviews.com/news/people-review-bombing-metro-exodus-time-positive-3664757.

[40] Ali Jones, *Metro games are getting review-bombed on Steam*, PCGamesN (Jan. 30, 2019), www.pcgamesn.com/metro-exodus/metro-2033-last-light-review-bomb.

[41] Andy Chalk, *Players protest Epic's Metro Exodus exclusive by review-bombing the series on Steam*, PC Gamer (Jan. 30, 2019), https://www.pcgamer.com/metro-review-bomb-steam/; Michael McWhertor, *Valve calls exclusive Metro Exodus deal with Epic 'unfair' to Steam customers*, Polygon (Jan. 28, 2019), https://www.polygon.com/2019/1/28/18201004/valve-metro-exodus-epic-games-store.

175.    Notably, Metro Exodus is a single-player game, rather than an online multiplayer, and can be added to a user's Steam library, meaning there is no disadvantage in playability or harm to the Steam user community from initially purchasing the game from Epic Games Store.

176.    On or about April 3, 2019, game studio Gearbox announced its highly anticipated new game Borderlands 3 would be an Epic Games Store exclusive, a decision made by publisher 2K/Take Two, not Gearbox.  The launch date was September 13, 2019, and the game would be available on other digital storefronts in April 2020.  Thousands of fans immediately went on Steam to review bomb the currently available Gearbox games, including Borderlands 2, in protest, specifically mentioning Epic Games.  Valve refused to remove the false reviews.[42]

177.    Glumberland, an indie studio, signed a temporary exclusivity deal with Epic Games Store for a guaranteed minimum on sales of its new game Ooblets.  The revenue guarantee was crucial to allowing the two-person studio, partially funded through Patreon supporters throughout its years in development, to stay in business and continue to improve the game.  Within days, the two developers reportedly received thousands of threats as commenters angry about the Epic Games Store unleashed an internet mob on the individual developers.[43]

178.    Review bombing can cause a game's Steam score, or average user rating, to plummet.  For example, Metro 2033 dropped from an 89% positive review to 46%, and Metro Last Light dropped from 90% to 43%.[44]  Consequently, the game likely will not be featured on the Steam store homepage, which includes recommendations from friends, curators, and the Steam

---

[42]   Austin Wood, *Randy Pitchford on Steam review bombing: "makes me kind of happy" Borderlands 3 PC is an Epic exclusive*, Gamesradar (Apr. 9, 2019), https://www.gamesradar.com/randy-pitchford-on-steam-review-bombing-makes-me-kind-of-happy-borderlands-3-pc-is-an-epic-exclusive/.

[43]   Jason Rodriguez, *Ooblets: The Story So Far – What's with the outrage and fake screenshots?*, PC Invasion (Aug. 6, 2019), https://www.pcinvasion.com/ooblets-the-story-so-far-whats-with-the-outrage-and-fake-screenshots/; Matthew Handrahan, *Ooblets dev received thousands of "hateful, threatening messages" over Epic exclusivity*, gamesindustry.biz (Aug. 5, 2019), https://www.gamesindustry.biz/articles/2019-08-05-ooblets-dev-received-thousands-of-hateful-threatening-messages-over-epic-exclusivity.

[44]   Jones, *Metro games are getting review-bombed on Steam*, *supra* note 40.

community, plus trending and popular categories, or included in specific recommendations and discovery queues to customers as those algorithms rely on Steam scores.

179.    This results in fewer sales and lower revenue for the Developer because the game will not surface to new potential purchasers.  Given that Steam offers over 50,000 games, a mechanism for discovery can be critical to drive sales for a lesser known game.

180.    Although a game may be purchased through numerous authorized outlets, only reviews from users who purchased on Steam contribute to the Steam score that is used in the game store algorithms.  That is, reviews from users who care less about the store from which they purchase and therefore are less likely to be outraged by an exclusivity deal, but who have legitimately purchased a Steam-hosted game and played the game on Steam using a valid account and valid Steam key, do not count for purposes of the Steam score algorithms.

