1

2

3

4

5

6

7

8

9

10

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DARK CATT STUDIOS HOLDINGS, INC., a Delaware corporation, and DARK CATT STUDIOS INTERACTIVE LLC, an Illinois limited liability company, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

VALVE CORPORATION, a Washington corporation,

Defendant.

Case No. 2:21-cv-00872-JCC

**DEFENDANT VALVE CORPORATION'S MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**NOTE ON MOTION CALENDAR: September 24, 2021**

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................... 1

II.     STATEMENT OF FACTS ....................................................................................... 4

III.    ARGUMENT .......................................................................................................... 6

        A.      LEGAL STANDARD ................................................................................. 6

        B.      DARK CATT FAILS TO ALLEGE ANTITRUST INJURY. ..................... 6

                1.      DARK CATT MUST PLAUSIBLY ALLEGE ANTITRUST
                        INJURY. ....................................................................................... 6

                2.      DARK CATT PREDICATES ITS ALLEGED INJURY ON
                        VALVE'S COMMISSION BEING SUPRACOMPETITIVE. ................. 7

                3.      DARK CATT'S ALLEGATIONS OF SUPRACOMPETITIVE
                        PRICING ARE IMPLAUSIBLE. ....................................................... 7

                4.      OTHER ALLEGATIONS DO NOT CURE THE IMPLAUSIBLE
                        SUPRACOMPETITIVE PRICE. ..................................................... 10

                5.      DARK CATT'S ALLEGED NON-PRICE ANTITRUST
                        INJURIES ARE ALSO IMPLAUSIBLE. ............................................ 12

        C.      DARK CATT FAILS TO ALLEGE A 75% MARKET SHARE OR
                MARKET POWER. ................................................................................. 13

        D.      VALVE'S STEAM KEY GUIDELINES AND TWO PROVISIONS
                DARK CATT CITES IN VALVE'S DEVELOPER CONTRACTS DO
                NOT COMBINE INTO AN ANTICOMPETITIVE MFN. .......................... 15

                1.      DARK CATT FAILS TO ALLEGE VALVE'S FREE STEAM
                        KEYS INJURE COMPETITION. .................................................... 15

                2.      DARK CATT'S ALLEGATIONS OF NON-STEAM KEYS
                        CONTRACTUAL PROVISIONS WITH DEVELOPERS ALSO
                        FAIL TO ALLEGE INJURY TO COMPETITION. ............................ 19

        E.      ALLEGATIONS OF THE STEAM REVIEW SYSTEM DO NOT
                ALLEGE INJURY TO COMPETITION. ..................................................... 22

        F.      DARK CATT'S CPA CLAIM FALLS WITH ITS FEDERAL
                ANTITRUST CLAIMS. ............................................................................ 24

IV.     CONCLUSION ...................................................................................................... 24

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - i

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs. v. Adelphia Supply USA*,
    2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017)........................................................10

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ...........................................................................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................................6, 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).......................................................................................6, 7

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
    483 F. Supp. 3d 38 (D. Mass. 2020) .....................................................................7

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ...........................................................................10

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)...........................................................................................8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)....................................................................................22, 23

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986)........................................................................................12

*Digene Corp. v. Third Wave Techs., Inc.*,
    323 F. App'x 902 (Fed. Cir. 2009) ....................................................................22

*Dominguez v. UAL Corp.*,
    666 F.3d 1359 (D.C. Cir. 2012)........................................................................12

*F.T.C. v. Facebook, Inc.*,
    2021 WL 2643627 (D.D.C. June 28, 2021).................................................2, 14, 15

*F.T.C. v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .............................................................11, 16, 22, 23

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
    852 F. Supp. 2d 1171 (N.D. Cal. 2012) ..............................................................18

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

**Page(s)**

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
   423 F.3d 374 (3d Cir. 2005)..................................................................................10

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ...............................................................................6

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   797 F.3d 538 (8th Cir. 2015) .................................................................................6

*Intel Corp. v. Fortress Inv. Grp. LLC*,
   511 F. Supp. 3d 1006 (N.D. Cal. 2021) .................................................................7

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003)..................................................................................12

*Lubic v. Fid. Nat. Fin., Inc.*,
   2009 WL 2160777 (W.D. Wash. July 20, 2009) ..................................................24

*Metronet Servs. Corp. v. Qwest Corp.*,
   2001 WL 765167 (W.D. Wash. Apr. 16, 2001)....................................................11

*N.C.A.A. v. Alston*,
   141 S. Ct. 2141 (2021)....................................................................................23, 24

*In re NCAA I-A Walk-On Football Players Litig.*,
   2006 WL 1207915 (W.D. Wash. May 3, 2006)......................................................7

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.*,
   2018 WL 4904918 (N.D. Cal. Oct. 9, 2018).........................................................22

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
   779 F.3d 1036 (9th Cir. 2015) .............................................................................18

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
   883 F.2d 1101 (1st Cir. 1989) ...............................................................3, 5, 19, 21

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
   797 F.2d 370 (7th Cir. 1986) ...............................................................................16

*PBTM LLC v. Football Nw., LLC*,
   511 F. Supp. 3d 1158 (W.D. Wash. 2021).............................................................24

*Pool Water Products v. Olin Corp.*,
   258 F.3d 1024 (9th Cir. 2001) ...............................................................................7

*Power Analytics Corp. v. Operation Tech., Inc.*,
   820 F. App'x 1005 (Fed. Cir. 2020) .....................................................................13

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - iii

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

**Page(s)**

*Rebel Oil Co., Inc. v. Atl. Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995) ................................................................6

*Sanderson v. Culligan Int'l Co.,*
    415 F.3d 620 (7th Cir. 2005) .............................................................24

*Somers v. Apple, Inc.,*
    729 F.3d 953 (9th Cir. 2013) ...................................................... *passim*

*Top Rank, Inc. v. Haymon,*
    2015 WL 9948936 (C.D. Cal. Oct. 16, 2015)........................................7

*U.S. v. Topco Associates, Inc.,*
    405 U.S. 596 (1972)...........................................................................24

*Wolfire Games, LLC, et al. v. Valve Corp.,*
    No. 2:21-cv-00563 ................................................................ *passim*

**Statutes**

Washington Consumer Protection Act, RCW 19.86 ............................................1, 24

Sherman Act, 15 U.S.C. § 2.......................................................1, 16, 24

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...........................................................................1

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - iv

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1    **I.    INTRODUCTION**

2    On June 23, 2021, Valve moved to compel the individual plaintiffs in *Wolfire Games,*

3    *LLC, et al. v. Valve Corp.*, No. 2:21-cv-00563 ("*Wolfire*"), to arbitrate as agreed in the Steam

4    Subscriber Agreement, and to stay the claims of Wolfire Games ("Wolfire"), the sole developer

5    plaintiff, pending arbitration.  *Wolfire* Dkt. # 35.  Plaintiffs here, parent and subsidiary ("Dark

6    Catt"), are a developer like Wolfire.  If the Court stays Wolfire's claims, Valve will move to stay

7    Dark Catt's as well.  Alternatively, Valve moves under Fed. R. Civ. P. 12(b)(6) to dismiss Dark

8    Catt's Complaint (Dkt. # 1) because it does not state claims upon which relief can be granted

9    under Section 2 of the Sherman Act or the Washington Consumer Protection Act ("CPA").

10    Valve also moved to dismiss the *Wolfire* Complaint, *Wolfire* Dkt. # 37 ("*Wolfire* MTD"),

11    which is much like Dark Catt's.  The main differences are: (1) developer Dark Catt is not joined

12    by consumer plaintiffs; (2) Dark Catt does not advance a tying claim or propose two separate

13    antitrust markets; and (3) Dark Catt adds to its Steam Keys claims two provisions in Valve's

14    contract with developers (one about game and update release timing, the other about add-on

15    content), and says together they amount to an anticompetitive Most-Favored-Nations agreement.

16    Dark Catt's Complaint fails to state a monopolization or CPA claim for two

17    straightforward reasons like those set forth in Valve's motion to dismiss the *Wolfire* Complaint.

