1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DARK CATT STUDIOS HOLDINGS, INC., and
DARK CATT STUDIOS INTERACTIVE LLC,
on behalf of themselves and all others similarly
situated,

        Plaintiffs,

    v.

VALVE CORPORATION,

        Defendant.

CASE NO.:  2:21-cv-00872-JCC

**DARK CATT PLAINTIFFS'
OPPOSITION TO MOTION TO
DISMISS CLASS ACTION
COMPLAINT**

NOTE ON MOTION CALENDAR:
Oct. 28, 2021

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1

**TABLE OF CONTENTS**

2
**Page**

3   I.      INTRODUCTION ................................................................................................... 1

4   II.     STATEMENT OF FACTS ...................................................................................... 2

5   III.    LEGAL STANDARD .............................................................................................. 4

6   IV.     ARGUMENT ........................................................................................................... 4

7           A.      Dark Catt Sufficiently Alleges Antitrust Injury from Valve's Conduct ................ 4

8                   1.      Dark Catt Plausibly Alleges that Valve's Commission Is
                            Supracompetitive ................................................................................... 5
9

10                  2.      *Somers* Is Not Controlling and Does Not Support Valve's
                            Argument .............................................................................................. 12

11                  3.      Dark Catt Alleges Non-Price Injuries ..................................................... 13

12          B.      Dark Catt Alleges Valve Has Market Power in the Relevant Market ................. 14

13                  1.      Valve's Factual Attack on the 75% Market Share Is Unavailing ............ 14

14                  2.      Dark Catt Includes Significant Other Market Power Allegations ........... 15

15                  3.      Two of the Three Claims Do Not Require Market Power ....................... 16

16                  4.      Valve Cannot Introduce Its Own Market Share Figure ........................... 16

17                  5.      The *Facebook* Opinion Does Not Help Valve's Argument ..................... 18

18          C.      Dark Catt Plausibly Alleges Valve's Anticompetitive Conduct .......................... 18

19                  1.      Dark Catt Adequately Explains the Role of Steam Keys in Valve's
                            Scheme ................................................................................................. 20
20

21                  2.      Dark Catt Pleads that Valve's Pricing and Marketing Provisions
                            Form an Anticompetitive MFN .............................................................. 21

22                  3.      Dark Catt Alleges Valve Uses the Review System as Part of Its
                            Scheme ................................................................................................. 23
23

24          D.      Dark Catt States a Claim Under the Washington CPA ......................................... 24

        V.      CONCLUSION ....................................................................................................... 24
25

26

27

28

1

## TABLE OF AUTHORITIES

2                                                                             **Page**

3                                    **CASES**

4   *Advanced Health-Care Serv. v. Radford Cmty. Hosp.*,
        910 F. 2d 139 (4th Cir. 1990) ...................................................14
5
    *Am. Nat'l Mfg. v. Select Comfort Corp.*,
6       2016 WL 9450472 (C.D. Cal. Sept. 28, 2016) ..............................23

7   *Ashcroft v. Iqbal*,
        556 U.S. 662 (2009)..............................................................4, 6
8
    *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
9       472 U.S. 585 (1985) ...............................................................20

10  *Beech-Nut Nutrition Corp. v. Gerber Prods. Co.*,
        69 F. App'x 350 (9th Cir. 2003) ................................................4
11
    *Bell Atl. Corp. v. Twombly*,
12      550 U.S. 544 (2007) ......................................................4, 11, 21

13  *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
        483 F. Supp. 3d 38 (D. Mass. 2020) .........................................12
14
    *Blue Cross & Blue Shield of Ohio v. Bingaman*,
15      1996 WL 677094 (N.D. Ohio June 24, 1996).............................23

16  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
        429 U.S. 477 (1977).................................................................4
17
    *Cal. Energy Co. v. S. Cal. Edison Co.*,
18      1992 WL 330263 (N.D. Cal. Sept. 22, 1992) .............................18

19  *Choker v. Pet Emergency Clinic, P.S.*,
        2021 WL 934037 (E.D. Wash. Mar. 11, 2021)...........................17
20
    *City of Anaheim v. S. Cal. Edison Co.*,
21      955 F.2d 1373 (9th Cir. 1992) ...................................................6

22  *Cox v. Ametek, Inc.*,
        2017 WL 4792424 (S.D. Cal. Oct. 24, 2017) .............................11
23
    *Free Freehand Corp. v. Adobe Sys.*,
24      852 F. Supp. 2d 1171 (N.D. Cal. 2012) ...........................5, 11, 18

25  *FTC v. Facebook, Inc.*,
        2021 WL 2643627 (D.D.C. June 28, 2021) ...............................18
26
    *FTC v. Qualcomm Inc.*,
27      969 F.3d 974 (9th Cir. 2020) ...................................................20

28

*FTC v. SureScripts LLC,*
    424 F. Supp. 3d 92 (D.D.C. 2020) ................................................................15, 21

*Gatan, Inc. v. Nion Co.,*
    2017 WL 3478837 (N.D. Cal. Aug. 14, 2017) ..........................................................5

*Glen Holly Entm't, Inc. v. Tektronix Inc.,*
    343 F.3d 1000 (9th Cir. 2003) ................................................................................4

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,*
    627 F.2d 919 (9th Cir. 1980) ..................................................................................7

*In re Elec. Books Antitrust Litig.,*
    859 F. Supp. 2d 671 (S.D.N.Y. 2012) .....................................................................19

*Intel Corp. v. Fortress Inv. Grp. LLC,*
    511 F. Supp. 3d 1006 (N.D. Cal. 2021) .................................................................13

*Khoja v. Orexigen Therapeutics, Inc.,*
    899 F.3d 988 (9th Cir. 2018) ..............................................................6, 14, 17, 20

*Klem v. Wash. Mut. Bank,*
    176 Wn.2d 771, 295 P.3d 1179 (2013) ..................................................................16

*Lazy Y. Ranch LTD v. Behrens,*
    546 F.3d 580 (9th Cir. 2008) ..................................................................................8

*Lorain J. Co. v. United States,*
    342 U.S. 143 (1951) ...............................................................................................20

*Metronet Servs. Corp. v. Qwest Corp.,*
    2001 WL 765167 (W.D. Wash. Apr. 16, 2001) ........................................................9

*Newcal Indus. v. Ikon Office Sols.,*
    513 F.3d 1038 (9th Cir. 2008) ...............................................................................14

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.,*
    883 F.2d 1101 (1st Cir. 1989) ..........................................................................21, 22

*Rebel Oil Co. v. Atl. Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995) .................................................................................15

*REX - Real Est. Exch. Inc. v. Zillow Inc.,*
    2021 WL 3930694 (W.D. Wash. Sept. 2, 2021) .....................................................24

*Romero v. Securus Techs., Inc.,*
    216 F. Supp. 3d 1078 (S.D. Cal. 2016) ..................................................................11

*Simon & Simon, PC v. Align Tech., Inc.,*
    2021 WL 1309299 (N.D. Cal. Apr. 8, 2021) ............................................................9

*Sitzer v. Nat'l Ass'n of Realtors,*
    420 F. Supp. 3d 903 (W.D. Mo. 2019) ...................................................................24

-iii-

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.,*
    88 F.3d 780 (9th Cir. 1996) ...........................................................................19

*Somers v. Apple, Inc.,*
    729 F.3d 953 (9th Cir. 2013) ...........................................................................12

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993)..........................................................................................16

*Staley v. Gilead Scis., Inc.,*
    446 F. Supp. 3d 578 (N.D. Cal. 2020) .............................................................23

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) ...........................................................................4

*Tele Atlas N.V. v. NAVTEQ Corp.,*
    2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) .................................................21

*Thompson v. Clear Channel Commc'ns, Inc.,*
    247 F.R.D. 98 (C.D. Cal. 2007).......................................................................13

*Top Rank, Inc. v. Haymon,*
    2015 WL 9948936 (C.D. Cal. Oct. 16, 2015)..................................................12

