1

2

3

4

5

6

7

The Honorable John C. Coughenour

8

UNITED STATES DISTRICT COURT

9

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

10

11   DARK CATT STUDIOS HOLDINGS, INC.,
a Delaware corporation, and DARK CATT
12   STUDIOS INTERACTIVE LLC, an Illinois
limited liability company, on behalf of
13   themselves and all others similarly situated,

14                                    Plaintiffs,

15        v.

16   VALVE CORPORATION, a Washington
corporation,
17

18                                    Defendant.

19

Case No. 2:21-cv-00872-JCC

**DEFENDANT VALVE CORPORATION'S
MOTION TO DISMISS PLAINTIFFS'
AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF**

**NOTE ON MOTION CALENDAR:
APRIL 8, 2022**

20

21

22

23

24

25

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT  - (2:21-CV-00872-JCC)

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................. 4

III. ARGUMENT ....................................................................................................... 6

    A.   LEGAL STANDARD................................................................................ 6

    B.   DARK CATT FAILS TO ALLEGE VALVE'S FREE STEAM KEYS INJURE COMPETITION ........................................................................ 6

    C.   DARK CATT STILL FAILS TO ALLEGE THAT VALVE'S AGREEMENTS WITH DEVELOPERS—BY THEIR TERMS OR IN THEIR ENFORCEMENT—CONSTITUTE ANTICOMPETITIVE CONDUCT ............................................................................................ 11

        1.   THE COURT ALREADY FOUND THAT VALVE'S ALLEGED USE OF THESE CONTRACTUAL TERMS DID NOT CONSTITUTE ANTICOMPETITIVE CONDUCT. ............................ 12

        2.   DARK CATT FAILS TO ALLEGE THAT VALVE'S INTERPRETATION AND ENFORCEMENT OF THESE CONTRACTUAL TERMS CONSTITUTE ANTICOMPETITIVE CONDUCT. ............................................................................... 13

    D.   STEAM REVIEW ALLEGATIONS STILL DO NOT ALLEGE ANTICOMPETITIVE CONDUCT ...................................................... 16

    E.   DARK CATT FAILS TO ALLEGE ANTITRUST INJURY FROM A SUPRACOMPETITIVE COMMISSION OR NON-PRICE HARMS .............. 19

        1.   DARK CATT MUST PLAUSIBLY ALLEGE ANTITRUST INJURY. ............................................................................................ 19

        2.   DARK CATT'S NEW ALLEGATIONS RENDER A SUPRACOMPETITIVE COMMISSION IMPLAUSIBLE. ................... 19

        3.   DARK CATT'S CLAIMS OF NON-PRICE HARMS FAIL TO PLAUSIBLY ALLEGE ANTITRUST INJURY................................... 22

IV.  CONCLUSION................................................................................................... 24

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - i

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

130067256

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                      **Page(s)**

3

*Aerotec Intl., Inc. v. Honeywell Intl., Inc.,*
4
    836 F.3d 1171 (9th Cir. 2016) ................................................................1, 6, 11

5
*Am. Ad Mgmt., Inc., v. Gen. Tel. Co. of Calif.,*
    190 F.3d 1051 (9th Cir. 1999) ..................................................................15, 16
6

7
*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)......................................................................................6, 19
8
*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
9
    472 U.S. 585 (1985)........................................................................................1, 11

10
*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)......................................................................................6, 19
11

12
*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.,*
    483 F. Supp. 3d 38 (D. Mass. 2020) ..............................................................19

13
*Dominguez v. UAL Corp.,*
14
    666 F.3d 1359 (D.C. Cir. 2012)......................................................................22

15
*F.T.C. v. Qualcomm Inc.,*
    969 F.3d 974 (9th Cir. 2020) ..........................................................................7
16

17
*Hicks v. PGA Tour, Inc.,*
    897 F.3d 1109 (9th Cir. 2018) ........................................................................6

18
*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.,*
19
    797 F.3d 538 (8th Cir. 2015) ..........................................................................6

20
*Intel Corp. v. Fortress Inv. Grp. LLC,*
    511 F. Supp. 3d 1006 (N.D. Cal. 2021) ........................................................19
21
*In re Musical Instruments and Equipment Antitrust Litig.,*
22
    798 F.3d 1186 (9th Cir. 2015) ......................................................................15

23
*N.C.A.A. v. Alston,*
    141 S. Ct. 2141 (2021)....................................................................................18
24

25
*In re NCAA I-A Walk-On Football Players Litig.,*
    2006 WL 1207915 (W.D. Wash. May 3, 2006)............................................19

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - ii

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

130067256

**Page(s)**

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
   797 F.2d 370 (7th Cir. 1986) ...............................................................10

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ...............................................................19

*Sanderson v. Culligan Int'l Co.*,
   415 F.3d 620 (7th Cir. 2005) ...............................................................18

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013) ........................................................ *passim*

*Top Rank, Inc. v. Haymon*,
   2015 WL 9948936 (C.D. Cal. Oct. 16, 2015)......................................19

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...........................................................................1

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - iii

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

## I.  INTRODUCTION

Valve moves under Fed. R. Civ. P. 12(b)(6) to dismiss Dark Catt's Amended Complaint (Dkt. # 68) because, like the original, it does not plausibly allege any unlawful conduct by Valve in violation of Section 2 of the Sherman Act or the Washington Consumer Protection Act. Valve respectfully requests that the Court dismiss this case with prejudice.

First, Dark Catt fails to allege anything unlawful about Valve's "Steam Keys" program. Steam Keys are code numbers that allow Steam-enabled games to be activated on Steam. Valve gives Steam Keys to developers *for free*. Developers can then sell them at retail stores or online to gamers, or give them to reviewers. The customer buys (or the reviewer receives) a Steam Key from the developer, logs into Steam, enters the code, and downloads and plays the game on Steam using Valve's infrastructure just as if the game was purchased on Steam—*all without anyone paying Valve anything*. Dark Catt alleges Valve's Steam Key Guidelines violate antitrust laws because they ask developers to treat Steam customers fairly by setting their prices for Steam-enabled games on Steam as low as they charge for those same Steam-enabled games sold elsewhere using Steam Keys, for which they pay Valve no commission. Dark Catt also alleges Valve violates antitrust laws because it limits the number of Steam Keys it gives developers.

The Court already dismissed Dark Catt's Steam Key claims because Valve has no duty to provide Steam Keys (citing *Aerotec Intl., Inc. v. Honeywell Intl., Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016)), and under *Aerotec* and *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985), does not engage in antitrust conduct "[s]o long as it has a valid business reason for the terms it attaches." Order (Dkt. # 56) at 4. "And nothing in Dark Catt's complaint suggests that Defendant's Steam Keys terms are irrational." *Id*. The same is true of the Amended Complaint. "[I]nsisting that Steam customers get comparable deals to non-Steam customers" who buy access to Steam-enabled games through free Steam Keys is as legitimate and rational now as before. *Id*. So is limiting the number of free Steam Keys Valve gives developers.

Dark Catt's only new allegations regarding Steam Keys hurt its case. Dark Catt now

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 1

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

admits that Valve supplies developers with Steam Keys free of charge, Am. Compl. ¶¶ 13, 160, and that Steam Keys deliver only a small minority of Steam-enabled games, *id.* ¶¶ 61–62. Despite "seeming to provide a free service," Dark Catt argues, Valve exacts a cost through its Steam Keys by using them to direct traffic back to Steam. Am. Compl. ¶ 15. All this adds is the natural consequence of a developer's decision to distribute games through Steam: a Steam Key buyer (or free recipient) must visit Steam to play that version of the game.