181.    As a practical matter, gamers principally rely on Steam and Metacritic ratings when evaluating games.  Other PC gaming stores import Steam reviews rather than using their own review system, further spreading the impact of review bombing on Steam and impairing Developers' ability to survive in the marketplace.

182.    Valve has a policy of not deleting reviews, even when clearly irrelevant to the game itself and abusive (and accordingly in violation of the terms of use of the system).  In 2019, it implemented a new process to use "tools and developer feedback to identify anomalous review activity"; internally "dig into what happened"; and "discuss whether the review activity should be marked 'off-topic.'"[45] Valve has full discretion to even undertake a review and then make a unilateral, uncontestable decision to mark review bombs as "off-topic."

183.    Reviews marked "off-topic" will not count for the Steam score by default, but users can change this setting to include "off-topic" reviews in the Steam scores they see and that generate their recommendations.  Regardless, the reviews remain on the game or Developer page.

---

[45] Valve Corporation, *Steam – 2019 Year in Review* (Feb. 5, 2020), https://steamcommunity.com/groups/steamworks/announcements/detail/1697229969000435735.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

184.    Consequently, bad reviews, without any connection to the quality of a game but instead employed as punishment for "disloyalty" to Steam, can bury a game on the Steam store and permanently cripple a Developer's sales, even in the rare instances where Valve will review and mark them as off-topic.

185.    Though these reviews are not posted by Valve itself, it refuses to remove the reviews although they violate its rules and guidelines, including rules requiring reviews to be relevant and constructive and rules against harassment, abusive language, and swearing.[46]

186.    And developers have gotten the message.  For example, Unfold Games, Wlad Marhulets' one-person development studio, was preparing to launch its first game, Darq.  The game had been listed on Steam for some time and generated a lot of interest.  Mr. Marhulets refused an offer from Epic Games Store to enter a one-year timed exclusive deal that included an upfront payment and minimum revenue guarantee.  This offer occurred around the time that Glumberland announced its timed exclusive with Epic to great backlash, and Mr. Marhulets received many inquiries about whether he would enter a similar deal.  He made a public statement that he had refused the Epic exclusive, although recognizing that he probably would have made more money on Epic, because he had already announced the game would be available on Steam on a specific date and did not want to upset customers.[47]

187.    The SDA gives Developers 30 days to cure any breach of the agreement, including fixing any pricing discrepancies.  When it suits itself, Valve disregards this clause and removes games from the Steam store without giving Developers the specified time to cure the alleged breach.  Valve may also refuse to provide an explanation for the alleged breach or the information the Developer needs to cure it.

---

[46]  Valve Corporation, *Rules and Guidelines For Steam: Discussions, Reviews, and User Generated Content*, https://support.steampowered.com/kb_article.php?ref=4045-USHJ-3810 (last accessed June 25, 2021).

[47]  Unfold Games, *Why I turned down exclusivity deal from the Epic Games Store* (Aug. 17, 2019), https://medium.com/@unfoldgames/why-i-turned-down-exclusivity-deal-from-the-epic-store-developer-of-darq-7ee834ed0ac7.

188.     Steam removes games or Developers as a show of strength to keep Developers loyal and to maintain its monopoly, despite the cost.  Valve trades revenues it would receive from sales of the games it removes from Steam for acquisition and maintenance of its monopoly.  Valve's conduct makes economic sense only through the exclusion of competition.

189.     Valve engages in the above actions—including its abuse of contractual provisions, market access, and its review system—to secure and maintain Steam's monopoly in the worldwide PC game distribution market.

**E.     Valve Reaps Rewards from Its Monopoly at Developers' Expense**

190.     Under the SDA, Valve requires Developers to enter a revenue sharing agreement through which it extracts enormous profits from the volume of games and DLC sold on Steam.

191.     As noted above, beginning October 1, 2018, Valve implemented a three-tiered revenue share agreement it imposed on Developers:  30% on all of a game's earnings under $10 million go to Valve; 25% on all of a game's earnings between $10 million and $50 million; and 20% on all of a game's earnings over $50 million.  Previously, all sales were subject to a 30% commission to Valve.  Developers pay other fees as well.