18    First, just as in *Wolfire*, Dark Catt claims injury solely from paying Valve an allegedly

19    supracompetitive 30% commission on games it sold to consumers on Steam.  But it alleges no

20    facts from which the Court could plausibly infer that Valve's 30% commission (less for high-

21    volume games) is above a competitive level.  This alone dooms the Complaint.  Valve, an

22    innovator that created Steam in 2003 and shortly after 2004 began allowing other developers to

23    sell their games on Steam, set the 30% rate at the very beginning.  In fact, the 30% rate, chosen

24    when Valve had zero market share and no power to charge anything other than a competitive

25    rate, has remained the same (save volume discounts added in 2018), while Valve has allegedly

26    faced "competitive pressures for almost twenty years" from "billion-dollar companies with

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 1

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1   popular PC games."  ¶¶ 8, 67.[1]  In this environment, Valve has continuously enhanced Steam

2   with many new features prized by developers and gamers alike, meaning its quality-adjusted

3   price has fallen steadily over that period.  Competitive prices do not cause antitrust injury.

4         Second, just as in *Wolfire*, Dark Catt alleges that Valve has a 75% market share but

5   pleads no factual support, which alone also justifies dismissal.  In fact, the website the Complaint

6   cites for the 75% allegation, and an article the website relies on for Valve's sales, eviscerates the

7   75% assertion.  "If the numbers are right, that means Valve own[s] at least 18% of their specific

8   market" (the "dedicated PC digital game business") "and likely far more than that once in-game

9   purchases are accounted for."  ¶ 5 n.3 (cited article).  That is nowhere near 75%.  As in the recent

10  *Facebook* decision, the lack of factual support for the market share allegation means the essential

11  element of market power is insufficiently alleged.  *See F.T.C. v. Facebook, Inc.*, 2021 WL

12  2643627, at *1, *13–14 (D.D.C. June 28, 2021).

13        While these two deficiencies independently warrant dismissal (just as in *Wolfire*), Dark

14  Catt also fails to plausibly allege any unlawful conduct by Valve for three reasons:

15        First, Dark Catt fails to allege anything unlawful about Valve's "Steam Keys" program.

16  Steam Keys are code numbers that allow Steam-enabled games to be activated on Steam.  Valve

17  gives Steam Keys to developers *for free* as an accommodation.  Developers can then sell them at

18  retail stores or online to gamers, or give them to reviewers.  The customer buys (or the reviewer

19  receives) a Steam Key from the developer, logs into Steam, enters the code, and downloads and

20  plays the game on Steam using Valve's infrastructure just as if the game was purchased on

21  Steam—*all without anyone paying Valve anything*.  Dark Catt alleges Valve's Steam Key

22  guidelines violate the antitrust laws because they ask developers who want to take advantage of

23  Steam's features and popularity for free to treat Steam customers fairly by setting their prices for

24  Steam-enabled games on Steam as low as they charge for those same Steam-enabled games

25  when sold elsewhere using Steam Keys.  Dark Catt, like Wolfire, says this request is

26

---

[1]   Unless otherwise specified, paragraph references are to Dark Catt's Complaint, Dkt. # 1.

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1   anticompetitive.  But Valve has no duty under antitrust law to allow developers to use free Steam
2   Keys to undersell prices for the games they sell on Steam—or to provide Steam Keys at all.

3        Dark Catt goes one step further and alleges that Steam Keys are "required" by the
4   industry and that Valve uses them to "punish behavior seen as contrary to its position …
5   including … speaking out."  ¶ 158.  But, as to itself and others, the facts Dark Catt alleges and
6   documents it cites are either hollow or contradict its allegation, rendering this theory implausible.

7        Second, Dark Catt claims the Steam Key guidelines and two provisions in its contract
8   with developers somehow add up to a "Most Favored Nations ('MFN') provision preventing
9   price competition between storefronts."  ¶ 54.  But Dark Catt misrepresents the provisions'
10  applicability and alleges no harm to competition from any of them.  The Steam Key guidelines
11  ask developers who choose to use Steam Keys to give Steam customers the *lowest* available
12  price developers set for the game, and, contrary to Dark Catt's assertions, do not apply to non-
13  Steam Key versions of the game a developer may choose to sell elsewhere.  The two other terms
14  ask developers to keep their Steam games and downloadable content ("DLC") up to date.
15  Seeking the best price and up-to-date products for your customers is not harm to competition; it
16  *is* competition.  *See, e.g.*, *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield
17  of R.I.*, 883 F.2d 1101, 1113 (1st Cir. 1989) (upholding "Prudent Buyer" policy under which
18  insurer paid the lowest price physicians charged to any insurer).  Thus, Dark Catt alleges no
19  plausible antitrust injury.  Dark Catt also claims these terms prevent developers from offering
20  exclusive content or deals through other stores, but the facts it alleges show developers often
21  make exclusive deals with Valve's "billion-dollar" competitors like Epic.  ¶¶ 67, 164, 172, 176,
22  177.  Finally, contrary to Dark Catt's assertion, the DLC term specifically allows developers to
23  offer exclusive content through other distributors.  None of the provisions is plausibly alleged to
24  be anticompetitive; collectively, they do not add up to an unlawful MFN.

25       Finally, Dark Catt claims that Valve harms competition by allowing Steam users to post
26  reviews of games they purchase and play.  But that alleges no anticompetitive conduct.  Rather,

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 3

1  it improperly invites the Court to become the arbiter of whether Valve and other online sellers

2  should allow customer reviews and, if so, what customers should be allowed to say.

3  **II.   STATEMENT OF FACTS**

4           Valve started as a video game developer in 1996, and in 2003 launched Steam, a

5  pioneering online gaming platform to facilitate game updates and other enhancements gamers

6  value as they play.  ¶ 3.  A year later, it opened up Steam to third-party game developers.  ¶ 4.

7  Those developers, not Valve, now produce the overwhelming majority of games customers buy

8  and play on Steam.  ¶ 89 n.23 (cited Letter Brief at 5).  Steam has been tremendously successful,

9  currently hosting over 50,000 games, with 120 million monthly active users.  *See* ¶¶ 4, 6.

10          Valve has always made Steam available for free to play games.  Like Wolfire, Dark Catt

11  disingenuously omits this fact, which the Court must glean from allegations of what Valve does

12  charge for: selling games on Steam.  Developers set their own prices and discounts on Steam.

13  *See* ¶¶ 106, 195.  Valve sells their games on Steam at these prices and sends developers the

14  revenue, less Valve's commission, sales tax, and refunds.  ¶ 8.  Thus, Valve earns revenue to pay

15  for Steam—for the servers and other infrastructure all over the world to enable players to access

16  their Steam accounts to buy and play games, for customer service agents, for employees who add

17  features to make it more popular with customers and developers, and other Steam expenses—by

18  charging a commission when game developers sell games to players on Steam.  *See* ¶¶ 1–5.

19          In 2007, Steam hosted just 150 games.  ¶ 4.  But over time, Valve developed and

20  improved Steam's features, providing increased value to its developer partners and customers.

21  Steam includes a digital storefront offering state-of-the art content delivery, cybersecurity, and

22  digital rights management.  *See* ¶ 117.  Steam gives developers access to a large pool of potential

23  customers, ¶¶ 5, 20, 42, 110, 124, support in 26 languages with locally customizable store pages,

24  and Steam's sizable following in North America, Europe, and beyond, ¶¶ 105–07.  The Steam

25  review system allows players to rate and comment on games, generating a game review score.

26  *See* ¶¶ 17, 178, 182–83.  Customers trust and rely on that system—other stores now import, and

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 4

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

other systems look to, a game's Steam score—such that games by even unknown developers garnering favorable reviews from Steam users can quickly generate large sales. *See* ¶¶ 18, 97, 179, 181. Finally, Valve developed Steam Keys, an accommodation to developers to enable them to sell copies of their Steam-enabled games in brick-and-mortar stores or online, or give them away to beta test new games or generate media and influencer publicity before release. ¶¶ 12, 58, 125, 147–48. As explained below, Valve gives developers Steam Keys *for free*.