*United States v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015)............................................................................23

*United States v. Blue Cross Blue Shield of Mich.,*
    809 F. Supp. 2d 665 (E.D. Mich. 2011)...........................................................22

*United States v. Delta Dental of R.I.,*
    943 F. Supp. 172 (D.R.I. 1996).......................................................................22

*United States v. Microsoft Corp,*
    253 F.3d 34 (D.C. Cir. 2001)...........................................................................20

*United States v. Ritchie,*
    342 F.3d 903 (9th Cir. 2003) ...........................................................................17

*W. Penn Allegheny Health Sys., Inc. v. UPMC,*
    627 F.3d 85 (3d Cir. 2010)................................................................................4

*Wi-LAN Inc. v. LG Elecs., Inc.,*
    382 F. Supp. 3d 1012 (S.D. Cal. 2019)..............................................................5

*William O. Gilley Enters. v. Atl. Richfield Co.,*
    588 F.3d 659 (9th Cir. 2009) .......................................................................4, 5

## RULES

Fed. R. Civ. P. 12(b)(6)............................................................................. *passim*

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

–iv–

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

## MISCELLANEOUS

Arthur Zuckerman, *75 Steam Statistics: 2020/2021 Facts, Market Share & Data Analysis,* Compare Camp (May 15, 2020), https://comparecamp.com/steam-statistics...........................................................14, 16, 17

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

–v–

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

I.      **INTRODUCTION**

In its Motion to Dismiss Dark Catt Plaintiffs' Complaint (ECF No. 38), Valve Corporation disputes Dark Catt's well-pleaded factual allegations, mischaracterizes those facts, and imports the Wolfire Plaintiffs' allegations from a related proceeding as if those allegations are in Dark Catt's Complaint. These are improper and ineffectual challenges under Federal Rule of Civil Procedure 12(b)(6). A defendant cannot rewrite a complaint to support its motion to dismiss, nor can it ask the Court at the pleadings stage to adjudicate which factual positions will eventually win out.

Valve first argues Dark Catt has not alleged antitrust injury because, Valve claims, its commission rate is not supracompetitive, a conclusion drawn from its ability to charge the same rate for almost twenty years. Length of time does not determine whether the commission rate is higher than it would be in a competitive market. Valve's contention ignores Dark Catt's detailed allegations explaining why the rate would be lower during the class period in the absence of Valve's wrongful conduct.

Valve next asks the Court to look at documents outside the Complaint to contest the truth of Dark Catt's allegation that Valve has a 75% market share. Valve asks the Court to reject the part of the cited article giving the 75% market share estimate in favor of other information, and to conclude 75% must be too high. This contention ignores the pleading standard. Valve similarly disregards Dark Catt's additional factual allegations establishing Valve's market power: its dominance in a properly defined relevant market, barriers to entry, supracompetitive pricing, and restricted output on third-party stores.

In a final salvo, Valve argues Dark Catt has not alleged anticompetitive conduct sufficient to state its antitrust claims. While continuing to refuse to accept Dark Catt's well-pleaded factual allegations as true or draw reasonable inferences in Dark Catt's favor, Valve adds another legal error. It disaggregates Dark Catt's allegations of Valve's monopolistic scheme into individual acts to be viewed only in isolation. Valve chooses an individual allegation in the Complaint, provides Valve's counter-story, insists that the particular example does not state a claim, and moves to another allegation to consider in isolation. Valve's intertwined actions cannot be disassociated and

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC
-1-
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1    dismissed; they are each an integral part of Valve's monopolistic scheme.

2         Valve's arguments are not proper under Rule 12(b)(6), and its motion should be denied.

3    **II.    STATEMENT OF FACTS**

4         Plaintiffs Dark Catt Studios Holdings, Inc. and Dark Catt Studios Interactive LLC

5    (collectively "Dark Catt") allege that Valve has attempted to monopolize and maintained its

6    monopoly in the worldwide market for personal computer ("PC") game distribution, including

7    through its Steam online game store. Dark Catt alleges a range of exclusionary conduct that harms

8    Publishers[1] who have no choice but to do business with Valve to gain access to a substantial

9    number of PC gaming customers. As a practical matter, Publishers need to be able to distribute

10   their games and add-on products and services via Steam to have any meaningful access to the PC

11   gaming ecosystem. Compl. ¶¶ 20, 117-26 (ECF No. 1). Valve's illegal dominance stems from

12   three types of conduct.

13        First, Valve imposes pricing and marketing restrictions on Publishers to control their

14   activity on other stores when selling the same games as available on Steam. *Id.* ¶¶ 9, 44, 46, 50.

15   Publishers cannot offer a lower price or a temporary exclusivity period on another store. This

16   harms their ability to monetize their PC games because they cannot lower their price to try to

17   increase sales without sacrificing profits (given the lower percentage of the sales price the other

18   store will take); nor can they negotiate financial incentives for exclusives. *Id.* ¶¶ 9-10, 47-49, 54-

19   55, 62, 72. Further, Publishers have little incentive to offer lower prices on other stores despite

20   those stores' lower revenue shares since they will have to correspondingly lower the price on

21   Steam. Publishers will then make less money on each Steam sale. *Id.* ¶¶ 130, 133.

22        Second, Valve leverages its authentication codes, called Steam keys, which it has built into

23   an industry standard, to enforce its pricing and marketing restrictions and limit Publishers' sales

24

25        [1] The Complaint uses "Developer" to refer to parties who "contracted with Valve Corporation to
26   distribute a PC game via Steam and sold such game," meaning the entities directly harmed by Valve's
     alleged practices. Compl. ¶ 202 (defining proposed class). The Court's recent Order referred to those
27   directly harmed entities as "Publishers." *See* Order at 2 n.1, ECF No. 52 (Oct. 5, 2021). Consistent with
     the Court's usage, Dark Catt uses "Publisher" here to clarify, as alleged in its Complaint and proposed
     class, it is not referring to the entities who were indirectly harmed by Valve's conduct.
28

on other stores. *Id.* ¶¶ 13-14, 144. Valve may not be obligated to provide keys in the first instance. But having decided to offer them and propel them into a standard, Valve now uses them to build and maintain its monopoly. *Id.* ¶¶ 148-49. Valve no longer allows Publishers to generate keys for their games and instead provides keys to Publishers at its own discretion and whim. *Id.* ¶¶ 152-53. Steam keys allow Valve to both track and limit the number of sales on third-party stores that sell Steam-enabled games and provide a coercive mechanism for its other restrictions on Publishers, as it can delay, limit, or cut off access to Publishers who violate its rules. *Id.* ¶¶ 154, 158-59.

Third, Valve uses its control over a game's visibility to punish Publishers that threaten its control of the PC game ecosystem. *Id.* ¶ 16. Valve has notified users of a Publisher's exclusive offering on another store, resulting in an attack on the Publisher's Steam store or game page, and/or derogatory comments on other social media sites. *Id.* ¶¶ 169-72. While Steam users post these reviews, Valve has a policy of not deleting them, including those that are irrelevant to the game and abusive, in violation of its own rules. *Id.* ¶¶ 182-83, 185. Negative reviews can have a significant influence on a game's visibility and sales. *Id.* ¶¶ 178, 181, 184.

This conduct has given Valve market power in the market for PC game distribution. Valve is able to control prices in the entire market through its requirement that Publishers not offer their games or add-on content at a lower price on another store if they are also sold on Steam. *Id.* ¶¶ 9, 62. Valve is able to exclude competitors by preventing rivals from attracting gamers through better pricing and marketing, such as exclusive offerings. *Id.* ¶¶ 11, 62-63, 72.