Second, Dark Catt claims the Steam Key Guidelines and two provisions in its contract with developers, the Steam Distribution Agreement ("SDA"), somehow add up to a "Most Favored Nation ('MFN') provision preventing price competition between storefronts." Am. Compl. ¶ 77, Compl. ¶ 54. But Dark Catt misrepresents the provisions' language and applicability, and still fails to allege unlawful antitrust conduct:

- The Steam Key Guidelines ask developers who choose to use Steam Keys not to give Steam customers a worse deal than they give Steam Key buyers for the same game. The Guidelines apply only to the Steam-enabled versions of games to which free Steam Keys give access. Epic's CEO's tweeted that "Valve can simply say 'no'" to prices for Epic-enabled versions, Am. Compl. ¶ 145, Compl. ¶ 61, and his own followers called him "disingenuous." *See* p. 13, below. Dark Catt's allegation that Valve "sets a price floor throughout the market," Am. Compl. ¶ 118, is contrary to the Guidelines and SDA terms, and likewise pleads no *facts*.

- "While the SDA does require game publishers to provide Steam customers with the most current version of their games and DLC [downloadable content]," SDA § 2.1 (Delivery), Am. Compl. ¶ 128, "nothing in the SDA requires that they be offered at comparable prices." Order at 5. "Therefore, the complaint's allegations regarding the SDA's price controls are not plausible." *Id.*

- "[T]he Court does not read the SDA," § 2.4 (DLC), Am. Compl. ¶¶ 131–32, "as containing an exclusivity provision.... And in any case, according to the

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 2

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

complaint, exclusive offerings are common in the industry. Therefore it would seem implausible that such agreements could constitute anti-competitive conduct." *Id*. at 5–6 (citations omitted).

- "[T]he SDA's requirement that Steam customers receive the most current version of a game and DLC," SDA §§ 2.1, 2.4, "like any contractual term, is only anti-competitive if not supported by a valid business reason. Here, it stands to reason that Steam would expect its customers to receive a comparable product to that offered through other storefronts. This is a basic business principle." *Id*. at 6 (citations omitted).

Dark Catt adds only a couple of alleged "examples of Valve explaining and enforcing the price parity and marketing restrictions MFN," Am. Compl. ¶ 143, from a blog by a developer suing Valve and an anonymous message board, *id*. ¶ 147 (Valve said it "would remove [Wolfire's game] from Steam if I allowed it to be sold at a lower price anywhere …"); *id*. ¶ 148 (Valve said, "Selling the game off Steam at a lower price wouldn't be considered giving Steam users a fair deal."). The Court found the original allegations implausible, Order at 5, and these additions add no meaningful new facts. Dark Catt's invitation to focus on Valve's alleged interpretation of its SDA and Steam Key Guidelines should not upset the Court's analysis.

Third, Dark Catt claims that by allowing Steam users to post reviews of games, Valve harms competition and "penalize[s] publishers who choose to sell a particular game exclusively through another storefront," as the Court described the allegation. *Id.* at 6. "But," the Court continued, "it is not clear how the resulting harms would flow from that which makes the conduct unlawful or represent the type of conduct the antitrust laws are intended to prevent." *Id.* (quotations and citations omitted). Dark Catt still alleges no anticompetitive conduct. Rather, it improperly invites the Court to become the arbiter of whether Valve and other online sellers should allow user reviews and, if so, what customers should be allowed to say. While Dark Catt now characterizes Valve's approach to its customers' reviews as one of "selective policing,"

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 3

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1  Dark Catt alleges no new facts rendering plausible the claim that Valve anticompetitively

2  removes some reviews, but not others.

3      Not only does Dark Catt fail to allege unlawful antitrust conduct, the Amended

4  Complaint does not allege antitrust injury either. Drawing reasonable inferences in Dark Catt's

5  favor (as it must, "at least at this point"), the Court found the Complaint plausibly alleged

6  Valve's commission to be supracompetitive because "except for recent volume discounts,

7  Defendant has consistently charged the same 30% …." *Id*. at 3. The Court recognized that

8  "supracompetitive fees cannot be plausibly alleged if the fee charged remains the same when a

9  defendant allegedly controlled the market and when it did not," but found the Complaint "did not

10 contain allegations suggesting that, at any point, Defendant was not the market leader for PC

11 game delivery." *Id*. at 3. But the Amended Complaint does contain such allegations, *see* pp. 21–

12 22, below, so the Court should now follow *Somers v. Apple, Inc*. and dismiss for an independent

13 reason—failure to allege antitrust injury by means of a supracompetitive price that was the same

14 "since [the defendant] entered the market … *before* it obtained monopoly in the … market, and

15 *after* it allegedly acquired monopoly." 729 F.3d 953, 964 (9th Cir. 2013) (emphasis in original).

16 Nor does Dark Catt allege diminished quality or output, other than by conclusory assertions.

17     Because Dark Catt alleged neither unlawful antitrust conduct nor antitrust injury, the

18 Court should dismiss the Amended Complaint.

19 **II.    STATEMENT OF FACTS**

20     Valve launched Steam in 2003. Am. Compl. ¶ 3. A year later, it opened Steam to third-

21 party game developers. Compl. ¶ 4. Those developers now produce the overwhelming majority

22 of games customers buy and play on Steam. Am. Compl. ¶ 45. Steam has been tremendously

23 successful, currently hosting over 50,000 games, with 120 million monthly active users. *Id*. ¶¶

24 45, 50.

25     Developers set their own prices for games on Steam. *Id*. ¶ 223. Valve sells their games on

26 Steam at these prices and sends developers the revenue, less Valve's commission, sales tax, and

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 4

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

refunds. *Id.* ¶ 202. Thus, Valve earns revenue to pay for Steam by charging a commission when game developers sell games on Steam. *Id.* ¶ 107.

Initially, Steam hosted relatively few games. *Id.* ¶ 44. But over time Valve developed and improved Steam's features, providing increased value to developers and customers. Steam includes a digital storefront offering content delivery, cybersecurity, and digital rights management. *Id.* ¶¶ 29, 44, 57. Steam gives developers access to a worldwide pool of potential customers with support in 26 languages. *Id.* ¶¶ 50, 106, 107. The Steam review system allows players to rate and comment on games, generating a game review score that can help a developer's future sales. *Id.* ¶ 99, 187.

Finally, Valve introduced Steam Keys to enable developers to sell copies of their Steam-enabled games in brick-and-mortar stores or online, or give them away to beta test new games or generate media and influencer publicity before release. *Id.* ¶¶ 11–12. As Dark Catt now admits, Valve gives developers Steam Keys for free. *Id.* ¶¶ 13, 160.

Valve has been facing competitive pressure for almost twenty years from rivals such as Epic, Electronic Arts, and Microsoft. Am. Compl. ¶ 23. Valve competes with these platforms to offer developers' games and with every other game seller to which PC gamers can turn. *Id.* ¶¶ 60, 69, 81, 210, 228, 238–248.