192.     The majority of Developers selling to consumers on Steam are subject to the 30% commission rate.  Smaller Developers most in need of access to the Steam store to monetize their games are charged the highest commission rate.

193.     Other storefronts offer more Developer-friendly revenue share agreements.  For example, Discord offered a 90/10 revenue split (Discord's store is now out of business), Indie Game Store offered a 80/20 split (with the option for a developer to reduce its share to 70% and give the remaining 10% to a charity of choice) (Indie Game Store is now out of business), Epic Games Store offers an 88/12 revenue split, and Humble Bundle offers a 75/25 split for games on the Humble Store and 95/5 revenue split for sales through the Humble Widget.  Microsoft recently announced it would lower its revenue share for PC games on the Microsoft Store to an 88/12 split, matching Epic Games Store.  Itch.io, a popular store for indie games, allows developers to set their own revenue share percentage anywhere from 0% to 100%.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

194.     Given the SDA DLC restrictions and Steam Key Rules, Developers must offer the best price for their games on Steam; they cannot use the more advantageous revenue share agreements to offer a lower price on competing stores to try to boost sales.

195.     In a competitive market, Developers may choose to offer lower prices to consumers on competing stores but they could still earn more money from a greater number of transactions at the lower retail prices given the other store's lower revenue share.   Valve's revenue share percentages would be forced down by competitive market pressure.

196.     For example, assuming a Developer could sell its game for $30 on Steam and $25 on the Microsoft Store, the revenue split would be $21 / $9 on Steam (70% / 30%) and $22 / $3 on Microsoft (88% / 12%), earning more money for the Developer and costing the customer significantly less.   In this example, the consumer would save $5, which would likely lead to increased sales (and revenues) on the site offering the cheaper price.   And the Developer would earn more revenue on each sale and more total revenue from higher sales.

197.     However, the SDA DLC restrictions and Steam Key Rules require that Developers offer no worse than the same price on the Microsoft Store as they offer on Steam.   Given Steam's market dominance, Steam will get more sales than other publishers when prices are equal, and its dominance will continue.

198.     Storefronts will only be able to attract a sufficient user base to become a real competitor to Steam when they can offer a better price or better promotions, but Developers are not able to work with the other stores to offer better terms to consumers because of the Steam contract restrictions on Developers, enforced by Steam's retaliatory conduct.

199.     The SDA DLC restrictions and Steam Key Rules therefore prevent competition from other stores.   Under normal market circumstances, Valve would have to lower its revenue sharing rate (at all three tiers of sales) to compete with the lower revenue sharing agreements offered by its competitors.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

200.    Consequently, Developers pay a supracompetitive revenue share to Valve because Valve prevents competition from other stores that would otherwise drive down its supracompetitive revenue sharing rate.

201.    Finally, consumers are harmed because Developers are not able fully to invest in game improvements, new games, and/or lower retail prices.

## VIII.  CLASS ACTION ALLEGATIONS

202.    Dark Catt brings this action on behalf of itself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) as representative of a Class defined as follows:

> All persons or entities in the United States that have contracted with Valve Corporation to distribute a PC game via Steam and sold such game on or after April 27, 2017, and continuing through the present until the effects of its scheme are eliminated (the "Class Period").  Excluded from the Class are (a) Defendant, its subsidiaries, affiliate entities, and employees, and (b) the Court and its personnel.

203.    The Class Members are so numerous that joinder is impracticable.  Hundreds of Developers have sold their games on Steam during the Class Period and continue to sell their games on Steam and on other stores using Steam keys.

204.    The anticompetitive conduct of Valve alleged herein has imposed, and threatens to continue to impose, a common antitrust injury on the Class Members.

205.    The identity of all Class Members is known by Valve.  Valve can identify the Class Members via its internal business records, including, but not limited to, Class Members' account, Steam key usage, contractual, financial, publishing, and sales histories with Valve and Steam.