The industry did not stand by idly. As Dark Catt concedes, Valve has been facing "competitive pressures for almost twenty years," ¶ 8, from rival platform-stores by Epic, Electronic Arts, Microsoft, Tiny Build, Discord, ¶ 21, and as Wolfire alleged, Amazon, *Wolfire* CAC ¶ 252. Valve competes with these platforms to offer developers' games. When developers choose to sell their games on Steam and other platforms, Valve competes for gamers' business with the non-Steam-enabled versions these platforms sell. And because Valve allows developers to resell their free Steam Keys without paying Valve anything, Steam faces competition from Steam Key resellers, who sell licenses for games users can then play on Steam. ¶¶ 41, 150–51.

Dark Catt, a developer, allegedly "created a PC game and made it compatible with Steam," then "sold its game to consumers on Steam and paid … Valve's mandatory 30% revenue share on game sales on Steam." ¶¶ 26–27. Unlike Wolfire and the seven individual plaintiffs in that case, Dark Catt here seeks to represent a class comprising only game developers. *See* ¶ 202. Also unlike Wolfire, Dart Catt does not argue that game sales and gaming platforms are separate products sold in separate markets. Rather, Dark Catt seeks to represent a class of developers that contracted with Valve to "distribute a PC game via Steam and sold such game on or after April 27, 2017." *Id.* Since it alleges the single market that Steam serves, Dark Catt omits the tying claims Wolfire asserted. Thus, Dark Catt's Complaint turns on whether it has plausibly alleged that Valve, amidst "competitive pressures for almost twenty years," ¶ 8, from "billion-dollar companies with popular PC games," ¶ 67, and "[i]ndustry behemoths," ¶ 119, has somehow "crossed the line into illegal monopolization," comparing it to Microsoft in the late 1990s, ¶ 23.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 5

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

1    The sole alleged harm for which Dark Catt seeks damages, for itself and its proposed

2    class, is paying "a supracompetitive revenue share to Valve" for sales of its games on Steam.

3    ¶¶ 220, 221, 230, 231, 238, 239.  Like Wolfire, Dark Catt concludes, without alleging facts that

4    could plausibly support its conclusion, that Valve's commission is above what "would be offered

5    in a competitive market."  ¶ 114.  As detailed below, the facts alleged establish the opposite.

6    **III.    ARGUMENT**

7        **A.    Legal Standard**

8        "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

9    accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

10   556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the

11   plaintiff pleads factual content that allows the court to draw the reasonable inference that the

12   defendant is liable for the misconduct alleged." *Id.*  "Where a complaint pleads facts that are

13   merely consistent with a defendant's liability, it stops short of the line between possibility and

14   plausibility of entitlement to relief." *Id.* (quotation marks omitted).  "Applying this standard is a

15   context-specific task that requires drawing on judicial experience and common sense." *Hicks v.*

16   *PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (quotation marks omitted).

17       This is especially true in antitrust cases.  "[I]t is one thing to be cautious before

18   dismissing an antitrust complaint in advance of discovery, but quite another to forget that

19   proceeding to antitrust discovery can be expensive." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

20   558 (2007) (citation omitted).  Consequently, "the federal courts have been reasonably

21   aggressive in weeding out meritless antitrust claims at the pleading stage." *Insulate SB, Inc. v.*

22   *Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (quotation marks omitted).

23       **B.    Dark Catt Fails to Allege Antitrust Injury.[2]**

            *1.    **Dark Catt must plausibly allege antitrust injury.***

24       All private antitrust claims require antitrust injury, *Rebel Oil Co., Inc. v. Atl. Richfield*

25

26   [2]    This section closely tracks Part III.D of the *Wolfire* MTD and for substantially similar
     reasons provides a basis to dismiss the Complaint independent of the allegedly unlawful conduct.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 6

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

1  *Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995), and a plaintiff who fails to adequately plead antitrust

2  injury lacks standing, *Somers v. Apple, Inc.*, 729 F.3d 953, 964 n.5 (9th Cir. 2013); *see also In re*

3  *NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *14 (W.D. Wash. May 3,

4  2006) ("Plaintiffs can obtain no remedy without proving antitrust injury.") (Coughenour, J.).

<blockquote>

2.   ***Dark Catt predicates its alleged injury on Valve's commission being supracompetitive.***
</blockquote>

5

6         Just as in *Wolfire*, the alleged injury to Dark Catt and the proposed class is based entirely

7  on the commission Valve receives on Steam's third-party sales (also termed Valve's "revenue

8  share" or fee).  ¶¶ 2, 220–21, 230–31, 238–39.  That injury must flow from aspects of Valve's

9  conduct that harm competition, *see Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1034 (9th

10  Cir. 2001) ("If the injury flows from aspects of the defendant's conduct that are beneficial or

11  neutral to competition, there is no antitrust injury."), so Dark Catt alleges (just as the *Wolfire*

12  Plaintiffs) that Valve's commission is "supracompetitive," *e.g.*, ¶¶ 20, 22, 75, 200.

13         "Claiming that prices are supra-competitive is a legal conclusion rather than a fact,

14  however, and must be supported by specific factual allegations."  *Bio-Rad Labs., Inc. v. 10X*

15  *Genomics, Inc.*, 483 F. Supp. 3d 38, 59 (D. Mass. 2020).  Thus, Dark Catt must allege facts

16  supporting an inference that Valve's commission is supracompetitive.  *See Intel Corp. v.*

17  *Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1027–29 (N.D. Cal. 2021) (dismissing antitrust

18  claims where allegations "arguably suggest that supracompetitive pricing is possible; however,

19  *Twombly* and *Iqbal* require plausibility and not just possibility"); *Top Rank, Inc. v. Haymon*,

20  2015 WL 9948936, at *8–9 (C.D. Cal. Oct. 16, 2015) (same where plaintiff "fail[ed] to allege

21  any evidentiary facts plausibly suggesting […] supracompetitive prices").

<blockquote>

3.   ***Dark Catt's allegations of supracompetitive pricing are implausible.***
</blockquote>

22

23         Dark Catt claims that Valve uses its alleged "monopoly tactics" to charge a supra-

24  competitive commission.  ¶ 8.  That commission is 30% for most developers, with volume

25  discounts added in October 2018 for high-selling games.  ¶¶ 191–92.  And just as in *Wolfire*,

26  Dark Catt crucially alleges that Valve has maintained the same 30% commission "for almost

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 7

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1    twenty years." *See* ¶ 8 ("Valve has not been forced to lower [its 30% tax] through competitive

2    pressures for almost twenty years.").

3         Steam launched in 2003 and began selling third-party games soon after the release of its

4    popular game, Half-Life 2, in November 2004.  ¶¶ 3–4.  Valve is allegedly now "the world's

5    largest distributor of PC games."  ¶ 5.  The Complaint does not allege precisely when Valve

6    assumed its purportedly dominant position, *see* ¶ 110 ("Since it was launched in 2003, Steam has

7    become the dominant distributor of PC games."), but the only reasonable inference based on its

8    factual allegations is that it took at least five and likely several more years, *see* ¶ 6 ("Valve's

9    success as a company has largely tracked the growth of Steam.  In 2005, Forbes estimated that

10   Valve had grossed $70 million.  As of 2012, the company was worth over $3 billion.").  This

11   means Valve allegedly charged the same 30% for *at least five years* before becoming dominant,

12   beginning when it was a "plucky gaming upstart" with "business acumen," ¶ 7, and had zero

13   market share (apart from selling its own games).  These factual allegations make it implausible

14   that 30% is supracompetitive and that Valve can charge it only because of its alleged dominance.

15        Other factual allegations render Dark Catt's theory even less plausible.  Valve has not

16   raised its 30% commission in nearly two decades, during which it went from zero to an alleged

17   75% market share, *e.g.*, ¶ 5, and the industry saw substantial growth in both output and demand,

18   *see* ¶ 4 (games on Steam went from 150 in 2007 to now over 50,000), ¶  6 (Valve worth over $3

19   billion in 2021, $10 billion in 2019).  And the alleged facts establish that over time Valve has

20   enhanced Steam with many features prized by developers and gamers alike, meaning its quality-

21   adjusted commission rate has actually fallen over this period.  *See* Part II, *supra*.  While "in a

22   concentrated market, the occurrence of a price *increase* does not in itself permit a rational

23   inference of […] supracompetitive pricing," *Brooke Grp. Ltd. v. Brown & Williamson Tobacco

24   Corp.*, 509 U.S. 209, 237 (1993) (emphasis added), Dark Catt fails to allege an increase for

25   nearly twenty years.  In fact, the only price change alleged is a *decrease* of up to 33% for high-

26   volume games.  *See* ¶ 191 (30% to 20%).  None of this permits a rational inference that Valve's

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 8

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1   commission is supracompetitive.