Valve's anticompetitive pricing and marketing restrictions have directly injured Dark Catt and the proposed Publisher class by forcing them to pay an inflated revenue share and limiting their options to sell PC games on other stores. *Id.* ¶¶ 20, 47-49, 62. Valve's restrictions prevent Publishers from obtaining better distribution terms from other stores in exchange for an exclusive promotion. *Id.* ¶¶ 48-49. The restrictions also prevent rivals from attracting a user base because Publishers cannot offer lower prices on another store or exclusive offerings to bring users to a competing store. By preventing rivals from competing effectively, Valve eliminates competitive

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC
-3-
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1  pressure it would otherwise face to lower its commission rate and cease its restrictions on

2  Publishers. *Id*. ¶¶ 47-49, 72-73, 143, 195-99.

3  **III.   LEGAL STANDARD**

4         "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

5  accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

6  662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating a

7  motion to dismiss, "[w]hen there are well-pleaded factual allegations, a court should assume their

8  veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

9  Further, "[i]f there are two alternative explanations, one advanced by defendant and the other

10 advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to

11 dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011).

12        Antitrust claims must be "plausible in light of basic economic principles." *William O.*

13 *Gilley Enters. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (internal quotation omitted).

14 But antitrust claims (that do not sound in fraud) have "no special pleading rule requiring greater

15 factual specificity." *Beech-Nut Nutrition Corp. v. Gerber Prods. Co.*, 69 F. App'x 350, 351 (9th

16 Cir. 2003); *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

17 **IV.   ARGUMENT**

18      **A.  Dark Catt Sufficiently Alleges Antitrust Injury from Valve's Conduct**

19        Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that

20 flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat,*

21 *Inc.*, 429 U.S. 477, 489 (1977). The Ninth Circuit requires five elements: "(1) unlawful conduct,

22 (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful,

23 and (4) that is of the type the antitrust laws were intended to prevent," and (5) "that the injured

24 party be a participant in the same market as the alleged malefactors." *Glen Holly Entm't, Inc. v.*

25 *Tektronix Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003) (internal quotations and citation omitted).

26 Valve at most challenges the first and second elements in arguing that supracompetitive pricing is

27 not plausible and therefore Dark Catt could not have been injured. *See* Mot. at 7-12.

28

1   Valve's arguments are premised on two flawed propositions that are incorrect as to the

2   factual allegations, economic principles, and governing law. Fundamentally, Valve's antitrust

3   injury arguments ignore the basic principles of evaluating a Rule 12(b)(6) motion: "All allegations

4   of material fact are taken as true and construed in the light most favorable to the non-moving

5   party." *Atl. Richfield Co.*, 588 F.3d 659 at 662.

### 1. Dark Catt Plausibly Alleges that Valve's Commission Is Supracompetitive

7   Valve's first flawed proposition is that Valve has maintained its 30% commission since the

8   mid-2000s and so the rate cannot be supracompetitive. Mot. at 7-8. Because the rate is supposedly

9   not supracompetitive, Dark Catt has not alleged antitrust injury from having paid the rate. *Id.* This

10  circular syllogism fails at the outset. It ignores Dark Catt's allegations that Valve's anticompetitive

11  conduct allows it to keep this high rate when it would have fallen in a competitive market.

12  Dark Catt alleges that it and the proposed Publisher class have been harmed by paying an

13  inflated fee to Valve to distribute their PC games on Steam. Paying too high of a price is a textbook

14  antitrust injury. *See Free Freehand Corp. v. Adobe Sys.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal.

15  2012) (noting supracompetitive prices and decreased innovation "are the type of injuries that

16  commonly satisfy the antitrust standing requirement" and collecting cases); *Wi-LAN Inc. v. LG*

17  *Elecs., Inc.*, 382 F. Supp. 3d 1012, 1024 (S.D. Cal. 2019); *Gatan, Inc. v. Nion Co.*, 2017 WL

18  3478837, at *5 (N.D. Cal. Aug. 14, 2017). The Complaint provides ample factual allegations to

19  support the reasonable inference that Dark Catt (and the proposed Publisher class) was harmed as

20  a direct result of Valve's conduct.

21  As an initial matter, supracompetitive pricing is determined by a comparison to the price

22  that would have prevailed if there was competition without the anticompetitive conduct, *i.e.*, the

23  "but-for world." Valve mistakes the symptom (a flat commission rate) for the disease

24  (monopolization) in arguing that the Court should look only at the commission rate over time to

25  determine if Dark Catt has plausibly alleged it was above the competitive level during the class

26  period, and accordingly injured those who paid it. If not infected with Valve's monopolistic

27  practices, a competitive PC game distribution market would have pushed Valve to lower its

28

commission rate, not maintain it.

Determining whether Dark Catt has sufficiently pled antitrust injury—through paying an actual commission rate above the but-for competitive rate—requires examining the "overall combined effect" of Valve's conduct. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376, 1378 (9th Cir. 1992). The Complaint describes in detail a series of anticompetitive acts that Valve used to obtain and maintain a monopoly in PC game distribution, including pricing and marketing restrictions and use of Steam keys to control Publishers' activity on other stores. It provides examples of how these restrictions have harmed both Publishers who attempted to escape its monopoly and rivals who have been unable to enter and compete effectively in the market for PC game distribution. Compl. ¶¶ 68-73, 117-19, 122-25, 163-67, 172-79, 186, 193-200.

Without Valve's restrictions, Publishers would have other viable options to distribute their games to purchasers and would no longer be reliant on Steam to reach customers. Publishers instead could negotiate more favorable distribution terms with Valve and its rivals, including a lower revenue share percentage. *Id.* ¶¶ 72-73. In a competitive, but-for world without Valve's illegal conduct, Dark Catt and similarly situated Publishers would have paid lower commissions to Valve because competition would have pushed down the commission rate Valve could charge.

Valve does not contend these factual allegations are legal conclusions that need not be accepted as true. *See Iqbal*, 556 U.S. at 678-79. It just does not like them. And so it seeks to introduce its own preferred contentions and explanations, thereby inverting the pleading standard. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("If defendants are permitted to present their own version of the facts at the pleading stage . . . it becomes near impossible" for a plaintiff to demonstrate a plausible claim for relief).

### a.    The Commission Rate's Constancy Is Not Informative

To support its argument that the "only reasonable inference" from Dark Catt's Complaint is that the 30% commission is not supracompetitive, Valve impermissibly turns to matters outside the Complaint and non sequiturs. Mot. at 8. Valve contends that "it took at least five and likely several more years" for Valve to become dominant and "it went from zero to an alleged 75%

market share" without raising its commission. *Id.* These assertions have no significance to whether Dark Catt has sufficiently alleged that it and the Publisher class were injured by paying the 30% commission charged during the class period.[2] Valve then compounds its flawed arguments:

First, Valve simply assumes that the 30% rate was competitive in 2005, which has no factual basis and is not at issue here. Even so, the relevant market looked much different then, with PC games sold as physical copies on discs at brick-and-mortar retailers. *See* Compl. ¶¶ 4, 120.

Second, even if the rate was competitive in 2005, there is no legal or economic basis to infer that it is competitive in 2017 (when the class period begins) or today. Valve ignores the changes in the market, detailed in the Complaint, that it encouraged and exploited to gain its monopoly. *See* Mot. at 11 (noting the Complaint "alleges an evolving gaming landscape"). It is implausible to assume, as Valve does, that in a competitive environment Valve's rate would remain unchanged through the shift to digital sales, online gameplay, and increased efficiencies.

Third, a monopolist or attempted monopolist can be liable for conduct that would not be actionable if undertaken by a company with "zero market share." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925 (9th Cir. 1980) ("What may be legal for the company lacking substantial market power may be illegal for the firm with such power.").

Lastly, Valve recently did lower its commission rate for certain high-selling games in the face of an emerging competitor: Epic Games Store. Compl. ¶¶ 113-14. Valve's attempt to paint this reduction as "price competition" and "volume discounts," Mot. at 11-12, cannot be squared with its argument that its otherwise flat 30% commission is de facto competitive given its long duration. Even if Valve could introduce an alternative explanation on a motion to dismiss, its argument that the lowered commission rate reflects a "volume discount" from "cost savings" falls short. *Id.* The "discount," which applies once a sales revenue threshold is reached, is unrelated to Valve's costs, for example, the number of transactions Valve processes to reach the threshold or the amount of data delivered. Valve has only speculation to support this argument, which cannot

---

[2] While Dark Catt does not need to allege the exact moment when Valve's monopoly began, particularly since it brings monopolization **and** attempted monopolization claims, it certainly has not alleged that the 30% commission ever reflected a competitive rate. Valve has no basis for this assumption.