Dark Catt, a developer, allegedly "created a PC game and made it compatible with Steam," then "sold its game to consumers on Steam and paid … Valve's mandatory 30% revenue share on game sales on Steam." *Id.* ¶ 28. Dark Catt seeks to represent a class of developers that contracted with Valve to "distribute a PC game via Steam and sold such game on or after April 27, 2017." *Id.* ¶ 256. Thus, Dark Catt's Amended Complaint turns on whether it has plausibly alleged that Valve, amidst competitive pressure from "billion-dollar companies with popular PC games," *id.* ¶ 244, and "[g]aming behemoths," *id.* ¶ 63, has somehow crossed the line into illegal monopolization. *Id.* ¶ 276. As detailed below, the facts alleged still establish the opposite.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 5

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

III.   **ARGUMENT**

A.   **Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of enti- tlement to relief." *Id.* (quotation marks omitted). "Applying this standard is a context-specific task that requires drawing on judicial experience and common sense." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (quotation marks omitted).

This is especially true in antitrust. "[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (citation omitted). Consequently, "the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage …." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (quotation marks omitted).

B.   **Dark Catt Fails to Allege Valve's Free Steam Keys Injure Competition**

In its Order dismissing the Complaint, the Court ruled that Dark Catt's Steam Keys allegations failed to allege anticompetitive conduct. The Court ruled that while Valve has no duty to make Steam Keys available to game developers, "[s]o long as it has a valid business reason for the terms it attaches to its Steam Keys, those terms cannot, as a matter of law, represent unlawful antitrade conduct." Order at 4 (citing *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)).[1] In line with this well-established principle, the Court further

---

[1] Under *Aerotec*, 836 F.3d at 1184, "there is 'no duty to deal under the terms and conditions

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 6

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

found that "nothing in Dark Catt's complaint suggests that Defendant's Steam Key terms are irrational," reinforcing its conclusion that Dark Catt failed to allege anticompetitive conduct.

Dark Catt's Amended Complaint does not disturb that conclusion. Notably, Dark Catt now admits that Valve supplies developers with Steam Keys free of charge, so that Valve foregoes the commissions developers pay when they sell the game on Steam. Am. Compl. ¶¶ 13, 160. Developers like Dark Catt thus realize a financial benefit when they sell a game with Steam Keys, pocketing the alleged 30% commission they would otherwise pay, leaving Valve to pay all of the costs of making the game available on Steam and operating and maintaining Steam.

Faced with the Court's prior ruling, Dark Catt adds allegations it hopes will save its Steam Keys claim, but its new allegations are futile. First, though, Dark Catt ineffectually repeats its claim that Steam Keys are an "industry standard" by which Valve "compels Publishers to follow Valve's restrictive pricing and marketing terms." Am. Compl. ¶ 11–12. Valve previously showed that Dark Catt did not describe any "industry standard" because it admitted that Steam Keys allegedly represent only 28% of Steam-enabled versions of games. Compl. ¶ 150; *see also* MTD Compl. (Dkt. # 38) at 16. Dark Catt strategically dropped that admission, though the Amended Complaint still cites *75 Steam Statistics*, its source. *See* Am. Compl. ¶¶ 47 n.11, 50 n.14. But the Amended Complaint is actually worse for it: while Dark Catt erases its 28% admission from paragraph 150, it admits that Steam Keys deliver only a small minority of Steam-enabled games. Am. Compl. ¶¶ 61–62 ("Other seemingly independent stores are selling Steam keys," but "[t]hese stores *pale in comparison to Steam*.") (emphasis added). Not only that: these independent stores are an even smaller proportion of *PC game sales overall*—which is the only relevant statistic for an *industry* standard in an antitrust case where the alleged relevant

---

preferred by [a competitor's] rivals;' there is only a duty not to refrain from dealing where the only conceivable rationale or purpose is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition'" (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457 (2009); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004)); *see also F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 7

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

market is game distribution for all PC platforms, not just Steam. Am. Compl. ¶ 81; *see also id.* ¶ 238 ("giant companies" like Epic, Electronic Arts, Ubisoft, and Microsoft distribute non-Steam enabled games). Dark Catt's "industry standard" allegation remains of no factual or legal effect.

Seeking something new, Dark Catt now alleges that a customer purchasing a game via a Steam Key "is directed away from the purchase site back to Steam to access and play the purchased game. The other site loses the ability to gain traction in the market (by keeping the customer on its site) while Valve earns a commission on future add-on content that the customer purchases to enhance the gameplay …." Am. Compl. ¶ 15. Dark Catt later elaborates on its allegation that a Steam Key purchase "directs" the customer back to Steam:

> Publishers and gamers are locked in to using Steam keys to buy, sell, promote, and play PC games. Publishers must make their games available on Steam and must have some amount of sales success to get approval for Steam keys to sell on other stores. Gamers that purchase a Steam key through another store are taken right back to Steam to redeem the key through their Steam account and play the game on Steam.

Am. Compl. ¶ 156. This an absurd allegation, because a Steam Key can be used only on Steam, and developers can distribute their non-Steam-enabled game versions anywhere they wish.

First, no developer is "locked in" or coerced into selling games on Steam or using Steam Keys. Developers naturally want to sell games where the gamers are. As an EA executive explained his reason for selling on Steam, "At the core, we are game makers, and our aspiration is to connect as many people as we can to the great games that we built and make it as frictionless as possible for them to do that. So with more players playing more games and more platforms, frankly, we want to be where the players are."[2] Steam Keys provide another avenue to distribute a Steam-enabled game, but Dark Catt alleges no facts that Valve forces Steam Keys on any developer or, apart from deterring free-riding and fraud, regulates what they do with them. And they can sell non-Steam-enabled versions of their games anywhere.

Second, Dark Catt alleges that customers who buy Steam Keys must go to Steam to play

---

[2] Chaim Gartenberg, *EA games are returning to Steam along with the EA Access subscription service*, THE VERGE (Oct. 29, 2019), https://www.theverge.com/2019/10/29/20937055/ea-games-steam-access-subscription-service-pc-storefront-jedi-fallen-order-sales. Am. Compl. n.22.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 8

130067256

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

the game, so "Steam keys therefore keep Publishers and customers in the Steam ecosystem even when they transact via a Steam key on a third-party store." Am. Compl. ¶ 157. But customers are not "directed away from the purchase site," *id.* ¶ 15, by any wrongful conduct by Valve. The developer decided to sell a Steam-enabled game, and the customers' decision to buy it naturally results in staying "in the Steam ecosystem"—because the game, by the developer's design, is unplayable without Steam. *Id.* ¶ 157. The developer and Steam Key seller can make any efforts off of Steam to sell additional games and content to a Steam Key customer. Nothing prevents that.

Third, once the customer goes to Steam to play the Steam-enabled game, the customer may then, at his or her discretion, decide whether to buy anything Steam or the game has to offer. While Dark Catt now complains that Valve "receives a 30% commission for the customer's subsequent purchases made in the game, and receives a commission for purchases made on the Steam Workshop or Marketplace," Am. Compl. ¶ 160, Dark Catt seeks damages only for "a supracompetitive revenue share to Valve *for sales of its game* on Steam," *id.* ¶ 274 (Count One—Monopoly) (emphasis added). And it nowhere alleges that it ever offered DLC or in-game purchases or lost the opportunity to sell any, or any facts to support such a claim on behalf of the developer class members. *Id.* ¶ 275. Count Two (Attempted Monopoly), like Count One, seeks supracompetitive commissions on games, but not DLC or in-game purchases. *Id.* ¶¶ 284–85. Count Three (CPA) seeks the same. *Id.* ¶¶ 292–93. With Dark Catt alleging no claim for injury other than game commissions, it fails to state a claim that it was injured when Steam Keys enabled Valve to make post-game sales of DLC or in-game purchases.