206.    There are numerous questions of law and fact that are common to the Class and that predominate over any issues affecting any individual Class Member, including *inter alia*:

    a.      Whether the restrictions Valve imposes on Developers, including the contractual restrictions outlined in its SDA and Steamworks Documentation, are anticompetitive;

    b.      Whether Valve has substantial market power in the market for PC game distribution in the United States and globally;

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

c.      Whether Valve has unlawfully monopolized, or attempted to monopolize, the PC game distribution market, including by way of contractual terms, policies, practices, mandates, and restraints described herein;

d.      Whether Valve has substantially foreclosed competition in the market for PC game distribution in the United States and worldwide;

e.      Whether Valve's scheme has permitted it to illegally acquire and/or maintain its monopoly in the PC game distribution market;

f.      Whether the conduct alleged herein artificially created, maintained, preserved, or enhanced Valve's market power in the PC game distribution market;

g.      Whether Valve's scheme has a legitimate procompetitive justification and, if so, whether it is outweighed by the anticompetitive effects of its conduct, and whether there are substantially less restrictive ways to achieve any supposed procompetitive purpose;

h.      The operative time period and extent of Valve's antitrust violations and any continuing effects;

i.      Whether the conduct alleged herein caused damages to Class Members in the form of paying a supracompetitive revenue share to Valve;

j.      The amount of damages incurred by the Class because of Valve's conduct; and

k.      The nature and scope of injunctive and other equitable relief necessary to restore a competitive market and protect the public interest.

207.    Dark Catt's interests are typical of, and not antagonistic to, those of other or absent Class Members, such that it can fairly and adequately represent and protect the interests of the Class Members.

208.    Dark Catt has retained counsel with substantial experience litigating complex antitrust class actions.

209.    Class treatment of Dark Catt's federal and state antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1  will permit a large number of similarly situated persons to prosecute common claims in a single

2  forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense

3  that numerous individual actions would engender.

4      210.    Valve's relationships with Dark Catt and the Class have been substantially uniform

5  in that Dark Catt paid Valve the supracompetitive revenue share (among other fees) and has been

6  subjected to Valve's monopolistic tactics.  Common questions of law and fact will predominate

7  over any individual questions of law and fact for the Class.

8      211.    Valve acts and continues to act on grounds generally applicable to the Class,

9  thereby making appropriate final equitable and injunctive relief with respect to the Class as a

10  whole.

11      212.    Dark Catt knows of no difficulty likely to be encountered in the maintenance of this

12  action as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3).

## IX.    CLAIMS FOR RELIEF

### COUNT ONE

**Illegal Monopoly Maintenance in Violation of 15 U.S.C. § 2**

16      213.    Dark Catt repeats and incorporates each of the allegations contained in the

17  paragraphs above as if fully set forth herein.

18      214.    Valve, through its ownership and control of Steam, has a monopoly in the PC game

19  distribution market and uses the Steam SDA and Steamworks Documentation and other conduct

20  alleged herein to maintain its monopoly.

21      215.    Valve, through its monopoly power and contracts, acts in an anticompetitive

22  manner to control the price of games and DLC set by Developers in the PC game distribution

23  market and keep prices at an elevated and uniform level.

24      216.    Valve's revenue sharing rate is substantially higher than it otherwise would be in a

25  competitive PC game distribution market free from Valve's anticompetitive practices.  Valve is

26  only able to maintain its supracompetitive rates due to the SDA DLC restrictions, Steam Key

27  Rules, the SDA marketing limitations, and/or other exclusionary and anticompetitive behavior.

28

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

217.   A marketplace without the restrictions imposed by the SDA DLC restrictions and Steam Key Rules would result in Steam lowering its revenue sharing rates to compete with its rival stores, resulting in increased revenues for Developers.

218.   A marketplace without the restrictions imposed by the SDA would result in rival stores using revenue sharing percentages, marketing efforts, revenue guarantees, and development funds to compete for Developers' games and DLC, and in turn compete for consumers.