2   Moreover (and contradicting its conclusory allegations to the contrary), the Complaint

3   factually alleges that Valve has faced substantial competition from "billion-dollar companies

4   with popular PC games," ¶ 67, "more efficient business models and […] more favorable

5   opportunities for Developers," ¶ 21, including (1) a nine-year campaign by "[i]ndustry

6   behemoth[]" Electronic Arts ("EA"), leveraging "popular franchises," ¶¶ 68, 119; (2) an ongoing

7   campaign by Microsoft, leveraging not only its "popular games and Windows operating system,"

8   but also its Xbox console, ¶¶ 69, 79, 81, 96, 193; (3) a rival storefront by Ubisoft launched in

9   2009 and leveraging its "blockbuster franchises," ¶ 70; (4) an entry by popular communications

10  service Discord in late 2018 (the same time Valve implemented its volume discounts, *see* ¶ 113),

11  leveraging its "existing user base of millions of active PC gamers and […] more favorable terms

12  for developers," ¶ 71; (5) Epic's store, launched with the "highly popular Fortnite game" and

13  spending hundreds of millions of dollars to attract developers and customers, ¶¶ 64–65; and (6)

14  Amazon, *Wolfire* CAC ¶¶ 20, 231, 252.  These facts make it implausible that the 30% (or less

15  with volume discounts) Valve charged throughout nearly twenty years of intense competition is

16  supracompetitive.

17  The Ninth Circuit ruled on this very issue under indistinguishable facts.  *Somers v. Apple,*

18  *Inc.*, 729 F.3d 953 (9th Cir. 2013).  Somers brought antitrust claims based on Apple's purported

19  monopoly of digital music sales.  *Id.* at 956.  Under her "overcharge theory," Somers alleged that

20  Apple was able to charge supracompetitive prices for digital music by thwarting competitors

21  with its anticompetitive conduct.  *Id.* at 964.  But the Ninth Circuit affirmed dismissal of Somers'

22  overcharge claims because the market facts rendered her overcharge theory implausible.  *Id.* at

23  964–66.  Apple had allegedly charged the same price (99 cents per song) since it entered the

24  market—both before and after it obtained a monopoly—and never changed that price, even after

25  a large seller (Amazon) entered the market.  *Id.* at 964.  These alleged market facts rendered

26  implausible Somers' overcharge theory, warranting dismissal of her antitrust claims.  *Id.*

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 9

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

Just as in *Somers*, Dark Catt's theory of harm is that Valve would be forced to lower its commission but for its dominance and anticompetitive conduct.  *See* ¶¶ 8, 216.  And Dark Catt's market allegations, detailed above, are actually weaker than those in *Somers*.  *Compare Somers*, 729 F.3d at 964 (alleging Apple had always charged the same price, including for one year before obtaining a monopoly) *with* ¶¶ 6, 8, 43 (alleging Valve has charged the same price for almost twenty years, including for many years before becoming dominant, and added volume discounts in 2018).  Dark Catt's factual allegations render implausible its claim that Valve's commission is supracompetitive, warranting dismissal.  *Somers*, 729 F.3d at 964; *see also Abbott Labs. v. Adelphia Supply USA*, 2017 WL 5992355, at *7 (E.D.N.Y. Aug. 10, 2017) (dismissing antitrust claims because allegations that price had stayed the same before and after competitor exclusion rendered implausible theory that unlawful conduct affected price).

> 4. ***Other allegations do not cure the implausible supracompetitive price.***

Dark Catt may try to sidestep *Somers* with other allegations, but they don't save the Complaint.  First, it may argue that some competitors charge less than Valve, *e.g.*, ¶ 193, making it plausible that Valve's rate is supracompetitive.  The Ninth Circuit rejected that argument in *Somers*.  729 F.3d at 965–66 ("[S]uch variations in pricing exist even in competitive markets.").  Here, Dark Catt admits the market regards Steam as superior, ¶ 68 ("'[Steam is] where the players are'"); ¶ 176 (describing gamer backlash when publisher 2K/Take Two did not release Borderlands 3 on Steam), which is consistent with Valve's ability to fairly command allegedly higher prices, *see Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Competitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product."); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) ("Generally you must pay more for higher quality.").  Moreover, 28% of Steam-enabled game sales are allegedly made via Steam Keys by third-party resellers.  *See* ¶ 150.  Since developers pay Valve no commission for games sold via free Steam Keys, those sales (as well as the volume-discount

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 10

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

1    rates of 25% and 20%) drop Valve's effective commission well below 30%.

2           Second, Dark Catt may point to its allegation that Valve's commission "would be forced

3    down by competitive market pressure." ¶ 195.  Not only does that conclusion ignore the wealth

4    of competitive pressures factually alleged, *see* Part III.B.3, *supra*, but it ignores a host of other

5    factors, including Steam's quality and the price-*increasing* effect of rising demand.  *See*

6    *Metronet Servs. Corp. v. Qwest Corp.*, 2001 WL 765167, at *6 n.4 (W.D. Wash. Apr. 16, 2001)

7    (Coughenour, J.) ("According to standard price theory, prices increase as output decreases and

8    demand rises.").  Dark Catt alleges just that for PC game digital distribution, ¶ 87 ("PC games

9    moved to digital distribution earlier than console games, which still have a significant physical

10   distribution component."), and for Steam, ¶ 110 (Steam has grown since 2003 to more than a

11   billion user accounts).  The Complaint also alleges an evolving gaming landscape, *e.g.*, ¶ 7

12   ("[Valve made the] early development of a digital distribution system that can support third-

13   party applications."), particularly ill-suited to inferences from simplified theories.  *See F.T.C. v.*

14   *Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) ("We decline to ascribe antitrust liability in

15   these dynamic and rapidly changing technology markets without clearer proof of anticompetitive

16   effect.").  Alleging a supracompetitive price requires facts, not vague predictions.

17          The fallacy in Dark Catt's logic is demonstrated by its example, where a hypothetical

18   developer selling on both Steam and a lower commission store could earn more money while

19   charging the customer less on the latter, leading to increased sales and revenue.  ¶ 196.  But Dark

20   Catt alleges numerous examples of developers taking advantage of just such lower commission

21   stores, and thus reaping all of the benefits—and applying all of the "competitive pressure"—

22   alleged, none of which depends on concurrently selling on Steam.  *See* ¶¶ 164, 172, 176, 177.[3]

23          Finally, Dark Catt alleges that the volume discounts Valve added in 2018 are "an

24   admission that the 30% rate was supracompetitive." ¶ 114.  But volume discounts are a means of

25   _____

26   [3]     For single-player games like Metro Exodus, Dark Catt alleges there is no advantage to
     selling on Steam.  *See* ¶ 175.  And while some lower commission stores may not be options for
     some developers, those alleged limitations are imposed by those stores, not by Valve.  *See* ¶ 123.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 11

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

price competition which "often reflect cost savings." *LePage's Inc. v. 3M*, 324 F.3d 141, 154

(3d Cir. 2003).  Thus, Dark Catt seeks to establish antitrust injury with evidence of price

competition.  "The antitrust laws require no such perverse result, for it is in the interest of

competition to permit dominant firms to engage in vigorous competition, including price

competition." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986) (cleaned up).

Dark Catt has alleged no plausible basis for making that conclusion, or its unsupported follow-up

conclusion that even those volume discounts "remain[] supracompetitive."  ¶ 114.

### 5.    *Dark Catt's alleged non-price antitrust injuries are also implausible.*

Alternatively, Dark Catt may attempt to shift the inquiry to its various allegations of non-

price injury.  *E.g.*, ¶ 135 ("suppresses quantity and quality").  But those alleged injuries would

mostly harm consumers, not Dark Catt (or the proposed class), *see* ¶ 22 ("Valve's practices have

also harmed […] consumers, who are now inured to Steam, paying supracompetitive prices […]

and/or being denied the benefits of the higher quality, higher quantity, and/or cheaper games and

more innovative delivery systems."); *see also* ¶¶ 49, 201, and so do not plead antitrust injury to

Dark Catt.  Antitrust injury requires "an injury to the plaintiff." *Somers*, 729 F.3d at 963.