1  replace the factual allegations in the Complaint and plausible inferences drawn therefrom.

2            **b.**     **A Quality-Adjusted Commission Rate Is a Faulty Concept**

3         Continuing to impermissibly allege its own version of facts, Valve next contends its

4  "quality-adjusted commission rate" has fallen. Mot. at 8-10. The Complaint does not contain any

5  allegation from which the reasonable inference could be drawn that "Valve has enhanced Steam

6  with many features prized by developers and gamers alike." *Id.* at 8. Tellingly, Valve cites only

7  Part II of its own Motion, which includes "facts" with no basis in the Complaint, and does not

8  specify what these supposedly new and valuable features are, when they were added, or why they

9  support the 30% commission as a competitive rate.[3] Valve continues to misunderstand that a

10  supracompetitive rate is determined with reference to the "but-for" world without the monopolistic

11  conduct, not some prior version of Steam with fewer features.

12         Regardless, the idea of a quality-adjusted ***commission rate***, compared to a quality-adjusted

13  ***price***, is economically nonsensical. Valve charges 30% of the purchase price set by the Publisher.

14  The "quality" of its service is no different for a game that costs $60 than a game that costs $10,

15  but Valve is paid $18 versus $3 for providing the same distribution service and quality.

16            **c.**     **The Superior Product Theory Lacks Support**

17         Putting aside Valve's argument that it is charging a ***lower*** relative commission given its

18  supposed quality, and an even lower "volume discount" commission for high-selling games, Valve

19  then claims that it is justified in charging a ***higher*** commission because of its quality. Valve's

20  contention that Steam is a superior product that rightly commands a higher price attempts to

21  manufacture a factual dispute, just like its quality-adjusted commission argument. Mot. at 10-12.

22  And it is just as out of place on a motion to dismiss.

23         Valve improperly seeks to introduce extrinsic facts and draw interpretations of the

24  Complaint in the light most favorable to Valve—that Steam's dominance comes from higher

25  quality rather than Valve's challenged conduct. *See Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580,

26  ───────────────

27     [3] Dark Catt's allegations are that Publishers need to use Steam's features to access the PC distribution market due to Valve's anticompetitive conduct, not that Publishers "prize[]" Steam's features. Compl. ¶¶ 9, 11, 117, 119. Valve cannot invent its own facts to argue Dark Catt's allegations are implausible.

28

-8-

588 (9th Cir. 2008). An antitrust plaintiff has no burden at the pleading stage to "rule out other possible explanations" for defendants' conduct; it does not need to identify "potential rationales" and then "explain why each of them could not conceivably explain the defendant's action." *Simon & Simon, PC v. Align Tech., Inc.*, 2021 WL 1309299, at *6 (N.D. Cal. Apr. 8, 2021).

### d.      Rising Demand Does Not Justify the Commission Rate

Valve's attempt to rely on the "price-*increasing* effect of rising demand" is similarly misplaced as it requires output to be decreasing. Mot. at 11 (quoting *Metronet Servs. Corp. v. Qwest Corp.*, 2001 WL 765167 (W.D. Wash. Apr. 16, 2001)). It elsewhere argues that output is increasing. *Id*. at 8 ("the industry saw substantial growth in both output and demand"), 11 ("volume discounts Valve added in 2018"), 13 ("the facts that are alleged show an increase in these non-price metrics" referencing "output, quality, innovation, or choice"). Valve's citation to the growth of Steam says nothing about the entire relevant market or output in the but-for world without Valve's wrongful conduct. *Id*. at 11, 13. Valve's self-contradictory statements are not a basis to dismiss Dark Catt's claims.

### e.      The 30% Rate Was Not Subject to "Intense Competition"

Valve's final attempts to argue Dark Catt's injury allegations are implausible distort Dark Catt's allegations. Valve contends that Dark Catt's example of a Publisher making more money by selling at a lower price on a store offering a lower revenue share than Valve, Mot. at 11 (citing Compl. ¶ 196), is at odds with "numerous examples of developers taking advantage of just such lower commission stores, and thus reaping all of the benefits." *Id*. at 11 (citing Compl. ¶¶ 164, 172, 176, 177). This is a nonsensical comparison divorced from Dark Catt's allegations.

The hypothetical in Complaint ¶ 196 notes that a Publisher could make more money on each sale even at a lower retail price, likely also increasing its total sales given the lower price, ***if*** Valve did not require the Publisher to keep its prices at the same level as on Steam. Compl. ¶¶ 196-97. But Valve ***does*** require the Publisher to offer the same price on Steam, undermining the Publisher's incentive to lower its retail price on the other store despite the lower commission. *Id*. ¶¶ 130, 197-98. The examples of Publishers attempting to take advantage of lower commissions

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-9-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

and other favorable terms offered by Epic Games Store do not render this hypothetical a "fallacy" because, as Valve admits, the Publishers were unable to sell "concurrently" on Steam. They had to choose to lose out on access to the vast majority of the market controlled by Valve if they wished to offer lower prices or a temporary exclusive elsewhere.

These Publishers tellingly returned to Steam after a temporary exclusivity period with Epic,[4] illustrating that Publishers remain dependent on Steam for access to the broad market and were punished for their disloyalty to Steam. Compl. ¶¶ 164 ("Valve would not authorize Steam keys"); 172 ("Valve issued a statement criticizing the exclusive . . . . 'This led to a bunch of negative review spamming on the previous Metro games'"); *see also id.* ¶¶ 176, 178. These Publishers' desperation to get out from under Valve's monopoly do not call into question Dark Catt's allegations of antitrust injury; they bolster them.

Similarly, Valve brazenly distorts Dark Catt's allegations about Steam's potential rivals. Far from facing "nearly twenty years of intense competition," the cited paragraphs describe how competitors, whether small or large, have not been able to compete with Valve due to its unlawful restrictions on Publishers. Mot. at 9. Valve selectively quotes from Dark Catt's allegations to concoct a contrary claim of "intense competition." For example, Valve quotes only the bolded text from the following allegations, *id.*, while omitting the context and real meaning:[5]

- "Even other **billion-dollar companies with popular PC games**, similar to Epic, have been unable to compete with Steam in the market for PC game distribution." Compl. ¶ 67.

- "Valve's practices have also harmed others . . ., including Valve's would-be competitors, third-party storefronts like Epic Games Store, Electronic Arts' Origin, Microsoft's store, Tiny Build's store, and Discord's store, which have been consistently unable to make incursions on Steam's market share despite pursuing **more efficient business models** and offering **more favorable opportunities for Developers**." *Id.* ¶ 21.

[4] The exception is indie studio Glumberland, which is using a "revenue guarantee" from Epic to "continue to improve the game." Compl. ¶ 177.

[5] The same is true of the other allegations Valve quotes. Mot. at 9 (also citing Compl. ¶¶ 69, 70, 71, 79, 81, 96, 193).

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

- "EA created its Origin store and game launcher in 2011 . . . [and] stopped releasing its games on Steam at that time. Despite the draw of its **popular franchises** such as FIFA, the Sims, and Battlefield, EA was unable to break through Valve's anticompetitive tactics in the PC game distribution market and returned its games to Steam in 2020 to 'be where the players are.'" *Id.* ¶ 68.

- "Even if they could overcome the financial barriers to entry, it would be almost impossible to attract a user base due to Valve's monopoly power and anticompetitive conduct to prevent new entry. **Industry behemoths** like EA have been unable to gain market share because of Valve's conduct." *Id.* ¶ 119.