Fourth, Valve's collection of "Steam key usage and other data concerning Publishers' sales through other stores" (which would naturally reflect "data about customers' gameplay practices and preferences") was previously alleged, Compl. ¶ 14, where the Court found Dark Catt's Steam Keys allegations insufficient. The most Dark Catt adds is that Steam Keys allow "Valve to collect data on Publishers' sales on other stores and keeping Publishers compliant with

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 9

130067256

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

Valve's restrictive policies to maintain access to Steam keys, determined at Valve's discretion."

Am. Compl. ¶ 177. But "collect[ing] data" about which stores sell the Steam Keys Valve gives

developers should be no surprise; businesses have good reason to know which distributors of

their product—in this case free Steam Keys—are making legitimate sales to consumers,

especially in a market Dark Catt alleges is filled with fraudulent operators. *Id.* ¶¶ 57 ("credit card

fraud … rampant in the industry"), 69 ("unauthorized and unlicensed Steam key resellers (*e.g.*,

G2A, Kinguin) operating in a gray market, some by selling both legitimate and improperly

obtained keys"), 175 (noting steps Valve takes against fake games and fraudulent developers).

As to "restrictive policies to maintain access to Steam keys," part of the Steam Keys allegations

the Court found insufficient, Valve has a "valid business reason," Order at 4, to distribute its free

Steam Keys in limited numbers to minimize free-riding on its large and longstanding investment

in the Steam platform that Steam Keys unlock for game play. Nothing irrational is alleged about

Valve's "data collection" and deterrence of free-riding. *Id.* Dark Catt's few words about it in the

Amended Complaint do not state a claim for anticompetitive conduct.

In paragraph 16, Dark Catt alleges that Valve "limits … the number of Steam Keys it will

authorize to a quantity lower than the Publisher's sales on Steam," adding nothing of signifi-

cance to its prior allegation that limiting the number of Steam Keys limits developers' sales

through other stores. Compl. ¶ 14. Dark Catt expands on this allegation in paragraphs 164–67,

asserting that "[t]his control, which has minimal or no procompetitive reason, cements Steam's

market dominance by allowing Valve to cap a Publisher's sales of the Publisher's own game on

other stores." Am. Compl. ¶ 167. But as the court in *Olympia Equip. Leasing Co. v. W. Union

Tel. Co.*, 797 F.2d 370, 375–76 (7th Cir. 1986) (Posner, J.), held, "a firm with lawful monopoly

power has no general duty to help its competitors, whether by holding a price umbrella over their

heads or by otherwise pulling its competitive punches" […] "to reduce its prices in order to help

consumers, [or …] to extend a helping hand to new entrants." In this case, Valve, as the Court

recognized, has no obligation to facilitate competition with itself by providing unlimited

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 10

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1  numbers of free Steam Keys so that developers and competing sellers of Steam-enabled games

2  can free-ride on Valve's investments. And as noted, Valve has additional legitimate reasons to

3  limit the number of Steam Keys, including deterrence of fraud and runaway use of free Steam

4  Keys. *See, e.g.*, MTD Compl. (Dkt. # 38) at 18–19. Finally, developers can sell whatever

5  quantities of games for non-Steam platforms they want. Valve has no involvement in that.

6  Under *Aerotec*, "there is only a duty not to refrain from dealing where *the only conceiv-*

7  *able rationale or purpose* is 'to sacrifice short-term benefits in order to obtain higher profits in

8  the long run from the exclusion of competition.'" *Aerotec*, 836 F.3d at 1184 (emphasis added).

9  That exception is extremely narrow; as the Supreme Court held in *Aspen Skiing Co. v. Aspen*

10  *Highlands Skiing Corp.*, 472 U.S. 585, 605, 608 (1985), the antitrust laws can be invoked for

11  refusing to deal only where there are "no valid business reasons" for refusing to deal with the

12  smaller owner and the defendant's conduct is not "justified by any normal business purpose." As

13  the Ninth Circuit noted two decades later,

> In *Aspen Skiing*, the defendant—who owned three of the four ski resorts in the market—discontinued a joint lift-ticket package with a smaller rival, the only other competitor in the market, and then flatly refused to sell the rival any lift tickets so it could create its own bundles. It is no wonder that the Supreme Court characterized this "limited exception" as "at or near the outer boundary of § 2 liability."

*Aerotec*, 836 F.3d at 1184 (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,*

*LLP*, 540 U.S. 398, 409 (2004)).

Here, Valve has ample legitimate justification for limiting Steam Key distribution. Valve

has not "flatly refused" to deal with rivals; nor has Dark Catt pled facts showing no "conceivable

rationale or purpose" for Valve's limitations on Steam Keys. It has alleged nothing new to

establish that Valve has any obligation to distribute Steam Keys, let alone in unlimited numbers.

Dark Catt fails to allege that Valve's conduct regarding Steam Keys violates the antitrust laws.

**C.** **Dark Catt Still Fails to Allege That Valve's Agreements with Developers—by Their Terms or in Their Enforcement—Constitute Anticompetitive Conduct**

Dark Catt's Amended Complaint fails to resuscitate its allegations that Valve's

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 11

130067256

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

agreements with developers create an anticompetitive MFN. This MFN allegedly results from the same three provisions of Valve's agreements with developers Dark Catt alleged before:

> (1) Section 2.1 of Valve's SDA, requiring that a game sold on Steam have the same release date as identical games released elsewhere (the "Delivery Provision"), *see* Am. Compl. ¶¶ 123–28, Compl. ¶¶ 46–49;[3]
>
> (2) Section 2.4 of the SDA, requiring that games developers decide to sell on Steam "maintain material parity" in DLC ("downloadable content") between Steam users and users of other distribution channels who make a comparable investment in the game and associated DLC, *see* Am. Compl. ¶¶ 129–34, Compl. ¶¶ 50–52; and
>
> (3) Valve's Steam Key Guidelines which "ask [developers] to treat Steam customers no worse than customers buying Steam keys outside of Steam," *see* Am. Compl. ¶¶ 135–36, Compl. ¶¶ 53–60.

Dark Catt now asserts that these terms and Valve's "interpretation and enforcement" of them create an anticompetitive MFN. Specifically, Valve allegedly prohibits developers from "offer[ing] their game or DLC at lower prices on other storefronts regardless of the actual costs of distribution on the other store," and "guarantees Valve the earliest access to game or add-on content, removing an important promotional tool … to attract customers to other stores" with better distribution agreements. Am. Compl. ¶¶ 114, 116, 123. But the agreements' terms are the same as before, and Dark Catt's claim that Valve's "interpretation and enforcement" makes them anticompetitive rests on no new facts of any consequence.

### 1.     *The Court Already Found That Valve's Alleged Use of These Contractual Terms Did Not Constitute Anticompetitive Conduct.*

The Court reviewed these sections of Valve's agreements and found no anticompetitive conduct alleged. Order at 4–6. As the Court observed, "nothing in the SDA" says anything about price controls. *Id.* at 5. Nor does it include an improper "exclusivity" requirement; instead, the SDA expressly permits developers to "offer special and unique promotional content through other distribution channels," so long as "material parity is maintained" between its customers

---

[3] Dark Catt's original Complaint neither cited nor quoted these SDA sections. But, as the Court observed, their terms were "frequently referenced" throughout the Complaint, such that they were incorporated by reference. Order at 5 n.1. The Amended Complaint now quotes from them.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 12

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

who purchase the game on Steam and users of other distribution channels who make a comparable investment in the game and associated DLC. *Id.* (quoting Dkt. 40 at 4). Indeed, as the Court observed, Dark Catt's Complaint listed several examples of developers making exclusive deals with other distributors. *Id.* Lastly, the Court found nothing anticompetitive about allegedly requiring developers to provide Steam customers the most current versions of their Steam games and DLC. To the contrary, one "would expect its customers to receive a comparable product to that offered through other storefronts." *Id.* That's just "a basic business principle." *Id.*

Nothing in Dark Catt's Amended Complaint challenges this analysis. Indeed, whereas Dark Catt had previously described Valve's contractual terms generally without specifying which sections it had in mind, Dark Catt now quotes the SDA terms Valve identified and the Court analyzed. *Compare* Dkt. 38 at 242–7 (discussing SDA §§ 2.1 & 2.4) *with* Am. Compl. ¶¶ 128, 131 (quoting §§ 2.1 & 2.4). The Amended Complaint confirms that Dark Catt's MFN claims rely on the same terms as before. Dark Catt still alleges no anticompetitive conduct.