219.   As discussed herein, the restrictions imposed by the SDA DLC restrictions, Steam Key Rules, and SDA marketing limitations and other conduct alleged herein prevent competition on Valve's revenue sharing rates and other business terms with Developers, which would lower Steam's market share and Valve's profits.  Valve's conduct excludes rival storefronts (those in existence and potential new market entrants) from competing on price and number of offerings, and is anticompetitive.

220.   Dark Catt was injured in its business and property by paying a supracompetitive revenue share to Valve for sales of its game on Steam.

221.    Class Members were similarly harmed in their business or property as a direct result of Valve's anticompetitive conduct.  Due to the conduct described herein, they too paid a supracompetitive revenue share to Valve.

222.   Valve uses the SDA DLC restrictions, Steam Key Rules, SDA marketing limitations, and other conduct alleged herein to illegally maintain monopoly power and hinder competition in the PC game distribution market.

223.   Every day Valve continues with its conduct described herein and the SDA DLC restrictions, Steam Key Rules, and SDA marketing limitations remain in effect, Valve continues to violate Section 2 of the Sherman Act.

## COUNT TWO

### Illegal Attempted Monopolization in Violation of 15 U.S.C. § 2

224.   Dark Catt repeats and incorporates each of the allegations contained in the paragraphs above as if fully set forth herein.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

225. Valve, through its market power, contracts, and other conduct alleged herein, acts in an anticompetitive and exclusionary manner to control the price of games and DLC set by Developers in the PC game distribution market. Valve acts with the specific intent of monopolizing the PC game distribution market and maintaining its supracompetitive revenue sharing rate.

226. Through its contracting practices, including the SDA DLC restrictions, Steam Key Rules, the SDA marketing limitations, and/or other exclusionary and anticompetitive conduct, Valve has a dangerous probability of success in monopolizing the PC game distribution market.

227. Valve's conduct has no legitimate business purpose but is designed to monopolize the PC game distribution market.

228. A marketplace without the restrictions imposed by the SDA DLC restrictions, Steam Key Rules, and SDA marketing limitations would force Valve to compete with rival stores on the terms they offer to Developers to distribute PC games, and in turn compete for consumers.

229. Instead, Valve's conduct excludes current and potential future rival storefronts from competing on price, quantity, and quality of PC games, which is anticompetitive. Valve's conduct is intended to establish and maintain Steam's monopoly in PC game distribution.

230. Dark Catt was injured in its business and property by paying a supracompetitive revenue share to Valve for sales of its game on Steam prior to being banned by Valve.

231. Class Members were similarly harmed in their business or property as a direct result of Valve's anticompetitive conduct in attempting to monopolize the PC game distribution market. The conduct described herein caused Class Members to pay a supracompetitive revenue share to Valve.

232. Every day the SDA DLC restrictions, Steam Key Rules, and SDA marketing limitations remain in effect, Valve continues to attempt to monopolize the global PC game distribution market in violation of Section 2 of the Sherman Act.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

## COUNT THREE

### Violation of Washington Consumer Protection Act (RCW 19.86)

233.   Dark Catt repeats and incorporates each of the allegations contained in the paragraphs above as if fully set forth herein.

234.   Valve's conduct alleged herein, including its contractual terms, exercise of its market power, and anticompetitive use of Steam keys, constitutes unfair or deceptive acts or practices.

235.   As alleged herein, Valve has attempted to monopolize or has monopolized the global PC game distribution market.  This conduct affects the trade or commerce of Washington, including because Valve has its principal place of business in Washington and does business with Developers within Washington.

236.   A marketplace without the restrictions imposed by the SDA DLC restrictions, Steam Key Rules, and SDA marketing limitations would force Valve to compete with rival stores on the terms they offer to Developers to distribute PC games, and in turn compete for consumers.

237.   Valve's conduct causes Developers to pay a supracompetitive revenue share to Valve and deprives game purchasers of a competitive marketplace with more innovative offerings and potentially lower prices.  Valve's conduct is accordingly against the public interest.  The exclusion of rival storefronts harms gaming consumers by limiting their options of where to purchase PC games and keeping the retail prices they pay above the competitive level and/or keeping the quality and quantity of games available below the competitive level.