The few non-price harms alleged to affect developers are just other ways of saying they

lost out on sales.  *See* ¶ 11 ("greater exposure," "more money"); ¶ 75 ("better marketing

support").  And Dark Catt's allegations of harm by lost game sales are either premised on

Valve's legitimate regulation of its free Steam Key accommodation, *see* ¶¶ 14, 144 (which as

discussed in Part III.D.1, *supra*, is not cognizable under the antitrust laws) or inextricably linked

to Valve's revenue sharing being supracompetitive, *see* ¶¶ 75, 133, 195–96.  And predicating

that harm on the notion that Valve's commission is supracompetitive impermissibly "piles

speculation atop speculation." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1364 (D.C. Cir. 2012)

(vacating judgment for lack of standing based on speculative injury).  The remaining alleged

non-price harm to developers is rendered implausible by contradictory factual allegations.

*Compare* ¶ 11 (harm in lack of developer choice) *with* ¶¶ 63–71 (detailing numerous rival

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 12

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

platforms for developers to choose).

Moreover, conspicuously absent from the Complaint are any alleged *facts* of reduced output, quality, innovation, or choice, making Dark Catt's allegations of non-price harms conclusory. *See Power Analytics Corp. v. Operation Tech., Inc.*, 820 F. App'x 1005, 1019–20 (Fed. Cir. 2020) (rejecting as conclusory allegations of reduced output, stifled innovation, and customer choice and accordingly dismissing antitrust claims for failure to plead antitrust injury). And tellingly, the facts that are alleged show an *increase* in these non-price metrics. *See* ¶ 4 (games available on Steam increased from 150 in 2007 to more than 50,000 in 2021); ¶¶ 63–71 (numerous new platforms launched). Dark Catt even gives examples of developers choosing other platforms over Steam for their revenue-sharing terms. ¶¶ 164, 165, 172, 176.

In sum, Dark Catt stakes all its claims on its conclusion that Valve's commission is supracompetitive, *see* ¶¶ 220–21, 230–31, 238–39 (sole allegations of injury/harm to Dark Catt and proposed class members in all three counts is paying "a supracompetitive revenue share"), but its factual allegations render that conclusion implausible. *Somers*, 729 F.3d at 964–67. Dark Catt thus fails to allege antitrust injury, *id.* at 967, lacks standing, *id.* at 964 n.5, and has no basis for damages, *id.* at 965, warranting dismissal of all claims on this basis alone.

## C.   Dark Catt Fails to Allege a 75% Market Share or Market Power.

Like the *Wolfire* Plaintiffs, Dark Catt alleges that Valve has 75% of the relevant market it calls "PC game distribution." ¶¶ 5, 7. It then alleges this gives Valve market or monopoly power, supposedly enabling it "to profitably maintain the prices offered on Steam at supracompetitive levels without losing sales to other stores that offer the same games[, and …] to exclude potential competitors from the PC game distribution market, harming Developers and potentially PC gaming customers." ¶ 78. But Dark Catt's 75% share allegations are no better that the *Wolfire* Plaintiffs'(*see Wolfire* MTD at 14). The Court should reject them here as well.

The Complaint's only "support" for the allegation that Valve has a 75% market share, and hence market power, is a citation to a third-party article in footnote 3. *See* Arthur

Zuckerman, *75 Steam Statistics* (cited at ¶ 5 n.3, visited Aug. 30, 2021).  That article includes a line saying "Steam is the world's largest distributor of PC games, taking up 75% of the global market share."  *Id.*  That's it; the article contains no source, analysis, or data for its 75% figure.

Not only that, but that article also makes the apparently contradictory assertion that, "Steam already accounts for more than 18% of PC game sales worldwide without taking in-game purchases into account."  *Id.*  A closer look at its cited source reconciles the discrepancy and further explains why the 75% figure has no support.  In the same paragraph where Dark Catt first makes the 75% allegation, it alleges, "In 2017, Steam generated over $4 billion worth of sales."  ¶ 5.  That is where Dark Catt cites the *75 Steam Statistics* article, ¶ 5 n.3, and when one looks to the sources that website lists, one sees that the author drew "over $4 billion worth of sales" from an article entitled "With $4.3 billion in sales, 2017 was Steam's biggest year yet" (cited as note 20 in *75 Steam Statistics*, visited Aug. 30, 2021).  When the latter article places Valve's asserted $4.3 billion sales in context, it eviscerates Plaintiffs' 75% allegation.  First, it accepts the $4.3 billion in sales from some unnamed source: "The $4.3 billion number is an estimate, but it's likely the most accurate one we're going to get, and it doesn't include revenue generated by DLC [downloadable content] or microtransactions."  *Id.*  Second, far from supporting a 75% market share, the article all but denies it: "If the numbers are right, *that means Valve own[s] at least 18% of their specific market*" (the "dedicated digital PC game business"), "and likely far more than that once in-game purchases are accounted for."  *Id.* (emphasis added).

Thus on an apples-to-apples basis—*i.e.*, comparing game sales without DLC and microtransactions—the article on which Dark Catt's 75% allegation rests concluded that Steam had "at least 18%" of the market.  That is a long way from 75% and well under any threshold for market power.  In *F.T.C. v. Facebook, Inc.*, 2021 WL 2643627, at *1 (D.D.C. June 28, 2021), the court dismissed the FTC's antitrust complaint because "the FTC's inability to offer any indication of the metric(s) or method(s) it used to calculate Facebook's market share renders its vague '60%-plus' assertion too speculative and conclusory to go forward."  Dark Catt's

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1   allegation of a 75% market share is even worse because the source Dark Catt relies on

2   contradicts its allegations.  Like the *Wolfire* Plaintiffs, Dark Catt has failed to plausibly allege

3   market power under *Facebook*, and the Court should dismiss the Complaint for that reason alone.

4       **D.    Valve's Steam Key Guidelines and Two Provisions Dark Catt Cites in
             Valve's Developer Contracts Do Not Combine into an Anticompetitive MFN.**

5           *1.    Dark Catt Fails to Allege Valve's Free Steam Keys Injure Competition.*

6           As in *Wolfire*, Dark Catt alleges that Valve's Steam Keys program helps Valve maintain

7   "monopoly power" in PC game distribution.  ¶ 222.  But Dark Catt never mentions that Valve

8   doesn't charge developers for Steam Keys, and *receives no revenue* when a developer sells a

9   Steam-enabled game through a brick-and-mortar or online store or gives one away for free.

10          Valve showed in the *Wolfire* MTD that it had no legal obligation to establish or continue

11  the Steam Keys program, let alone voluntarily forego all revenue from it.  Nor must Valve let

12  developers free-ride on its investment in creating and maintaining Steam.  Rather, as Valve's

13  "Steamworks" documentation (the "Steam Key guidelines")—which Dark Catt quotes and cites,

14  *see* ¶ 59 & n.12—states, "Steam keys are meant to be a convenient tool for game developers to

15  sell their game on other stores and at retail.  *Steam keys are free* and can be activated by

16  customers on Steam to grant a license to a product." (visited Aug. 30, 2021) (emphasis added).

17  Steam Keys give gamers the same experience as if they purchased a game on Steam.  Valve is

18  justifiably concerned about abuse of Steam Keys, whereby competitors (or fraudsters, *see* ¶ 151)

19  obtain free Steam Keys to use to Valve's disadvantage.[4]

20          Dark Catt's allegations of anticompetitive conduct are no more plausible than Wolfire's,

21  and in fact reinforce Valve's response that Wolfire, and now Dark Catt, seeks to enjoy the

22  benefits of Steam Keys without adhering to Valve's guidelines for Steam Keys sales—sales on

23  which the developer pays no commission to Valve yet enable the developers' customers to enjoy

24  every feature of Steam.  Dark Catt makes several serious-sounding allegations about Valve's

25
26  [4]      "Valve provides the same free bandwidth and services to customers activating a Steam
    key that it provides to customers buying a license on Steam.  We ask you to treat Steam cus-
    tomers no worse than customers buying Steam keys outside of Steam.  While there is no fee to
    generate keys on Steam, we ask that partners use the service judiciously."  Steam Key guidelines.