What is plainly alleged is that a number of sophisticated, well-funded companies[6] have been unable to overcome Valve's anticompetitive practices to gain share and provide a competitive restraint on Valve, including forcing its commission rate down to a competitive level. Far from supporting Valve's alternative narratives, these failures illustrate Valve's ability to exclude competitors through its restrictions on Publishers, control of Steam keys, and pattern of punishing Publishers.

In other words, Valve charges a fee in excess of what it would be able to charge if it did not exclude rivals through the wrongful conduct. Dark Catt and all the other Publishers who sold their PC games on Steam suffered antitrust injury as a result.

That Valve's 30% fee is above the competitive rate and injured Publishers is not only plausible under *Twombly*, but is the most plausible inference to be drawn from the failure of these potential rivals to make inroads into Valve's market power and force down its supracompetitive fee. *See Free Freehand Corp.*, 852 F. Supp. 2d at 1182 ("[I]t is reasonable to infer that" conduct that "made it more difficult for potential competitors . . . to enter the market," combined with existing barriers like "installed user bases and adoption as the standard" harmed competition).

---

[6] Valve also attempts to rely on allegations from the *Wolfire* Complaint about Amazon. The *Wolfire* Complaint is not incorporated by reference in Dark Catt's Complaint nor can the Court take judicial notice of the factual truth of the assertions. *See Romero v. Securus Techs., Inc.*, 216 F. Supp. 3d 1078, 1084 n.1 (S.D. Cal. 2016); *Cox v. Ametek, Inc.*, 2017 WL 4792424, at *4 (S.D. Cal. Oct. 24, 2017).

### 2. *Somers* Is Not Controlling and Does Not Support Valve's Argument

The second flawed proposition underlying Valve's argument that Dark Catt has not alleged antitrust injury stems from the Ninth Circuit's decision in *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013). Valve contends *Somers* controls the outcome here simply because it involved an allegation that the defendant did not change its prices. The stability of Valve's commission rate does not undercut the plausibility of Dark Catt's allegation that the rate is above the competitive level. That determination cannot be made without examining the underlying exclusionary conduct that supports the alleged monopolist's real-world price.

Contrary to Valve's assertion, the facts here are distinguishable from *Somers*. Valve does not set prices to consumers as Apple did in determining the generally applicable price for digital song downloads. Valve contractually requires Publishers not to set a lower retail price on another storefront—preventing the very price competition the Ninth Circuit noted that Apple faced from Amazon. That is, Valve's pricing and marketing restrictions have prevented the "presence of a competitor" and "increased competition" that would "generally lower[] prices." *Somers*, 729 F.3d at 964. Valve's consistent commission rate therefore does not "render[] implausible" Dark Catt's (non-conclusory) allegations that Valve's restrictions on Publishers excluded competitors and allowed it to charge a commission rate higher than the one that would prevail in a competitive market. *Cf. id.* ("The fact that Apple continuously charged the same price for its music irrespective of the absence or presence of a competitor renders implausible Somers' conclusory assertion that Apple's software updates affected music prices.").

Valve's other examples of insufficient allegations of supracompetitive pricing bear even less resemblance to Dark Catt's claims. *See* Mot. at 7. Two cases are challenges to patent acquisitions and subsequent aggregated licensing. *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 58-60 (D. Mass. 2020) (Clayton Act § 7 claim); *Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1027-29 (N.D. Cal. 2021) (Sherman Act § 1, Clayton Act § 7, and California claims). All three citations related to sufficiency of the allegations to establish market power, not antitrust injury. *Bio-Rad Labs.*, 483 F. Supp. 3d at 59-60; *Intel Corp.*, 511 F. Supp. 3d

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC
-12-
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1    at 1024, 1029; *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *8 (C.D. Cal. Oct. 16, 2015).

2           **3.   Dark Catt Alleges Non-Price Injuries**

3           Finally, Valve shadowboxes other injuries it thinks Dark Catt may be using to establish

4    antitrust injury, including injuries to consumers. Mot. at 12-13. Dark Catt establishes antitrust

5    injury with its allegations related to Publishers' overpayment. It also plausibly alleges harm

6    stemming from reduced "output, quality, innovation, or choice." *Id.* at 13 (asserting, without

7    support, that these injuries are "conspicuously absent"). Dark Catt alleges that Valve uses Steam

8    keys to artificially restrict supply of Steam-based games available for sale on other stores, Compl.

9    ¶ 154, "just as any other monopolist reduces output below the competitive level to charge a

10    supracompetitive price." *Thompson v. Clear Channel Commc'ns, Inc.*, 247 F.R.D. 98, 151 (C.D.

11    Cal. 2007) (finding that plaintiffs pled antitrust injury in alleging "they have suffered injury in the

12    form of the payment of supra-competitive prices" which "flow[s] from the illegal anticompetitive

13    effect of Defendants' conduct allowing it to engage in monopolistic pricing practices"). This is

14    clearly a harm from reduced output in the market as a whole.

15           The Complaint further explains how Valve's conduct reduces quality, innovation, and

16    choice, injuring Publishers and consequently consumers. For example, if Publishers were able to

17    keep a higher amount of their sales revenue or negotiate upfront payments for exclusives, they

18    could "pour more money into innovation" and "invest in additional development resources" to

19    increase the quality and quantity of games. Compl. ¶¶ 10, 49, 140. Without Valve's restrictions,

20    Publishers could, for example, sell their games at lower prices on other stores, helping those stores

21    gain traction in the market. This would increase Publishers' and consumers' choices for selling

22    and buying PC games and encourage more innovative delivery systems due to Steam and rival

23    stores competing to distribute Publishers' games and keep users' attention. *Id.* ¶¶ 11, 22, 135, 199.

24           In sum, Dark Catt alleges antitrust injury based on paying Valve a commission rate higher

25    than the rate that would have prevailed if Valve had not used a pattern of anticompetitive conduct

26    to exclude rivals. Valve's attempts to rewrite Dark Catt's factual allegations and its reliance on

27    distinguishable cases do not show the alleged antitrust injury is implausible or insufficient.

28

OPPOSITION TO MOTION TO DISMISS          -13-          **WILSON SONSINI GOODRICH & ROSATI**
No. 2:21-CV-00872-JCC                    701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

**B.  Dark Catt Alleges Valve Has Market Power in the Relevant Market**

**1.  Valve's Factual Attack on the 75% Market Share Is Unavailing**

Valve claims to attack the sufficiency of Dark Catt's market power allegations but its dispute is solely with one portion of one source the Complaint cites for Valve's market share, which in turn is only one part of Dark Catt's market power allegations. Mot. at 13-14 (discussing the source "Arthur Zuckerman, *75 Steam Statistics: 2020/2021 Facts, Market Share & Data Analysis*, Compare Camp (May 15, 2020), https://comparecamp.com/steam-statistics" ("*75 Steam Statistics*") cited in Compl. ¶ 5 n.3). Steam admits that this source, by a market researcher focused on product comparisons, states "'Steam is the world's largest distributor of PC games, taking up 75% of the global market share.'"). *Id*. at 14 (quoting *75 Steam Statistics*). That should be the end of the market power inquiry at the pleading stage.

Indeed, the 75% market share is a factual matter that must be taken as true at this stage. *See Newcal Indus. v. Ikon Office Sols.*, 513 F.3d 1038, 1044 (9th Cir. 2008) (stating that the "relevant market" is a factual element under Rule 12(b)(6)); *Advanced Health-Care Serv. v. Radford Cmty. Hosp.*, 910 F. 2d 139, 147 (4th Cir. 1990) (stating that the plaintiff's market share "factual allegations . . . must be accepted as true" on a motion to dismiss). Valve does not seriously dispute the accuracy of the number or its use by Dark Catt. Instead it searches for other market share estimates with no basis in the Complaint—or relation to Dark Catt's unchallenged market definition—that it would like the Court to credit in place of Dark Catt's well-pleaded market power allegations. This is impermissible. *See Khoja*, 899 F.3d at 1006.