2.   ***Dark Catt Fails to Allege That Valve's Interpretation and Enforcement of These Contractual Terms Constitute Anticompetitive Conduct.***

All but conceding the lack of anticompetitive conduct in Valve's contractual terms, Dark Catt now asks the Court to find anticompetitive injury in their "interpretation and enforcement." Am. Compl. ¶ 123. But this request is not supported by alleged facts. It too should be rejected.

For example, Dark Catt recycles a Tweet from Tim Sweeney, Epic's CEO, asserting "Valve can simply say 'no'" if a developer wants to sell an Epic-enabled version at a lower price. Am. Compl. ¶ 145, Compl. ¶ 61. The statement, which baldly asserts an opinion about what Valve can do (instead of what it has done) lacks any factual support, and Mr. Sweeney's own Twitter followers told him it was "disingenuous."[4] Am. Compl. ¶ 145, Compl. ¶ 61.

The Amended Complaint adds two blog posts but neither adds substance. *Id.* ¶¶ 147, 148.

---

[4] Tim Sweeney tweet, reply of Roberto Bruno (@IlTurco) of Jan. 31, 2019, https://twitter.com/TimSweeneyEpic/status/1090663312814157824 (correctly noting "[t]hat clause only applies to steam KEYS sold elsewhere, not to something like a game being sold at the Epic store"). Am. Compl. n.53, Compl. n.13.

DEFENDANT VALVE CORPORATION'S MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT – (2:21-CV-00872-JCC) - 13

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

The first is by Wolfire's CEO repeating allegations in its complaint and explaining why it is "seeking to represent game developers in a class action suit against Valve Corporation"[5]—*i.e.*, Wolfire's case pending before this Court. The second comes from a Reddit user identified only as "Snarkstopus" who described an exchange with an unnamed Steam representative and concluded, "It's not clear" whether Steam has "an explicit pricing rule."[6] Neither alleges that Valve ever enforced any supposed price control over non-Steam-enabled games, and cannot support Dark Catt's assertion. Notably, Wolfire's post was (like Epic's CEO's Tweet) met with skepticism. One reader replied, "I got the exact opposite response – that their parity terms only apply to 3rd party sales distributing their Steamworks keys," a "reasonable" policy "specifie[d]" in "the Steam distribution agreement" and "demonstrate[d]" by "countless other real-life cases."[7]

Dark Catt repeats two instances where Valve allegedly acted against developers for violating its terms. First, Dark Catt again raises the example of Valve "bann[ing] approximately 1,000 games," none Dark Catt's, "from Steam in a single day for allegedly abusing 'some Steamworks tools.'" Am. Compl. ¶ 142, Compl. ¶ 166. Second, Dark Catt recounts the time it tried to "offer[] its game for a temporary lower price on Humble Bundle and shortly thereafter was banned from Steam." Am. Compl. ¶ 149*, Compl. ¶ 165. Notably, Dark Catt does *not* allege it was banned *because of* its pricing. Regardless, these allegations fail to explain why either action was anticompetitive—as opposed to the straightforward enforcement of the SDA and Steam Key Guidelines this Court found not anticompetitive under the facts alleged. Because, as this Court has already ruled, nothing anticompetitive in Valve's Steam Key Guidelines or SDA was pled, Dark Catt's new and mostly recycled allegations do not plausibly plead

---

[5] Wolfire Games, *Regarding the Valve Class Action* (May 6, 2021), http://blog.wolfire.com/2021/05/Regarding-the-Valve-class-action. Am. Compl. n.55.

[6] Snarkstopus, *Does Steam Have a No Favored Nation Clause?*, REDDIT, https://www.reddit.com/r/gamedev/comments/n3k5kw/does_steam_have_a_no_favored_nation_clause/. Am. Compl. n.56.

[7] Wolfire Games, *Regarding the Valve Class Action*, reply of Cram, http://blog.wolfire.com/2021/05/Regarding-the-Valve-class-action. Am. Compl. n.55.

DEFENDANT VALVE CORPORATION'S MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT – (2:21-CV-00872-JCC) - 14

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1    anticompetitive conduct.

2        Dark Catt suggests that the SDA's provision requiring "material parity" is "understood by

3    Valve and Publishers to require pricing parity across stores and prevent exclusive offerings."

4    Am. Compl. ¶ 141. But this assertion contradicts the SDA's terms, which, as this Court

5    observed, set no price parity requirement and, in fact, expressly permit exclusives. Order at 5. It

6    is also contradicted by the various examples of exclusives in the market that Dark Catt noted

7    here and in the initial Complaint. *See* Am. Compl. ¶¶ 140, 243, 245, Compl. ¶¶ 164, 172, 176,

8    177; *see also* Am. Compl. ¶ 126 ("An exclusive is a common marketing tactic in many industries

9    to attract customers"). Even if not self-contradictory, this assertion about how the SDA is

10   "understood" fails to offer any facts that allege anticompetitive conduct.

11       Dark Catt also alleges that, according to "[i]ndustry press," prices for games in Epic's

12   store have had "the same price tags" as games on Steam when available on both. Am. Compl. ¶

13   146. For support, Dark Catt cites a nearly three-year-old article that merely reports the lack of an

14   initial price impact on games sold on Epic despite Epic's 12% commission rate. The article does

15   not reference Valve's contractual terms, let alone analyze their impact on Epic's game prices. If

16   anything, the article illustrates healthy competition from Valve's rivals, who lure developers with

17   lower commission rates and gamers with free games.[8] In short, this article cannot plausibly

18   support the claim that Valve's contractual provisions reflect anticompetitive conduct.

19       In any case, the mere allegation that competitors sell products at the same price, even

20   consciously, does not plausibly give rise to an antitrust claim. *See, e.g.*, *In re Musical Instru-*

21   *ments and Equipment Antitrust Litig.*, 798 F.3d 1186, 1193, 1195 (9th Cir. 2015) (mere fact that

22   manufacturers sold their guitars at same price did not state a claim for price-fixing conspiracy

23   where there were "independent business reasons" for their pricing decisions). That's even less of

24   a concern here, where Valve does not (and is not alleged to) set the price at which Dark Catt and

25
26   _____
     [8] Kyle Orland, *Epic CEO: "You're Going to See Lower Prices" on Epic Games Store*, ARS
     TECHNICA (Mar. 20, 2019), https://arstechnica.com/gaming/2019/03/epic-ceo-youre-going-to-
     see-lower-prices-on-epic-games-store/. Am. Compl. n.54.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 15

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

other developers sell their games—let alone conspire with its competitors to do so.