238.   Dark Catt was injured in its business and property by paying a supracompetitive revenue share to Valve for sales of its game on Steam.

239.   Class Members were similarly harmed in their business or property as a direct result of Valve's unfair methods of competition.  The conduct described herein caused Class Members to pay a supracompetitive revenue share to Valve.

240.   These injuries to Dark Catt and members of the Class were and are a direct and proximate result of Valve's unfair and deceptive acts or practices.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

## X.    PRAYER FOR RELIEF

241.    WHEREFORE, Dark Catt, on behalf of itself and those similarly situated, demands a trial by jury and respectfully requests:

a.    That the Court determine that Dark Catt's claim regarding the Class alleged herein is suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3);

b.    That the Court appoint Dark Catt as a representative of the Class;

c.    That Dark Catt's counsel be appointed as counsel for the Class;

d.    That the Court award, pursuant to 15 U.S.C. § 15 and the Washington Consumer Protection Act, damages, including compensatory and trebled damages, to the Class resulting from Valve's violations of the Sherman Act and Washington Consumer Protection Act;

e.    That the Court award, pursuant to 15 U.S.C. § 15 and the Washington Consumer Protection Act, Dark Catt's costs (including litigation, class notice, deposition, expert, database, and other costs) and reasonable attorneys' fees resulting from this suit;

f.    That the Court order, pursuant to 15 U.S.C. § 26 and the Washington Consumer Protection Act, permanent injunctive relief preventing Valve from continuing its unlawful acts in violation of the Sherman Act and Washington Consumer Protection Act;

g.    That Dark Catt and the Class be awarded pre-judgment and post-judgment interest as allowed by law on all sums awarded;

h.    That the Court adjudge and declare that Valve's conduct violates the laws set forth herein; and

i.    That the Court award such other and further relief as the Court may deem equitable, just and proper, or the law may allow.

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1

## XI.   JURY DEMAND

2      Pursuant to Fed. R. Civ. P. 38(b), Dark Catt demands a trial by jury of all issues properly

3  triable to a jury in this case.

4  Dated:  June 28, 2021

5                                             By: s/ Stephanie L. Jensen
                                               Stephanie L. Jensen, WSBA #42042
6                                             **WILSON SONSINI GOODRICH & ROSATI, P.C.**
                                               701 Fifth Avenue, Suite 5100
7                                             Seattle, WA  98104-7036
                                               Telephone:    (206) 883-2500
8                                             Facsimile:    (206) 883-2699
                                               Email:        sjensen@wsgr.com
9

10                                            Kenneth R. O'Rourke (*pro hac vice* pending)
                                               Scott A. Sher (*pro hac vice* pending)
11                                            Allison B. Smith (*pro hac vice* pending)
                                               **WILSON SONSINI GOODRICH & ROSATI, P.C.**
12                                            1700 K Street, NW, Suite 500
                                               Washington, DC  20006
13                                            Telephone:    (202) 973-8800
                                               Facsimile:    (202) 973-8899
14                                            Email:        korourke@wsgr.com
15                                                          ssher@wsgr.com
                                                            allison.smith@wsgr.com
16

17                                            W. Joseph Bruckner (*pro hac vice* pending)
                                               Joseph C. Bourne (*pro hac vice* pending)
18                                            Leona B. Ajavon (*pro hac vice* pending)
                                               **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
19                                            100 Washington Avenue S, Suite 2200
                                               Minneapolis, MN 55401
20                                            Telephone:    (612) 339-6900
                                               Facsimile:    (612) 339-0981
21                                            Email:        wjbruckner@locklaw.com
22                                                          jcbourne@locklaw.com
                                                            lbajavon@locklaw.com
23

24                                            *Attorneys for Plaintiffs Dark Catt Studios Holdings,*
                                               *Inc. and Dark Catt Studios Interactive LLC, and*
25                                            *Putative Class*

26

27

28