**FOX ROTHSCHILD LLP**

DEFENDANT VALVE CORPORATION'S MOTION TO          1001 FOURTH AVENUE, SUITE 4500
DISMISS - (2:21-CV-00872-JCC) - 15              SEATTLE, WA 98154
                                                206.624.3600

alleged anticompetitive use of the Steam Keys program, but, as with *Wolfire*, fails to allege facts that show anything abusive or that Valve had any obligation to provide Steam Keys at all:

> As the Supreme Court has repeatedly emphasized, there is no duty to deal under the terms and conditions preferred by a competitor's rivals. Likewise, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. This is because the antitrust laws, including the Sherman Act, were enacted for the protection of *competition*, not *competitors*.

*Qualcomm Inc.*, 969 F.3d at 993 (cleaned up, emphases in original); *see also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375–76 (7th Cir. 1986) (Posner, J.) ("[A] firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches" […] "to reduce its prices in order to help consumers, [or …] to extend a helping hand to new entrants.").

Dark Catt alleges that Steam Keys are "the industry standard for distributing authorized, licensed copies of games." ¶ 13. That is a very peculiar allegation, since Steam Keys have nothing to do with non-Steam enabled versions of games that Epic, Microsoft, and others sell. *See* ¶ 41. In addition, Steam Keys allegedly represent only 28% of Steam-enabled versions. ¶ 150. Combined with Dark Catt's allegation that distribution of Steam-enabled games is dominated by sales on Steam (which do not rely on Steam Keys), *see* ¶ 154, most distribution does not even allegedly conform to the supposed "industry standard." Thus, Dark Catt's allegation that Steam Keys are an "industry standard" is implausible on its face.

Dark Catt goes on to allege that "[a]s the industry standard, PC distributors and publishers require Steam keys to evaluate a game for possible funding, marketing support, or distribution, and industry media require Developers to provide Steam keys to trial games." ¶ 157. But the fact that Valve makes them available for these purposes for free, subject to the Steam Key guidelines, does not enable Dark Catt to declare them an "industry standard" and ask the Court to nullify the guidelines. And the Steam Keys guidelines make clear Steam Keys are not required; some of the media can access free copies through the "Curator Connect" program:

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 16

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1
2
3
4

> When you are nearing release and want to get a copy of your game in the
> hands of reviewers, press, influencers, streamers, or other individuals that
> can help bring awareness of your game and amplify your efforts, you can
> do so directly in Steam.  *Many of the popular streamers, journalists, and
> community gaming sites are set up as Curators in Steam, and you can use
> Curator Connect to send them a copy of your game without having to
> email out keys.*  These influencers can post their reviews on Steam or
> wherever else they already post reviews or stream your game.

5   https://partner.steamgames.com/doc/marketing/tools (emphasis added) (visited Aug. 30, 2021).[5]

6   The Complaint is devoid of *facts* that anyone evaluating a pre-release copy of a game "required"

7   the copy to be provided via Steam Keys, let alone was "punished" by a denial of a Steam Key.[6]

8         Continuing in this vein, Dark Catt alleges that Valve "victimized" developer Ys Net

9   because after Ys Net "anticipated being able to provide a Steam key at release to backers who

10   wanted a PC version of" its *Shenmue 3* game, "Valve would not authorize Steam keys for Ys Net

11   to provide its backers as anticipated."  ¶¶ 163–64.  But Dark Catt's account gives the lie to its

12   story: Ys Net and its publisher announced that when released, *Shenmue 3* would be exclusively

13   available *for one year on Epic Games Store—a Steam competitor*.  ¶ 164.  Ys Net "created a

14   Steam page well in advance to generate user interest" in a game it decided to sell exclusively for

15   a year on the Epic Games Store where Valve would not realize a cent.  *Id.*  And Ys Net expected

16   ("anticipated" in Dark Catt's mild-sounding formulation) that Valve would make Steam Keys

17   available for free to its Kickstarter investors so they could play it on Steam upon release, again

18   without Valve receiving a cent.  *Id.*  The antitrust laws do not require Valve to pay for such

19   blatant free-riding, and it's hard to imagine a better example of Valve taking a reasonable step to

20   deter a developer from abusing Steam Keys to Valve's detriment.  "As the Supreme Court has

21   repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a

22   competitor's] rivals ....'"  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th

23

24   [5]     From the Steamworks Documentation, which Dark Catt cites and quotes at ¶ 59 & n.12.

25   [6]     Dark Catt alleges in the sketchiest of terms that "Valve substantially delayed granting
Dark Catt's request for Steam keys it planned to sell on Humble Bundle."  ¶ 160.  This is not an
example of supposed "industry standard" pre-release distribution for evaluation by the press,
26   etc., and in any event, Dark Catt fails to allege it sustained any injury from this delay in granting
its request for Steam Keys.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 17

1  Cir. 2016) (quoting *Pac. Bell Tel. Co. v. linkLine Comm., Inc.*, 555 U.S. 438, 457 (2009)).[7]

2  Nor does the Complaint plausibly allege anticompetitive conduct or retaliation when

3  Valve allegedly "delayed approving additional Steam keys" for a developer promoting its game

4  "on other sites."  ¶ 165.  To begin, the documents Dark Catt cites in footnote 36 contain nothing

5  to support its conclusory "retaliation" allegation.[8]  And those documents show what Dark Catt is

6  really after: that developers get as many Steam Keys as they want so they can free-ride on

7  Valve's creation and maintenance of Steam without limit.  The press release (cited at ¶ 165 n.36,

8  visited Aug. 30, 2021) reports the free promotion of *Ark: Survival Evolved* on Epic (the "other

9  site[]," ¶ 165) was set for June 11 to 18, 2020, but the first comment in the Steam Community

10  Discussion (cited at ¶ 165 n.36, visited Aug. 30, 2021) about the game's unavailability from

11  Humble Bundle, allegedly due to Valve not providing enough Steam Keys, was three months

12  later, on September 9, 2020.  Far from containing anything about retaliation, the entire tenor of

13  that discussing and a cited Facebook post (cited at ¶ 165 n.36, visited Aug. 17, 2021 (Facebook

14  account may be needed)) is just that Humble Bundle got far too many orders when it put *Ark* on

15  sale at $9.99—understandable since the prevailing retail price was $35.  That led to the game

16  publisher, Studio Weekend, being unable to supply enough Steam Keys to meet the big demand

17  at the rock-bottom price.  Valve has legitimate concerns over runaway usage of its free Steam

18  Keys program to the detriment of purchases on Steam, and it is entitled to limit the availability of

19  Steam Keys to deter free-riding on its investment in Steam.  The antitrust laws don't require

20  Valve to subsidize cut-rate pricing.  Dark Catt's allegations about *Ark* do not state a claim.

21  Finally, there is nothing retaliatory in a so-called purge of games for abuse of the

22  Steamworks tools that, if too broad, was, as Dark Catt admits, "soon" corrected.  ¶¶ 166–67.

---

23  [7]    *See also Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1184 (N.D. Cal.
24  2012) ("[A defendant] has no duty to license its technology to foster competition or to give away
   its technology for others to clone.").

25  [8]    The Court may consider the documents Dark Catt cites over its conclusory allegations.
26  *See Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043 (9th Cir. 2015) (Court
   may "consider documents whose contents are alleged in a complaint and whose authenticity no
   party questions, but which are not physically attached to the plaintiff's pleading." (cleaned up)).

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 18

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1    Valve showed in the *Wolfire* motion to dismiss that it has no duty to give away free

2    Steam Keys and may ask developers who receive them to follow the Steam Key guidelines.

3    Dark Catt alleges examples of the very free riding these guidelines are meant to prevent.  Calling

4    Steam Keys an "industry standard" converts none of Valve's conduct into antitrust injury.

5              2.      ***Dark Catt's Allegations of Non-Steam Keys Contractual Provisions with Developers Also Fail to Allege Injury to Competition.***

6    Dark Catt claims Valve's Steam Key guidelines and a pair of non-Steam Key contractual

7    terms with game developers create an anticompetitive MFN.  *See* ¶¶ 54–55, 62, 128.  They don't.