While the foregoing should dispose of the issue, Valve complains that the underlying data is not provided, and that there is no source. To the contrary, a list of sources is provided at the end of the full article and in graphics throughout, as Valve knows because it relies on one of these cited sources to present its preferred, contrary market share estimate. Mot. at 14 ("when one looks to the sources that website [*75 Steam Statistics*] lists, one sees that the author drew 'over $4 billion worth of sales' from an article . . . cited as note 20 in *75 Steam Statistics*" and then discussing "the latter article"). Dark Catt can reasonably rely on a market share figure provided by an industry

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-14-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

researcher that accords with all its other allegations about Valve's dominance without needing to provide more data underlying the statistic. Valve attempts to erect an impossible standard for a plaintiff to adequately state a claim without full discovery from the defendant and other industry participants. *See FTC v. SureScripts LLC*, 424 F. Supp. 3d 92, 103-04 (D.D.C. 2020) (such factual denials "speak to the merits and the need for further factual development through discovery"). Dark Catt has provided a reliable market share estimate to support its claims.

### 2. Dark Catt Includes Significant Other Market Power Allegations

Dark Catt's market power allegations, moreover, do not solely depend on the 75% market share allegation, even though it is a material factual allegation that the Court should accept as true. Valve's Motion says nothing about Dark Catt's other allegations, summarized below, that plausibly suggest Valve has substantial power in the relevant market.

"Market power may be demonstrated through either of two types of proof": direct proof of injury to competition, *i.e.*, "evidence of restricted output and supracompetitive prices," or circumstantial evidence related to the market structure, namely, defining a relevant market, showing the defendant's dominant share of the market, and showing significant barriers to entry and competitors' inability to increase their output in the short term. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). The Complaint includes both types of evidence.

For direct proof of injury to competition, Dark Catt details how Valve restricts output by limiting the sales of third-party stores selling Steam keys to ensure that they remain below Valve's sales for the same game. Compl. ¶¶ 152-54. Most other stores are selling Steam keys, giving Valve control over total market output. *Id.* ¶ 156. And the Complaint shows that Valve is able to charge supracompetitive commissions because its anticompetitive conduct leaves no adequate alternative—not reliant on Steam directly or indirectly—for Publishers to distribute their PC games. Numerous companies have attempted to enter the market but have been unable to make a meaningful dent in Valve's dominance because of Valve's conduct, despite offering lower commission rates and other more favorable distribution terms. *Id.* ¶¶ 63, 119, 122-24.

As circumstantial evidence, Dark Catt alleges a relevant market of worldwide PC game distribution, which Valve does not challenge. Dark Catt alleges numerous facts about Valve's dominant share of that market, beyond the 75% market share figure:

- "largest distributor of PC games," generating "over $4 billion worth of sales" in 2017 with "120 million monthly active players," *id*. ¶ 5;

- "$10 billion market capitalization" with Steam as "largest source of revenue," *id*. ¶ 6;

- Epic, its biggest competitor, sold $265 million of third-party games in 2020, *id*. ¶ 64;

- "ensuring Steam keys remain the industry standard," *id*. ¶ 13;

- EA started selling its games on Steam after nine years of using only its own store to "be where the players are," *id*. ¶ 68.

And the Complaint shows significant barriers to entry, including financial barriers like credit card fraud and initial capital outlays, economies of scale, existing and entrenched user bases, and Valve's control over the technology standard used in the industry. *Id.* ¶¶ 117, 119, 122, 125, 155-57. These allegations are more than sufficient to plead Valve's market power.

### 3. Two of the Three Claims Do Not Require Market Power

Valve likewise does not explain why a failure to allege market power means "the Court should dismiss the Complaint for that reason alone," Mot. at 15, when neither Count Two nor Count Three of Dark Catt's Complaint requires market power as an element of the claim. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (elements for Sherman Act § 2 attempted monopolization claim); *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 782, 295 P.3d 1179 (2013) (elements for Washington Consumer Protection Act claim).

### 4. Valve Cannot Introduce Its Own Market Share Figure

As noted, Valve's factual dispute with Dark Catt's 75% market share allegation comes from a different statement in an article cited in the Complaint. Compl. ¶ 5 n.3 (citing *75 Steam Statistics*).[7] Valve points to a statement in *75 Steam Statistics* that relates to a different metric

---

[7] Valve does not explain how the article is incorporated by reference in the Complaint or otherwise properly before the Court. A court may consider a document outside the complaint only if incorporated by reference because either (1) "the complaint refers to it extensively" or (2) the document itself forms

("more than 18% of PC game sales worldwide without taking in-game purchases into account"). Mot. at 14. To prop up this other metric, it asks the Court to take a "closer look" at a separate article cited within *75 Steam Statistics* that is supposedly the source for the 18% figure. *Id.* (quoting the second article that is not referenced in the Complaint or provided with Valve's Motion).

Now two steps removed from the Complaint, Valve points to a revenue figure "from some unnamed source" from which the 18% figure is apparently calculated. *Id.* The unnamed source has further qualified its estimate with the caveats "[i]f the numbers are right" and that the percentage is "likely far more than that once in-game purchases are accounted for." *Id.* (quoting the second article). Yet Valve contends this mysterious "18% or more" calculation "eviscerates Plaintiffs' 75% allegation," which, to recap, is based on the market researcher's original article. *Id.*

Further undermining Valve's argument, this alternative 18% figure does not correspond to the relevant market Dark Catt alleges. It looks at Valve's (generally 30%) cut of the revenues from sales on Steam, not total sales on Steam. *Id.* (explaining, via impermissible sources outside the Complaint, that the 18% figure is based on Valve's "$4.3 billion worth of sales," *i.e.*, Valve's total sales commissions, not the total sales of PC games made on Steam). And it admittedly "doesn't include revenue generated by DLC [downloadable content] or microtransactions," *id.* (quoting the second article), although these transactions are included in Dark Catt's relevant market. *See* Compl. ¶¶ 50-54 (discussing importance of revenues from DLC).

Valve does not provide any legal basis for its extrinsic and speculative "analysis." *See Khoja*, 899 F.3d at 998 (warning against "pil[ing] on numerous documents to [defendants'] motions to dismiss to undermine the complaint" to try to "resolve competing theories against the complaint"). Valve requests the Court not only look at a document outside the Complaint and accept the truth of a vague statement made there, but also replace Dark Catt's well-pleaded factual allegations with this one vague statement.

---

the basis of the claim. *Choker v. Pet Emergency Clinic, P.S.*, 2021 WL 934037, at *3 (E.D. Wash. Mar. 11, 2021) (citing *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). The *75 Steam Statistics* article fits neither, and the other article Valve uses has no connection to the Complaint.

1    **5.   The *Facebook* Opinion Does Not Help Valve's Argument**

2        The recent *Facebook* opinion has no relevance to Dark Catt's market power allegations.

3    The FTC's relevant market of personal social networking was "idiosyncratically drawn" and "thin"

4    in factual allegations so the court "demand[ed] something more robust" from the market-share

5    allegations. *FTC v. Facebook, Inc.*, 2021 WL 2643627, at *12 (D.D.C. June 28, 2021). Its market

6    share allegations, which "d[id] not even provide an estimated actual figure or range" for

7    Facebook's share at any time during the ten-year period at issue, were insufficient to plausibly

8    establish Facebook's market power. *Id.* Here, in contrast, the market share is measured by revenue,

9    Mot. at 14, a "typical metric" for a "more traditional goods market" like the distribution of PC

10   games, sold as individual units at non-zero prices. *Facebook*, 2021 WL 2643627, at *1.

11   **C.  Dark Catt Plausibly Alleges Valve's Anticompetitive Conduct**

12       Valve additionally challenges whether Dark Catt plausibly alleges that Valve engaged in

13   anticompetitive conduct. *See* Mot. at 15-24.[8] As with Valve's arguments on injury and market

14   power, its contention that Dark Catt has not plausibly alleged anticompetitive conduct fails for

15   attempting to introduce and rely on facts outside the Complaint, disaggregate Dark Catt's well-

16   pled factual allegations, and mischaracterize the legal issues.