Finally, Dark Catt tries to counter the Court's observation that exclusives are common in the industry, Order at 5, by asserting they are "a rare promotional tool in the PC game distribution market." Am. Compl. ¶ 243. As a preliminary point, Dark Catt fundamentally misstates the SDA's provision about "exclusives." Dark Catt alleges, "Under the Delivery clause, Developers are unable to offer a new game, update, or add-on through a third-party store before delivering that application to Steam." Am. Compl. ¶ 124, Compl. ¶ 137. But the Delivery clause, SDA § 2.1, applies only to "Applications," *see* Am. Compl. ¶ 128, a defined term limited to games "provided … for distribution over Steam." Dkt. # 40 at 3. The SDA does *not* bar a developer from offering new games as exclusives elsewhere. Many do, as noted just below.

For support, Dark Catt alleges that in contrast to PCs, Sony's PlayStation, a gaming console, offers 300 games as exclusives to compete with Microsoft's Xbox console. *Id.* But this fact about a single company's practice with games for consoles does not make Dark Catt's conclusion about PC exclusives plausible, especially when the facts alleged elsewhere contradict it. For example, in the next paragraph Dark Catt alleges that Epic, a "billion-dollar" PC rival, Am. Compl. ¶ 244, uses exclusives as a strategy to compete against Valve—a fact alleged in the original Complaint, Compl. ¶ 140. And Dark Catt continues to recount examples of other Valve competitors offering exclusives. *See* Am. Compl. ¶¶ 140, 243, 245, Compl. ¶¶ 164, 172, 176, 177; *see also* Am. Compl. ¶ 126 ("An exclusive is a common marketing tactic in many industries to attract customers[.]"). Dark Catt's conclusion that exclusives are "rare" is implausible.

Dark Catt's Amended Complaint fails to plead facts that could lead the Court to overturn its prior ruling relating to Valve's contractual terms.

### D.   Steam Review Allegations Still Do Not Allege Anticompetitive Conduct

Dark Catt again alleges that Valve's management of game reviews violates antitrust laws. The Court rejected this allegation before as Dark Catt failed to allege how any "resulting harms" from this conduct "flow from that which makes the conduct unlawful or represent the type of

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 16

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

conduct the antitrust laws [a]re intended to prevent." Order at 6 (quoting *Am. Ad Mgmt., Inc., v. Gen. Tel. Co. of Calif.*, 190 F.3d 1051, 1055 (9th Cir. 1999)) (cleaned up). Nothing has changed.

Dark Catt still acknowledges that reviews "are not posted by Valve itself," Am. Compl. ¶ 196, Compl. ¶ 185; instead, they come from an "online community." Am. Compl. ¶ 180. Dark Catt fails to transform independent *consumer* reviews into anticompetitive conduct by Valve.

First, Dark Catt again alleges that Valve "refuses to remove the reviews although they violate its rules and guidelines." Am. Compl. ¶ 196, Compl. ¶ 185. But this assumes the antitrust laws require Valve to review and censor comments Dark Catt finds—or, more accurately, might find—inappropriate. As before, Dark Catt fails to allege any facts to support that assumption, let alone define a standard for deletion or how it would even be feasible. *See* Am. Compl. ¶ 50 ("In 2020, Steam recorded 120 million monthly active players, 25 million peak concurrent users, and 2.6 million new purchases per month. It has over one billion user accounts.").[9]

Second, Dark Catt's allegations show that Valve has done what it can to address problems from negative reviews. Specifically, Valve implemented in 2019 a process to "identify anomalous review activity" and make it more difficult for "off-topic" reviews to impact a game's Steam score. Am. Compl. ¶¶ 193–94, 19 n.3, Compl. ¶¶ 182–83 & 17 n.7. The Amended Complaint again cites an article reporting that "Steam has already attempted to curtail the effect of review bombing by implementing graphs, which let you chart whether reviews have been generally positive or negative over the game's lifespan, and to jump straight to a spike of negative reviews to see the complaint behind it."[10] The article explains, "This allows you to judge for yourself how seriously you want to take the issue. It's much the same as jumping straight to the one-star reviews on Amazon, only with more context." ¶ 19 n.3. As the author

---

[9]  The Amended Complaint adds the conclusory allegation that Valve engages in "selective policing" of "[m]alicious negative reviews," Am. Compl. ¶ 18, which suggests that Valve applies its user review policy inconsistently. But Dark Catt offers no examples of such conduct or any other facts to support that assertion.

[10] Rachel Kaser, *Game review bombs are here to stay – so let's use them for good*, THE NEXT WEB (Mar. 4, 2019), https://thenextweb.com/gaming/2019/03/04/game-review-bombing-steam-good-bad/. Am. Compl. ¶ 19 n.3, Compl. ¶ 17 n.7.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 17

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

concludes, "Short of taking the nuclear option—removing reviews entirely—it's hard to see what else platforms like Steam and Amazon could do to ameliorate review bombs." *Id.* Epic Games, the author reports, has taken this "nuclear option," "cut[ting] game reviews entirely." *Id.*

As before, Dark Catt attempts to create a duty under antitrust law to monitor and delete reviews, but that is a business decision not subject to antitrust law. Dark Catt again invites the Court to manage Valve's (and other companies') user review policy, but this would violate the "wide berth" that "antitrust courts must give" to business judgments. *N.C.A.A. v. Alston*, 141 S. Ct. 2141, 2163 (2021). "Judges must be wary, too, of the temptation to specify 'the proper price, quantity, and other terms of dealing'—cognizant that they are neither economic nor industry experts." *Id.* (quoting *Trinko,* 540 U.S. at 408).

Third, Dark Catt repeats its allegation that Valve "encourages and/or allows its users to improperly attack Developers using Steam reviews," Am. Compl. ¶ 178, Compl. ¶ 168, and offers the same "example" from the original Complaint—the release of the game Metro Exodus, Am. Compl. ¶ 181, Compl. ¶ 172. "Valve issued a statement criticizing" a developer who pre-sold its game on Steam but reversed course and released it exclusively on Epic Game Store instead. Am. Compl. ¶¶ 181–82, Compl. ¶¶ 172–73. But the developer's decision harmed Valve's customers, because gamers who pre-purchased on Steam would have to wait a full year after release to play. Valve responded, "We think the decision to remove the game is unfair to Steam customers," "[e]specially after a long pre-sale period."[11] That's the extent of Valve's connection to the alleged negative user reviews. The remaining examples do not mention Valve at all, *see* Am. Compl. ¶¶ 185–87, but even this one fails to allege any anticompetitive conduct. *See Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005) (Easterbrook, J.) ("What producers say about each other's goods in an effort to sway consumers is competition in action.").

---

[11] Jake Tucker, *People are review-bombing Metro Exodus, but this time: it's positive*, TRUSTED REVIEWS (Feb. 25, 2019), https://www.trustedreviews.com/news/people-review-bombing-metroexodus-time-positive-3664757. Am. Compl. ¶ 182 n.67, Compl. ¶ 172 n.39.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 18

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

Lastly, even if Dark Catt had alleged an anticompetitive act by Valve, it continues to offer no facts to establish a plausible connection between critical reviews and the antitrust injuries it asserts. Indeed, Dark Catt never alleges that any negatively reviewed game was its own, or that Valve's alleged actions actually affected anyone's game sales including its own.

The foregoing is enough for the Court to dismiss Dark Catt's Amended Complaint, because, as before, it fails to allege unlawful conduct or antitrust injury flowing from that conduct. But Dark Catt's other allegations, discussed next, provide an additional ground for dismissal: failure to plausibly allege that Valve's commission is supracompetitive.