8    Dark Catt alleges three provisions together add up to an anticompetitive MFN: (1) the

9    Steam Key guidelines, quoted at ¶ 59; (2) the "Delivery" provision in the Software Development

10   Agreement ("SDA") "requiring Developers [if they decide to sell on Steam] to make their games

11   (and any updated version) available on Steam at the same time they become commercially

12   available through any other source," ¶ 46; and (3) the "DLC" (downloadable content) provision

13   "requir[ing] Developers to offer their DLC [additional content for games] to Steam customers at

14   the best price and earliest availability for which it is available on any other marketplace," ¶ 53.

15   As Dark Catt admits, most-favored-nations clauses can foster competition.  ¶ 129.

16   Seeking the best price for your customers can be the essence of competition.  *See, e.g.*, *Ocean*

17   *State Physicians Health Plan, Inc.*, 883 F.2d at 1113 (upholding plan paying the lowest price

18   physicians charged any insurer).  But in claiming these guidelines and contractual terms create

19   an anticompetitive MFN, the Complaint misrepresents what they do and fails to allege facts from

20   which the Court could plausibly infer harm to competition.

21   *a.  Steam Key Guidelines.*  Falsely claiming that Steam Keys guidelines reach beyond

22   Steam-enabled games to non-Steam versions sold on other platforms, Dark Catt quotes a tweet

23   from Tim Sweeney, CEO of Steam competitor, Epic (*see* ¶¶ 63–65), asserting that "Valve can

24   simply say 'no'" if a "'developer wishes to sell their game for a lower price on Epic Games store

25   than Steam.'"  ¶ 61.  But the Steam Keys guidelines, which require developers to offer Steam

26   customers as good a price for their game on Steam as they charge elsewhere *for the same Steam-*

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 19

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

*enabled game sold via Steam Keys*, have nothing to do with the price developers charge for games enabled for the Epic Games Store, as they do not rely on Steam Keys.  *See* Part III.D.1, *supra*.  Mr. Sweeney's tweet is not a factual allegation that Valve can "say 'no'" to prices on Epic; indeed, one of his Twitter followers corrected his "disingenuous" assertion: "That clause only applies to steam KEYS sold elsewhere, not to something like a game being sold at the Epic store."  *See* Tim Sweeney tweet, reply of Roberto Bruno (@IlTurco) of Jan. 31, 2019 (emphasis added) (cited at ¶ 61 n.13, viewed on Aug. 30, 2021).  No harm to competition is alleged.

   *b.  The Delivery Provision.*  This provision governs timing of releases if developers decide to sell a game on Steam.  If so, they agree to release it (and later updates, if any) on Steam at the same time they release the game elsewhere.  ¶¶ 46, 137; *see also* SDA § 2.1, Ex. A to Declaration of Karl Quackenbush (filed concurrently).  It requires developers to keep their Steam versions up to date; otherwise Valve could wind up selling outdated goods, an obvious customer-service issue.  Dark Catt alleges that it "prohibits Developers from entering exclusive offerings with other storefronts," which "suppresses competition by ensuring Steam has access to the newest inventory, on its terms, instead of having to negotiate for the newest releases in a competitive market."  ¶ 47.  But the assertions that it prohibits exclusive deals with competitors and "suppresses competition" rest on no facts; indeed, they contradict the facts alleged.

   First, the Complaint alleges numerous instances of developers entering into exclusive offerings with other stores, as they are free to do.  *See* ¶ 164 (Shenmue 3 initially released exclusively on Epic), ¶ 172 (same for Metro Exodus), ¶ 176 (Borderlands 3), ¶ 177 (Ooblets); *see also* ¶ 64 (Epic "committing $444 million to exclusivity deals in 2020"), ¶ 140 ("Epic Games Store solicits timed exclusives from Developers."), ¶ 186 (Unfold Games refused offer from Epic for one-year exclusive, as owner "did not want to upset customers" after announcing it "would be available on Steam on a specific date.").[9]  Competition abounds.

---

[9]    Plaintiffs allege that competing platforms are "not options for many Developers because (a) they only host and sell their own games; (b) they only take high-profile games or games with

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

Second, for developers that choose to sell a game on Steam, the Complaint alleges no facts that any developer suffered harm from offering its game or an update on Steam at the same time as elsewhere.  Dark Catt speculates that some developers could negotiate better terms by offering games or updates first to one store and then to another, ¶ 47, but alleges no facts that this timing provision has ever caused it harm.  Rather, the facts alleged show developers do make exclusive deals with Valve's competitors.  No competitive harm is alleged.

c.  The DLC Provision.  This provision requires developers that sell a game on Steam and sell or give away DLC (downloadable content, which could be a cosmetic change or a new story or mission) for that game to give their customers who bought the game on Steam "comparable DLC" at the same time as customers who bought the game elsewhere.  ¶¶ 50, 53.

The complaint vaguely alleges that "restrictions on DLC as well as other terms imposed on Developers are, in practice and effect a type of Most Favored Nations ("MFN") provision preventing price competition between storefronts."  ¶ 54.  These "restrictions on DLC" and "other terms" supposedly prevent developers from "monetize[ing] their DLC at a better rate on another store or use[ing] DLC exclusives to attract customers to another store."  Id.  But no factual allegation backs up the claim that these provisions prevent price competition for DLC.

First, developers can make whatever deal they wish with another storefront to sell their DLC at any profit margin they can negotiate.  For example, they could sell DLC through a Steam competitor that charges a lower commission—say Epic or Microsoft at 12%, see ¶¶ 140, 196— and pocket the savings over Valve's 30% (25% or 20% for high-volume games).

Second, the DLC provision permits exclusive DLC elsewhere: the Developer ▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

a proven sales record as a business strategy to draw gamers from Steam; or (c) they offer only DRM-free games, meaning Developers do not have any anti-piracy protections."  ¶ 123.  Valve, by contrast, accepts virtually any game from any developer, which is why it offers 50,000 games.  See ¶ 81.  If Valve's competitors are less open to small developers like Dark Catt or fail to add value like anti-piracy protection, that is due to the competitive market, not Valve's actions.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 21

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1   ████████████████████████████████████████████████████████ SDA

2   § 2.4, Ex. A to Quackenbush Decl.  DLC exclusives with Valve's competitors are *explicitly*

3   *allowed*, and Dark Catt alleges no instance of Valve thwarting one.  No competitive harm here.

4         In sum, Dark Catt's factual allegations do not allege injury to competition from any of the

5   three provisions that supposedly combine to make an MFN.  *See Nicolosi Distrib., Inc. v.*

6   *FinishMaster, Inc.*, 2018 WL 4904918, at *5 (N.D. Cal. Oct. 9, 2018) ("Nicolosi must

7   sufficiently allege an injury to competition by identifying a contract with some anticompetitive

8   effect.") (cleaned up); *see also Digene Corp. v. Third Wave Techs., Inc.*, 323 F. App'x 902, 912

9   (Fed. Cir. 2009) (finding no anticompetitive effect from a never-enforced termination clause).

10         **E.**    <u>**Allegations of the Steam Review System Do Not Allege Injury to**</u>
               <u>**Competition.**</u>

11         Dark Catt claims Valve harms competition by allowing Steam users to post game

12   reviews.  ¶¶ 16, 19.  Dark Catt admits they "are not posted by Valve itself," ¶ 185, yet "must

13   prove [that it suffered] antitrust injury, which is to say injury of the type the antitrust laws were

14   intended to prevent and that flows from that which makes *defendants'* acts unlawful." *Brunswick*

15   *Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis added)).

16         The Complaint implausibly attempts to transform customer reviews into anticompetitive

17   conduct on Valve's part.  First, it alleges that Valve "does not timely remove […] inappropriate

18   reviews."  ¶ 168.  But under the *facts* alleged, the antitrust laws impose no duty on Valve to

19   remove reviews Dark Catt deems inappropriate.  *See Qualcomm Inc.*, 969 F.3d at 993.  The

20   Complaint leaves one guessing what standard of censorship would satisfy Dark Catt or if it's

21   even feasible with 120 million monthly and 25 million peak concurrent Steam users.  *See* ¶ 42.