17       Just as courts evaluating a motion to dismiss must accept the facts pled in a complaint as

18   true and draw all reasonable inferences in favor of the non-moving party, they must read the

19   complaint as a whole in evaluating its sufficiency. This is particularly true for fact-intensive

20   monopolization claims, where the alleged acts must be analyzed in the aggregate. *Free FreeHand*

21   *Corp.*, 852 F. Supp. 2d at 1184 ("The allegations of anticompetitive acts, and their alleged

22   aggregated anticompetitive effect, fall squarely within the bounds of established monopoly broth

23   theory."); *Cal. Energy Co. v. S. Cal. Edison Co.*, 1992 WL 330263, at *2 (N.D. Cal. Sept. 22,

24   1992) (explaining monopolization allegations "should not be dissected as individual acts, as the . . .

25

26       [8] To the extent Valve attempts to rely on arguments made in its motion to dismiss the *Wolfire*
27   Complaint, this is improper. *See* Mot. at 15 ("As in *Wolfire*"; "Valve showed in the *Wolfire* MTD";
     "Wolfire, and now Dark Catt, seeks to enjoy the benefits of Steam Keys"); *id.* at 19 ("Valve showed in the
28   *Wolfire* motion to dismiss").

1    defendants assert, but rather must be viewed as a whole").

2          A defendant's purported business rationales for a challenged practice also are not proper

3    considerations on a motion to dismiss. *See SmileCare Dental Grp. v. Delta Dental Plan of Cal.,*

4    *Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) (finding "the existence of valid business reasons is ordinarily

5    a question of fact" and departing from the rule only because the policy at issue was "supported as

6    a matter of law by a legitimate business justification" by a prior decision). And the actual legal

7    theory pled in the complaint should be analyzed, not a straw man erected by the defendant. *See,*

8    *e.g.*, *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 692 (S.D.N.Y. 2012) (denying motion

9    to dismiss where defendants' "contentions misconstrue the nature of" the alleged wrongdoing).

10         Under the proper pleading standard, there is no question Dark Catt plausibly alleges that

11   Valve engaged in anticompetitive conduct in the PC game distribution market. Valve controls

12   Publishers' pricing, marketing, and other activities on rival stores competing to sell the same

13   games available on Steam. Compl. ¶ 9. Publishers are prohibited from selling their games and DLC

14   for lower prices to consumers on rival stores. *Id.* ¶¶ 9-11. They are similarly prohibited from

15   making their games, updates, or add-on content available through a third-party store earlier than

16   they are available on Steam, preventing any exclusive offerings with other stores. *Id.* ¶¶ 46-48, 50-

17   53. Valve's restrictions are, in practice and effect, a most favored nation ("MFN") provision

18   designed to limit competition between Steam and its rivals, to Steam's sole benefit. *Id.* ¶ 54.

19         Valve also uses Steam keys to enforce its restrictive pricing and marketing terms and to

20   monitor and control Publishers. *Id.* ¶ 12. It has worked to make Steam keys the accepted industry

21   standard for distribution of digital copies of games, keeping Publishers reliant on Steam. *Id.* ¶ 58.

22   Steam keys also provide Valve data about Publishers' sales through other stores and authority to

23   limit the number of sales Publishers can make in those stores. *Id.* ¶¶ 13-14. In another prong of its

24   anticompetitive scheme, Valve uses its control of the publicity and visibility of games on Steam

25   to keep Publishers in check, including by banning Publishers or games with little or no

26   investigation of alleged wrongdoing and allowing review bombing, *i.e.*, failing to remove negative

27   reviews unrelated to a game, when Publishers utilize alternative stores. *Id.* ¶¶ 16-17.

28

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1

### 1.  Dark Catt Adequately Explains the Role of Steam Keys in Valve's Scheme

2

Valve focuses most of its Steam key argument on its contention that "it has no duty to give

3 away free Steam Keys." Mot. at 19. This misses the point. Dark Catt does not allege that Valve

4 had a duty to provide Steam keys. But once it has made that decision, and encouraged keys to be

5 used as an industry standard to distribute PC games, Compl. ¶¶ 13, 125, 148-49, 157, Valve cannot

6 use the keys to gain or maintain its monopoly. *See Aspen Skiing Co. v. Aspen Highlands Skiing*

7 *Corp.*, 472 U.S. 585, 600-01 (1985) (a monopolist's refusal to deal may "give rise to liability"

8 because "the right to refuse to deal with other firms does not mean that the right is unqualified");

9 *Lorain J. Co. v. United States*, 342 U.S. 143, 155 (1951) (a monopolist's claimed right to select its

10 customers "is neither absolute nor exempt from regulation. Its exercise as a purposeful means of

11 monopolizing interstate commerce is prohibited by the Sherman Act.").

12

Valve's contention that Steam keys are free is similarly irrelevant to Dark Catt's claims.[9]

13 Even so, Valve cannot use them to exclude Publishers and rivals from the PC gaming market so

14 that Valve can maintain its monopoly position and extract greater profits. *See, e.g.*, *United States*

15 *v. Microsoft Corp*, 253 F.3d 34, 61 (D.C. Cir. 2001) (holding that overall conduct to put up

16 obstacles for users to download and access a rival's product was exclusionary conduct that violated

17 § 2 of the Sherman Act). Here, Valve does not merely put up obstacles for certain Publishers to

18 gain access to Steam keys, but delays or removes access to Steam keys altogether.

19

Its claims of offsetting procompetitive justifications for its Steam key restrictions,

20 including preventing free-riding, have no place in deciding a motion to dismiss. This is a factual

21 issue to be determined on a full record. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir.

22 2020) (describing "three[-]part burden-shifting test under the rule of reason": "if a plaintiff

23 successfully establishes a prima facie case under § 2 by demonstrating anticompetitive effect, then

24 the monopolist may proffer a 'procompetitive justification' for its conduct") (citation omitted).

25

26 ⁹ Because Dark Catt does not plead this fact, Mot. 15 ("Dark Catt never mentions that Valve doesn't
charge developers for Steam Keys"), Valve cannot rely on it on a motion to dismiss. *See Twombly*, 550
27 U.S. at 572; *Khoja*, 899 F.3d at 1002 (defendants may not "insert their own version of events into the
complaint to defeat otherwise cognizable claims").
28

The same is true of its arguments about Dark Catt's examples of Valve delaying Steam key authorizations to punish Publishers and limit sales on third-party sites. Mot. at 17-19. Its "response is largely factual, denying the [plaintiff's] allegations," which "are not adequate grounds for dismissing" a complaint. *SureScripts*, 424 F. Supp. 3d at 103-04. Valve goes further, providing its alternative facts, legal interpretation, and then claiming that the one example does not state a claim. Mot. at 18 ("Dark Catt's allegations about *Ark* do not state a claim."). That of course is not the pleading standard; Valve cannot dissect each allegation and say each is insufficient standing alone. *See Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4911230, at *2 (N.D. Cal. Nov. 13, 2008).

### 2. Dark Catt Pleads that Valve's Pricing and Marketing Provisions Form an Anticompetitive MFN

Valve also argues that its various contractual restraints do not amount to an "anticompetitive MFN" because "[s]eeking the best price for your customers can be the essence of competition." Mot. at 19 (citing *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1113 (1st Cir. 1989)). But this is not what Valve's MFN is doing. Valve gets the law wrong, and impermissibly relies on extrinsic facts and mischaracterization of Dark Catt's allegations to make its argument.