### E.   Dark Catt Fails to Allege Antitrust Injury from a Supracompetitive Commission or Non-Price Harms

#### 1.   Dark Catt Must Plausibly Allege Antitrust Injury.

All private antitrust claims require antitrust injury, *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995), and a plaintiff who fails to adequately plead antitrust injury lacks standing, *Somers v. Apple, Inc.*, 729 F.3d 953, 964 n.5 (9th Cir. 2013); *see also In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *14 (W.D. Wash. May 3, 2006) ("Plaintiffs can obtain *no* remedy without proving antitrust injury.") (Coughenour, J.).

#### 2.   Dark Catt's New Allegations Render a Supracompetitive Commission Implausible.

For antitrust injury, Dark Catt alleges "supracompetitive commissions on its game sales, paying Valve 30% of the Sales price on Steam plus other fees." Am. Compl. ¶ 2. "Claiming that prices are supracompetitive is a legal conclusion rather than a fact, however, and must be supported by specific factual allegations." *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 59 (D. Mass. 2020). Thus, Dark Catt must allege facts supporting a reasonable inference that Valve's commission is supracompetitive. *See Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1027–29 (N.D. Cal. 2021) (dismissing antitrust claims where allegations "arguably suggest that supracompetitive pricing is possible; however, *Twombly* and *Iqbal* require plausibility and not just possibility"); *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *8–9 (C.D. Cal. Oct. 16, 2015) (same where plaintiff "fail[ed] to allege any

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 19

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

evidentiary facts plausibly suggesting […] supracompetitive prices").

The Ninth Circuit affirmed dismissal of a complaint against Apple alleging that its supposedly supracompetitive "price for music downloads remained the same (99 cents) since it entered the market in 2003, *before* it obtained monopoly in the audio download market, and *after* it allegedly acquired monopoly in that market in 2004." *Somers*, 729 F.3d at 964 (emphasis in original). Like *Somers*, the Court recognized that "an injury based on the payment of a supracompetitive fee cannot be plausibly alleged if the fee charged remains the same when a defendant allegedly controlled the market and when it did not." Order at 3 (citing its *Wolfire* Order and *Somers*). Unlike Wolfire, Dark Catt escaped dismissal on this ground because the Court declined to infer "at least at this point" that Valve was not always "the market leader," *id.*—the Court's shorthand for its earlier statement that dismissal is required if the defendant's fee remained the same when it allegedly "controlled the market" and when it did not, *id.*, and the Ninth Circuit's affirmance of dismissal when Apple charged the same price before and after "it allegedly acquired monopoly." *Somers*, 729 F.3d at 964.

Dark Catt's new allegations in the Amended Complaint make it plain that Valve set its 30% commission when it first opened Steam to third-party developers, shortly after launching it in 2003—before Valve allegedly had monopoly power—and allegedly maintained 30% until its October 2018 volume discounts. These new allegations bring Dark Catt's claim within *Somers*.

Valve launched Steam in 2003, Am. Compl. ¶ 3, and "originally set its 30% commission rate based on the rate charged decades ago by large media companies …," Am. Compl. ¶ 201. "Before October 1, 2018, Valve's commission for all sales on Steam was 30% …." Am. Compl. ¶ 48. Of course, Valve could have no monopoly of the alleged "PC game distribution" market, Am. Compl. ¶ 6, Compl. ¶ 9, when it first entered and Steam had zero market share. Dark Catt now admits as much: by allowing Half Life 2 to be played only on Steam upon its release in 2004, Am. Compl. ¶ 44, Valve "*started to build* its 'stranglehold on the PC gaming market'" and "*began* contracting with third parties to distribute their games on Steam for a cut of the revenue,"

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 20

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1    Am. Compl. ¶ 45 (emphasis added).

2         Other additions to the Amended Complaint reinforce this allegation that Valve had no

3    monopoly in 2004, but had only "started to build" toward a monopoly Dark Catt claims it has:

4         • "*In 2012*, more than half of Valve's revenue came from selling games over Steam

5              and 'lack of competition allowed it to seize as much as 70% of the market.'" *In*

6              *2011*," Valve's market share was 'half to 70%' of the market." Am. Compl. ¶ 46

7              (emphasis added) (quoting FORBES article cited at n.7).

8         •  "Valve has developed and published only one PC game since 2017, relying

9              instead on the billions of dollars in revenue Steam generates." Am. Compl. ¶ 49.

10             This alleged change in strategy due to Steam's success came more than a dozen

11             years after its launch.

12        • The examples of Valve allegedly seeking to maintain a monopoly occurred in

13             2017 or later: (i) Valve allegedly adopted new Steam Key Guidelines in August

14             2017, Am. Compl. ¶ 163; (ii) Valve allegedly adopted its volume discounts on

15             October 1, 2018, Am. Compl. ¶ 48; (iii) Valve's alleged conduct regarding the

16             game Metro Exodus's "harm to Valve's monopoly" occurred in 2019, Am.

17             Compl. ¶ 184 & nn.68 & 69; (iv) same for Valve's alleged conduct regarding -

18             Borderlands 3 and Shenmue III, Am. Compl. ¶¶ 185–186 & nn.70 & 71; (v)

19             Discord launched its store in 2018 to compete with Valve but its store later went

20             out of business, Am. Compl. ¶¶ 204–06; (vi) "Ubisoft stopped releasing some of

21             its games on Steam in favor of its own Store Uplay and Epic Games Store" in

22             2019 "[b]ut like EA, it has not been able to fully pull its games from Steam due to

23             Steam's control of the PC game ecosystem," Am. Compl. ¶ 210 & n.82.

24        In short, Valve allegedly "is *now* using a variety of tactics to enhance and maintain its

25    monopoly power …." Am. Compl. ¶ 52 (emphasis added). But Valve undisputedly set its 30%

26    commission at Steam's beginning, which, as the only reasonable inference from the Amended

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 21

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

Complaint shows, was "*before* it obtained monopoly …." *Somers*, 729 F.3d at 964 (emphasis in original). And the Amended Complaint now contains "allegations suggesting that" when Steam launched, it "was not the market leader," meaning it did not have a monopoly or "controlled the market," Order at 3, but rather had "started to build" toward a monopoly Dark Catt claims Valve has now, Am. Compl. ¶ 45, which allegedly took years. As in *Somers*, Dark Catt's Amended Complaint should be dismissed for failure to allege antitrust injury from a supracompetitive rate set before it allegedly obtained a monopoly.

### 3. *Dark Catt's Claims of Non-Price Harms Fail to Plausibly Allege Antitrust Injury.*

The Amended Complaint alleges no facts that push Dark Catt's claims of non-price harms into the realm of plausibility. Many flow directly from its claim that Valve's commission is supracompetitive, which Dark Catt says keeps game prices too high, resulting in fewer sales and less money for developers. *See* Am. Compl. ¶¶ 113, 235, 249-50. Predicating those harms on the notion that Valve's commission is supracompetitive impermissibly "piles speculation atop speculation." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1364 (D.C. Cir. 2012) (vacating judgment for lack of standing based on speculative injury). Valve shows in the preceding section that the Amended Complaint does not plausibly allege a supracompetitive commission. It follows that the Amended Complaint does not allege the reciprocal economic result of a higher price either: lower quantity sold, or lower output.