22         Even if Valve had such a duty, the Complaint alleges that Valve voluntarily implemented

23   a process in 2019 to identify "anomalous review activity" for internal review, and an article it

24   quotes reports Valve adopted another to enable customers to easily view a game's long-term

25   trend of reviews and home in on any negative spike to judge it for themselves.  ¶¶ 182–83 & n.7.

26   According to the 2019 The Next Web article the Complaint quotes at ¶ 17 n.7 (viewed on

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 22

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

Aug. 30, 2021), "Steam has already attempted to curtail the effect of review bombing by implementing graphs, which let you chart whether reviews have been generally positive or negative over the game's lifespan, and to jump straight to a spike of negative reviews to see the complaint behind it."  As the article explained, "[t]his allows you to judge for yourself how seriously you want to take the issue.  It's much the same as jumping straight to the one-star reviews on Amazon, only with more context."  *Id.*  As the author concludes, "[s]hort of taking the nuclear option—removing reviews entirely—it's hard to see what else platforms like Steam and Amazon could do to ameliorate review bombs."  *Id.*  As the Supreme Court recently reaffirmed, "antitrust courts must give wide berth to business judgments before finding liability."  *N.C.A.A. v. Alston*, 141 S. Ct. 2141, 2163 (2021).  Dark Catt's beef with how Valve manages user reviews invites the Court, improperly, to become the arbiter of how Valve and many other companies do it, but it does not allege conduct that gives rise to antitrust liability.[10]

Second, the Complaint nebulously alleges that Valve "encourages and/or allows its users to improperly attack Developers using Steam reviews," ¶ 168, but never alleges this happened to Dark Catt.  As its "example," the Complaint alleges that, "when Developers offer exclusives on other stores, Valve *may* use social media channels to notify its followers of the Developers' action, resulting in an attack on the Developer."  ¶ 169 (emphasis added).  The only factual allegation of what "may" happen is the release of the game Metro Exodus.  *See* ¶ 172.  Its developer pre-sold the game on Steam before releasing it, but then changed its mind and made a one-year exclusive deal with Epic, which meant gamers who had pre-purchased on Steam would have to wait a full year after release to play.  *See* ¶¶ 172–73.

Dark Catt says that "Valve issued a statement criticizing the exclusive, calling it unfair to Steam customers."  ¶ 172.  In fact, Valve criticized the developers pre-selling the game to Steam

---

[10]    Moreover, none of the Complaint's factual allegations about customer reviews allege any loss in sales.  *See* ¶ 164 (Shenmue 3), ¶¶ 172–75 (Metro Exodus), ¶ 176 (Borderlands 3), ¶ 177 (Ooblets), ¶ 186 (Darq).  Thus, the Complaint does not even allege harm to competitors, let alone to competition.  *See Brunswick Corp.*, 429 U.S. at 488 ("The antitrust laws, however, were enacted for 'the protection of competition not competitors.'").

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 23

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

customers before making the "decision to pledge their exclusivity to Epic's offering."  Trusted

Reviews article (cited at ¶ 172 n.39, viewed Aug. 30, 2021).  Valve said, "'We think the decision

to remove the game is unfair to Steam customers," "[e]specially after a long pre-sale period.'"

*Id.*  Again, Dark Catt improperly invites the Court to arbitrate how companies manage customer

reviews and what Valve said online about this conduct, but alleges no injury to competition.  *See*

*Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005) (Easterbrook, J.) ("What

producers say about each others' goods in an effort to sway consumers is competition in

action.").[11]  Indeed, this allegation shows competition in action—the "continuing war between

the Epic Game Store and Steam."  ¶ 172 n.39 (cited article).

Steam allows users to express themselves, allegedly by "a policy of not deleting

reviews."  ¶ 182.  Epic took the opposite tack, deciding to "cut game reviews entirely" on its

competing platform.  ¶ 17 n.7 (cited article).  The Sherman Act, "the Magna Carta of free

enterprise," *U.S. v. Topco Associates, Inc.*, 405 U.S. 596, 610 (1972), does not empower the

Court to decide whether online businesses should allow reviews or to regulate their management.

### F.  Dark Catt's CPA Claim Falls With Its Federal Antitrust Claims.

Dark Catt bases its CPA claim, ¶¶ 233–40, entirely on its Sherman Act claims.  "The

[CPA] is modeled after federal antitrust statutes."  *Lubic v. Fid. Nat. Fin., Inc.*, 2009 WL

2160777, at *5 (W.D. Wash. July 20, 2009).  Courts routinely dismiss CPA claims along with

federal antitrust claims.  *See id.* (dismissing CPA claims for the same reasons as Sherman Act

claims); *see also PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178–82 (W.D. Wash.

2021) (same).  This Court should too.

## IV.  CONCLUSION

Dark Catt fail to allege antitrust injury, market power, and unlawful conduct.  Rather, it

attacks a popular service consumers value in a competitive market.  The Court should grant the

motion and dismiss its claims, or stay them pending the *Wolfire* individual plaintiffs' arbitration.

---

[11]    Although the Complaint alleges that "[v]ia its Steam review system, Valve is willing to ban games or Developers after little or no investigation of reported wrongful behavior," ¶ 17, Dark Catt makes no factual allegation of any such ban.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 24

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1

2 DATED this 30th day of August 2021.

3                                                 FOX ROTHSCHILD LLP

4

5                                                 s/ Gavin W. Skok
                                                  Gavin W. Skok, WSBA #29766
6                                                 Laura P. Hansen, WSBA #48669
                                                  1001 Fourth Avenue, Suite 4500
7                                                 Seattle, WA 98154
                                                  Telephone:    206.624.3600
8                                                 Facsimile:    206.389.1708
                                                  E-mail:       gskok@foxrothschild.com
9                                                               lhansen@foxrothschild.com

10

11                                                MONTGOMERY McCRACKEN WALKER &
                                                  RHOADS LLP
12

13
                                                  s/ Charles B. Casper
14                                                Charles B. Casper, admitted pro hac vice
                                                  1735 Market Street, 21st Floor
15                                                Philadelphia, PA  19103
                                                  Telephone:    215.772.1500
16                                                Email:        ccasper@mmwr.com

17
                                                  Attorneys for Defendant
18

19

20

21

22

23

24

25

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 25

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

## **CERTIFICATE OF SERVICE**

I certify that I am a secretary at the law firm of Fox Rothschild LLP in Seattle, Washington.  I am a U.S. citizen over the age of eighteen years and not a party to the within cause.  On the date shown below, I caused to be served a true and correct copy of the foregoing on counsel of record for all other parties to this action as indicated below:

### **Service List**

| | |
|---|---|
| Stephanie L. Jenson | ☐ Via US Mail |
| WILSON SONSINI GOODRICH & ROSATI, P.C. | ☐ Via Messenger |
| 701 Fifth Avenue, Suite 5100 | ☒ Via CM/ECF / Email |
| Seattle, WA 98104-7036 | ☐ Via over-night delivery |
| Telephone: (206) 883-2500 | |
| Facsimile: (206) 883-2699 | |
| Email: sjensen@wsgr.com | |

Kenneth R. O'Rourke
Scott A. Sher
Allison B. Smith
WILSON SONSINI GOODRICH & ROSATI, P.C.
1700 K Street, NW, Suite 500
Washington, DC 20006
Telephone: (202) 973-8800
Facsimile: (202) 973-8899
Email: korourke@wsgr.com
ssher@wsgr.com; allison.smith@wsgr.com

W. Joseph Bruckner
Joseph C. Bourne
Leona B. Ajavon
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email: wjbruckner@locklaw.com;
jcbourne@locklaw.com;
lbajavon@locklaw.com

*Attorneys for Plaintiffs*

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 26

1    I declare under penalty of perjury that the foregoing is true and correct.

2    EXECUTED this 30th day of August 2021, in Tacoma, Washington.

3

4                                                    _____
                                                     Courtney R. Brooks
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 27

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600