Dark Catt alleges that Publishers contractually agree that if they are going to make a game available on Steam also available on another store, they will make the game and any DLC or add-on content available at the same price and at the same time on Steam. Compl. ¶¶ 46-62. Valve cannot run from its own language:

- The Publisher must maintain "material parity" between DLC offered to Steam users and users on other stores "who make a comparable investment in the [game] and the associated DLC," Mot. at 21-22 (quoting SDA § 2.4);
- "It is important that you don't give Steam customers a worse deal," Compl. ¶ 59;
- "It's OK to run a discount on different stores at different times as long as you plan to give a comparable offer to Steam customers within a reasonable amount of time," *id.*;

- "Keep in mind that the perceived price in the bundle/subscription should be a price you are willing to run the game at a standalone price or discount on Steam," *id.*

Dark Catt alleges that industry participants understand that Valve means pricing parity and enforces the agreements in this way. *Id*. ¶ 60. Contrary to Valve's claims, Dark Catt explains in detail how the provisions function together to prevent Publishers from obtaining better distribution terms from competing stores. *See* Compl. ¶¶ 128-43 (explaining how delivery provision, DLC provision, and pricing provisions harm competition generally and Publishers specifically).

Valve again takes Dark Catt's MFN allegations out of context and supplants them with its own "facts." It takes issue with the Complaint's quote of a tweet from Epic CEO Tim Sweeney as "not a factual allegation," but then asks the Court to consider a reply tweet by some other user as a fact that negates Dark Catt's allegations. Mot. at 20.[10] This is improper procedurally and substantively. Similarly, the "instances of developers entering into exclusive offerings with other stores," *id.*, meant they could not offer their games on Steam during this period, and resulted in great backlash from users. None of this shows that "[c]ompetition abounds." *id*.

Valve's attempt to analogize the facts of this case to *Ocean State* falls flat. *Ocean State* involved a post-trial judgment, not a motion to dismiss. 883 F.2d at 1102. And the defendant's MFN ensured that it would receive the lowest price from its suppliers. *Id.* at 1103-04. By contrast, Valve's MFN guarantees nothing about its own costs (the commissions it pays its suppliers— Publishers). The MFN operates on transactions between Publishers and purchasers, not Valve's own purchases. The MFN chills competition between Valve and its rivals by preventing Publishers from offering better deals to consumers through rival distributors, which in turn forestalls their meaningful and effective competition. *See United States v. Delta Dental of R.I.*, 943 F. Supp. 172, 176-78 (D.R.I. 1996) (distinguishing *Ocean State*); *see also United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 674 (E.D. Mich. 2011) (denying motion to dismiss claims

---

[10] Dark Catt alleges that the Steamworks Documentation applies to "Steam-hosted game[s]" Compl. ¶ 58; *also id*. ¶ 62, and acknowledges Epic does not sell Steam keys, *id*. ¶ 61. Valve's contention that Dark Catt makes false claims, Mot. at 19-20, is misplaced. Dark Catt alleges that most other stores are selling Steam keys, and that Valve's anticompetitive MFN still affects pricing on Epic Games Store, as Epic's CEO stated. Compl. ¶¶ 61-62 & n.13, 122-24, 150, 161.

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-22-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

where plaintiffs explained how MFNs could exclude entry and competition in relevant market; "a factual inquiry and, ultimately, a balancing of anticompetitive and procompetitive effects must be made but not at the pleading stage").

Courts recognize that in certain contexts, MFNs "can be misused to anticompetitive ends." *United States v. Apple, Inc.*, 791 F.3d 290, 320 (2d Cir. 2015) (internal quotes and citation omitted); *see Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 609-12 (N.D. Cal. 2020) (discussing contractual provisions that were "basically" MFN clauses and denying motion to dismiss); *Blue Cross & Blue Shield of Ohio v. Bingaman*, 1996 WL 677094, at *4 (N.D. Ohio June 24, 1996) (MFN clauses may be illegal if defendants have anticompetitive intent or lack legitimate business justifications). This is a fact-specific determination inappropriate on a motion to dismiss.

### 3.   Dark Catt Alleges Valve Uses the Review System as Part of Its Scheme

Valve lastly argues that customer reviews are not anticompetitive. Mot. 22-24. Here, too, Valve errs in addressing one type of conduct in isolation. *See Am. Nat'l Mfg. v. Select Comfort Corp.*, 2016 WL 9450472, at *3 (C.D. Cal. Sept. 28, 2016) (rejecting argument that "focuse[d] on isolated conduct and d[id] not consider this conduct as part of a larger, allegedly monopolistic scheme"). Dark Catt does not allege Valve has a generalized duty to moderate reviews. It does allege, in detail, how Valve uses customer reviews as part of its anticompetitive scheme.

Valve's arguments over individual examples do not undermine Dark Catt's allegations. Dark Catt explains Valve's affirmative conduct in using the review system to punish Publishers. *See* Compl. ¶¶ 172 ("Valve issued a statement criticizing the exclusive, calling the decision 'unfair to Steam customers,' and posted the statement on Metro Exodus's Steam store page. 'This led to a bunch of negative review spamming on the previous Metro games'"); 178 (average reviews for the two Metro games dropped from 89% positive to 46% and 90% to 43%). And Dark Catt explains the effect of Valve's policy not to moderate reviews. It does not delete the reviews; at most it gave itself the discretion to mark some as "off topic," but even then does not remove the reviews. *Id.* ¶¶ 182-85. Dark Catt is not seeking to impose "a standard of censorship," Mot. at 22; these reviews violate Valve's own rules of conduct, but Valve does not take action because the predictability of

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC
-23-
**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1   retaliation by Steam users against Publishers who use other stores disciplines Publishers and keeps

2   them dependent on Valve, reinforcing Valve's monopoly. Compl. ¶¶ 17-19, 181-86.

3          In short, Dark Catt plausibly alleges Valve's anticompetitive conduct through its factual

4   allegations that Valve used a variety of contractual provisions and non-contractual tools to prevent

5   Publishers from selling their games through a rival storefront at better prices or with better non-

6   price features. Proving liability will require a fact-specific determination of Valve's conduct and

7   its impact on the market, but at the pleadings stage, nothing else is required. *See REX - Real Est.*

8   *Exch. Inc. v. Zillow Inc.*, 2021 WL 3930694, at *5 n.5 (W.D. Wash. Sept. 2, 2021) (on a 12(b)(6)

9   motion, court evaluates whether challenged conduct plausibly exerts an unreasonable restraint on

10  trade and does not consider or balance any claimed procompetitive justifications); *Sitzer v. Nat'l*

11  *Ass'n of Realtors*, 420 F. Supp. 3d 903, 915 (W.D. Mo. 2019) (same).

12         **D.  Dark Catt States a Claim Under the Washington CPA**

13         Valve's only challenge to Dark Catt's Washington Consumer Protection Act claim is that

14  it has the same deficiencies as the Sherman Act claims. This argument accordingly fails for the

15  reasons above.

16  **V.     CONCLUSION**

17         Dark Catt respectfully requests that the Court deny Valve's motion to dismiss the Dark

18  Catt Complaint.

19  Dated:  October 8, 2021

20                                          By: *s/ Stephanie L. Jensen*

21                                          Stephanie L. Jensen, WSBA #42042
                                            **WILSON SONSINI GOODRICH & ROSATI, P.C.**
22                                          701 Fifth Avenue, Suite 5100
                                            Seattle, WA  98104-7036
23                                          Telephone: (206) 883-2500
                                            Facsimile:  (206) 883-2699
24                                          Email: sjensen@wsgr.com

25                                          Kenneth R. O'Rourke (*pro hac vice*)
26                                          Scott A. Sher (*pro hac vice*)
                                            Allison B. Smith (*pro hac vice*)
27                                          **WILSON SONSINI GOODRICH & ROSATI, P.C.**
                                            1700 K Street, NW, Suite 500
28

Washington, DC  20006
Telephone: (202) 973-8800
Facsimile:  (202) 973-8899
Email: korourke@wsgr.com
Email: ssher@wsgr.com
Email: allison.smith@wsgr.com

W. Joseph Bruckner (*pro hac vice*)
Joseph C. Bourne (*pro hac vice*)
Leona B. Ajavon (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
Email: wjbruckner@locklaw.com
Email: jcbourne@locklaw.com
Email: lbajavon@locklaw.com

*Attorneys for Plaintiffs Dark Catt Studios
Holdings, Inc. and Dark Catt Studios
Interactive LLC, and Putative Class*

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-25-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500