Many of Dark Catt's other non-price harm allegations are merely veiled attacks on Valve's Steam Keys or Steam Distribution Agreement terms, *see, e.g.*, Am. Compl. ¶¶ 123, 162, 166, which the Court previously dismissed. *See* Order at 4–5. Dark Catt complains of Valve's "marketing restrictions" and allegedly inferior "marketing support." *See* Am. Compl. ¶¶ 123, 113. What Dark Catt means is that developers allegedly "cannot use lower pricing" on other platforms under the Steam Key Guidelines or "offer a new game, update, or add-on through a third-party store before delivering that application to Steam" under SDA § 2.1 (Delivery)—*i.e.*, an "exclusive" on another store. Am. Compl. ¶¶ 113, 119, 123, 124. Those are the "marketing

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 22

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

restrictions." But Valve "has a valid business reason for the terms it attaches to Steam Keys" asking developers not to sell games using the free Steam Keys for less than on Steam, Order at 4, and Valve does not prohibit exclusives. On the contrary, "exclusive offerings are common in the industry." *Id*. at 5. When it complains that Valve's conduct deprives it of the allegedly "better marketing support" it could be getting on other platforms, Am. Compl. ¶ 113, Dark Catt is not talking about more marketing staff or more creative, platform-led game promotion. Like "marketing restrictions," this allegation is just another recapitulation of Dark Catt's claims about Steam Key Guidelines and SDA § 2.1. Am. Compl. ¶ 123. Like last time, the Steam Keys and SDA allegations fail to allege anticompetitive conduct. *See supra* Sections III.B & C.

Dark Catt's allegations that Valve's conduct has diminished game quality, output, and innovation are entirely conclusory. Valve's conduct allegedly "results in higher prices paid by its PC gaming customers and/or reductions in output and/or quality of games." Am. Compl. ¶ 119, Compl. ¶ 130. But Dark Catt's factual allegations contradict its conclusions about quality. For example, while Dark Catt, citing no facts, alleges that Valve's conduct suppresses the quality of PC games, *see* Am. Compl. ¶ 237, Microsoft's Xbox chief Phil Spencer says, in a document Dark Catt cites, "We know millions of PC gamers trust Steam as a great source to buy PC games and we've heard the feedback that PC gamers would like that choice."[12]

Dark Catt's factual allegations similarly contradict its conclusion that Valve's conduct suppresses PC game output. Am. Compl. ¶ 237. Dark Catt's original Complaint alleged that PC game output has exploded since Valve entered the market. *See* Compl. ¶ 4 (games available on Steam increased from 150 in 2007 to more than 50,000 in 2021). In an ineffectual attempt to bury this trajectory, Dark Catt removed the 150-game figure from its Amended Complaint, but still alleges that Steam grew from hosting only Valve's own games in 2003 to "at least 50,000"

---

[12] Nick Statt, *Microsoft will distribute more Xbox titles through Steam and finally support Win32 games*, THE VERGE (May 30, 2019), https://www.theverge.com/2019/5/30/18645250/microsoft-xbox-game-studios-publishing-valve-steam-32-bit-windows. Am. Compl. ¶ 246 n.98.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 23

130067256

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

today. Am. Compl. ¶ 45. The Court should not be fooled; the Amended Complaint tells the same story of Steam's popularity and growth as before.

Dark Catt also alleges that Valve's conduct stymies innovation, Am. Compl. ¶ 9, but, again, fails to plead any *facts* demonstrating reduced innovation. And, again, facts in the documents Dark Catt cites contradict its conclusory allegation. An industry publication Dark Catt repeatedly cites proclaims, "Valve has proven its prowess as an innovative powerhouse."[13]

Thus, Dark Catt alleges no cognizable non-price antitrust injury. Its allegations impermissibly piggyback on the allegations that Valve's commission is supracompetitive and that Valve's Steam Keys Guidelines and SDA terms are anticompetitive. And Dark Catt's conclusory allegations that Valve has suppressed "output and/or quality of games" and innovation lack facts.

## IV.    <u>CONCLUSION</u>

The Court dismissed the Complaint because it failed to allege unlawful antitrust conduct from Steam Key Guidelines, SDA sections, or game reviews. The Amended Complaint cures none of these deficiencies. That alone justifies dismissal of each of Dark Catt's claims. What's more, Dark Catt now alleges facts showing that Valve did not have monopoly power when it set the 30% commission that remains, subject to volume discounts added in 2018. Rather, Valve allegedly "started to build" a monopoly in 2004, had 50–70% market share in 2011 and 2012, all but stopped developing new games since 2017, and engaged in nearly all of the conduct Dark Catt challenges in 2017 or later. Those allegations bring the case within *Somers v. Apple*, providing an independent ground for dismissal, because commission rates remained unchanged, except for volume discounts, since before Valve allegedly acquired a monopoly.

Dark Catt has shown that it cannot remedy the failings of its original complaint through amendment. The Court should dismiss this case with prejudice.

---

[13] J. Conditt, *'Half-Life: Alyx' is proof Valve answers to no one*, ENGADGET (Mar. 18, 2020), https://www.engadget.com/2020-03-18-half-life-alyx-valve-steam-stockholders-boo.html. Am. Compl. ¶¶ 45 n.5, 47 n.12, 217 n.83.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 24

130067256

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1    DATED this 28th day of January, 2022.

2                                    FOX ROTHSCHILD LLP

3

4                                    s/ Gavin W. Skok
                                     Gavin W. Skok, WSBA #29766
5                                    Laura P. Hansen, WSBA #48669
                                     1001 Fourth Avenue, Suite 4500
6                                    Seattle, WA 98154
                                     Telephone:    206.624.3600
7                                    Facsimile:    206.389.1708
                                     E-mail:       gskok@foxrothschild.com
8                                                  lhansen@foxrothschild.com

9

10                                   MONTGOMERY McCRACKEN WALKER &
                                     RHOADS LLP
11

12                                   s/ Charles B. Casper
13                                   Charles B. Casper, admitted pro hac vice
                                     1735 Market Street, 21st Floor
14                                   Philadelphia, PA  19103
                                     Telephone:    215.772.1500
15                                   Facsimile:    215.772.7620
                                     Email:        ccasper@mmwr.com
16

17

18

19

20

21

22

23

24

25

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - 25

130067256

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## CERTIFICATE OF SERVICE

I certify that I am a secretary at the law firm of Fox Rothschild LLP in Seattle, Washington.  I am a U.S. citizen over the age of eighteen years and not a party to the within cause.  On the date shown below, I caused to be served a true and correct copy of the foregoing on counsel of record for all other parties to this action as indicated below:

### Service List

Stephanie L. Jensen
WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone: (206) 883-2500
Facsimile: (206) 883-2699
Email: sjensen@wsgr.com

☐ Via US Mail
☐ Via Messenger
☒ Via CM/ECF / Email
☐ Via over-night delivery

Kenneth R. O'Rourke
Scott A. Sher
Allison B. Smith
WILSON SONSINI GOODRICH & ROSATI, P.C.
1700 K Street, NW, Suite 500
Washington, DC 20006
Telephone: (202) 973-8800
Facsimile: (202) 973-8899
Email: korourke@wsgr.com
ssher@wsgr.com; allison.smith@wsgr.com

W. Joseph Bruckner
Joseph C. Bourne
Leona B. Ajavon
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email: wjbruckner@locklaw.com;
jcbourne@locklaw.com;
lbajavon@locklaw.com

*Attorneys for Plaintiffs*

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 26

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

130067256

1    I declare under penalty of perjury that the foregoing is true and correct.

2    EXECUTED this 28th day of January, 2022, in Puyallup, Washington.

3

4    _____
     Courtney R. Brooks

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00872-JCC) - 27

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600