1

2

3

4

5

6

7

8

9

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

| | |
|---|---|
| DARK CATT STUDIOS HOLDINGS, INC., and DARK CATT STUDIOS INTERACTIVE LLC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VALVE CORPORATION,<br><br>Defendant. | CASE NO.:  2:21-cv-00872-JCC<br><br>**DARK CATT PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>NOTE ON MOTION CALENDAR: Apr. 8, 2022 |

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS .................................................................................. 2

III.  LEGAL STANDARD ......................................................................................... 5

IV.  ARGUMENT ...................................................................................................... 5

    A.  Dark Catt Sufficiently Alleges Exclusionary Conduct ........................... 5

        1.  Dark Catt Pleads that Valve's Pricing and Marketing Restraints Form an Anticompetitive MFN ......................................... 6

        2.  Dark Catt Adequately Explains the Role of Steam Keys in Valve's Scheme ................................................................................ 11

        3.  Dark Catt Alleges Valve Uses the Review System as Part of Its Scheme ...................................................................................... 17

    B.  Dark Catt Alleges Antitrust Injury Caused by Valve's Exclusionary Conduct ................................................................................................. 19

        1.  Dark Catt Plausibly Alleges a Supracompetitive Commission ................ 19

        2.  Dark Catt Alleges Injury from Lost Promotional and Investment Opportunities .............................................................................. 23

V.  CONCLUSION ................................................................................................. 24

OPPOSITION TO MOTION TO DISMISS
No. 2:21-cv-00872-JCC

-i-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1

## TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4

5 *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
     836 F.3d 1171 (9th Cir. 2016) ...............................................................................16, 17

6 *Am. Nat'l Mfg. v. Select Comfort Corp.,*
     2016 WL 9450472 (C.D. Cal. Sept. 28, 2016) ...................................................................13
7

8 *Anderson News, LLC v. Am. Media, Inc.,*
     680 F.3d 162 (2d Cir. 2012).................................................................................................10

9 *Ashcroft v. Iqbal,*
     556 U.S. 662 (2009).................................................................................................................5
10

11 *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
     472 U.S. 585 (1985).........................................................................................................16, 17

12 *Beech-Nut Nutrition Corp. v. Gerber Prods. Co.,*
     69 F. App'x 350 (9th Cir. 2003) ............................................................................................5
13

14 *Bell Atl. Corp. v. Twombly,*
     550 U.S. 544 (2007)...................................................................................................2, 5, 10, 11

15 *City of Anaheim v. S. Cal. Edison Co.,*
     955 F.2d 1373 (9th Cir. 1992) .............................................................................................11
16

17 *Coto Settlement v. Eisenberg,*
     593 F.3d 1031 (9th Cir. 2010) .............................................................................................18

18 *Eastman Kodak Co. v. Image Tech. Servs.,*
     504 U.S. 451 (1992)...............................................................................................................14
19

20 *Est. of Kekona v. Alaska Airlines, Inc.,*
     2018 WL 1317826 (W.D. Wash. Mar. 14, 2018) (Coughenour, J.) ..................................10

21 *Evergreen Partnering Grp., Inc. v. Pactiv Corp.,*
     720 F.3d 33 (1st Cir. 2013)...................................................................................................18
22

23 *Exeltis USA, Inc. v. First Databank, Inc.,*
     779 F. App'x 486 (9th Cir. 2019) ..........................................................................................2

24 *Fed. Trade Comm'n v. Surescripts, LLC,*
     424 F. Supp. 3d 92 (D.D.C. 2020)...................................................................................13, 18
25

26 *Free Freehand Corp. v. Adobe Sys.,*
     852 F. Supp. 2d 1171 (N.D. Cal. 2012) ..............................................................................11

27 *In re Musical Instruments & Equip. Antitrust Litig.,*
     798 F.3d 1186 (9th Cir. 2015)...............................................................................................11

28

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-ii-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ...................................................................................10

*Menard v. CSX Transp., Inc.*,
   698 F.3d 40 (1st Cir. 2012) .....................................................................................10

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021)..............................................................................................19

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
   797 F.2d 370 (7th Cir. 1986) ...........................................................................16, 17

*Park v. Thompson*,
   851 F.3d 910 (9th Cir. 2017) ...................................................................................17

*Ramirez v. Cnty. of San Bernardino*,
   806 F.3d 1002 (9th Cir. 2015) .................................................................................10

*REX - Real Est. Exch. Inc. v. Zillow Inc.*,
   2021 WL 3930694 (W.D. Wash. Sept. 2, 2021)......................................................15

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013) .......................................................................21, 22, 23

*Staley v. Gilead Scis., Inc.*,
   446 F. Supp. 3d 578 (N.D. Cal. 2020) .......................................................................8

*T-Scan Corp. v. Alfresco Software Americas, Inc.*,
   2011 WL 13234271 (W.D. Wash. June 24, 2011) (Coughenour, J.)..........................13

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961).....................................................................................................8

*In re Live Concert Antitrust Litig.*,
   247 F.R.D. 98 (C.D. Cal. 2007) ................................................................................23

*United States v. Am. Tobacco Co.*,
   221 U.S. 106 (1911).....................................................................................................5

*United States v. Blue Cross Blue Shield of Mich.*,
   809 F. Supp. 2d 665 (E.D. Mich. 2011)......................................................................9

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005)......................................................................................13

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966).....................................................................................................5

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ....................................................................................18

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-iii-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020),
    *cert. denied sub nom*,
    *Comcast Corp. v. Viamedia, Inc.*, 141 S. Ct. 2877 (2021) .................................................15

*William O. Gilley Enters. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) ........................................................................................22

*Wolfire Games, LLC v. Valve Corp.*,
    No. 2:21-cv-563-JCC (W.D. Wash. filed Apr. 27, 2021) ...................................................6

## STATUTES

Sherman Act § 1..............................................................................................................11

## RULES

Fed. R. Civ. P. 8.......................................................................................................2, 5, 10

Fed. R. Civ. P. 12(b)(6)..........................................................................................10, 13, 16, 21

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-iv-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1    **I.      INTRODUCTION**

2          Dark Catt Plaintiffs allege that Defendant Valve Corporation ("Valve") holds a 75% to

3    80% share in the worldwide personal computer ("PC") game distribution market, a relevant

4    antitrust market. Valve gained and maintains this monopoly by barring Publishers from selling

5    their games at lower prices or offering better promotions on other stores. Valve enforces its

6    restrictions by controlling Steam keys and game reviews, punishing Publishers for using other

7    stores, and liming Publishers' sales volumes. Publishers who violate the restrictions risk retaliation

8    and exclusion from Steam, which effectively excludes them from the PC game distribution market

9    and PC game customers. With these restrictions, Valve insulates itself from competitive pressures

10   it would otherwise face to offer Publishers more favorable distribution terms.

11         As a result, Valve extracts a commission for its PC game distribution services far higher

12   than the competitive rate. The commission imposed on Publishers far exceeds Valve's costs plus

13   a reasonable return and generates billions of dollars in revenue each year. By keeping competing

14   stores out of the market and preventing competition that would force down its commission, Valve

15   collects inflated commissions from Publishers in violation of federal and state antitrust laws.

16         Valve's Motion to Dismiss (ECF No. 64) largely repeats arguments from its prior motion.

17   But Dark Catt addressed the deficiencies noted in the Court's Order (ECF No. 56), adding

18   significant factual allegations to the Amended Complaint (ECF No. 57). The detailed, non-

19   conclusory allegations lay out Valve's monopoly power, exclusionary conduct, impact on the

20   market, and resulting harm to Dark Catt and other Publishers.

21         Valve's Motion relies on its reconfigured portrayal of its conduct and the market, bolstered

22   by "facts" extrinsic to the Amended Complaint. It asks the Court to weigh Dark Catt's factual

23   allegations individually to assess Dark Catt's claim rather than considering them as a whole and

24   to resolve supposed factual disputes in Valve's favor. For instance, Valve asserts that it does not

25   impose a most favored nation ("MFN") restraint on Publishers, contrary to its own written

26   guidelines and employees' admissions. Valve argues Steam keys are a beneficial service provided

27   to Publishers, disregarding Dark Catt's examples of how Valve uses them as an output restraint

28

1    and enforcement mechanism for the MFN. And Valve asserts that it has no obligation to censor

2    user reviews, ignoring Dark Catt's actual allegations of Valve's use of the review system and

3    algorithms to punish Publishers who violate the pricing and marketing restrictions MFN.

4        The Amended Complaint easily satisfies Rule 8's pleading requirement of "a short and

5    plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2);

6    *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007). The Motion should be denied.

7    **II.    STATEMENT OF FACTS**

8        Plaintiffs Dark Catt Studios Holdings, Inc. and Dark Catt Studios Interactive LLC

9    (collectively "Dark Catt") allege that Valve attempted to monopolize and maintains its monopoly

10   in the worldwide market for PC game distribution, including through its Steam online game store.

11   To have any meaningful access to PC gaming customers, Publishers—including large and

12   experienced studios—must publish and sell their games through Steam. Am. Compl. ¶¶ 1, 4. Valve

13   wields its market power to ensure it acts as the gatekeeper to the entire PC gaming market, pushing

14   out competitors who would put downward pressure on its revenue sharing percentage while

15   ensuring the majority of PC game sales are made through Steam. *Id.* ¶¶ 5, 7-9.

16       Valve controls and profits from two sectors of the relevant market: purchases made directly

17   on Steam and purchases of Steam keys regardless of where the key is purchased. *Id.* ¶¶ 8, 13. These

18   sectors combined account for 75% to 80% of the market. *Id.* ¶¶ 50, 54, 61.[1] The remaining 20% to

19   25% of the market consists of rival independent stores such as Epic and GOG, but they remain

20   much smaller than Steam. *Id.* ¶¶ 50-51. For example, Valve sells billions of dollars of third-party

21   games every year, while Epic Games Store sold a fraction of that amount (approximately $265

22   million) and GOG's 2020 annual revenues were about $90 million. *Id.* ¶¶ 47, 51, 62.

23       Valve executes its scheme in three principal ways, each of which amplifies the others. *Id.*

24

25   [1] Valve's reference to "28% of Steam-enabled versions of games" being sold as Steam keys, citing
     the original Complaint, is procedurally improper and factually incorrect. Mot. at 7. The Amended
26   Complaint has superseded the original, and the latter no longer performs any function. *See Exeltis USA,
     Inc. v. First Databank, Inc.*, 779 F. App'x 486, 487 (9th Cir. 2019). Regardless, Valve misinterprets the
27   28% figure, which was the percentage of *total Steam revenues* from Steam key sales. Lastly, Valve based
     a substantial part of its first motion to dismiss on the unreliability of this source, but now wants the Court
28   to rely on it to make factual findings. Mot. at 7-8.

¶ 6. **First,** Valve restricts Publishers' pricing and marketing activities on other third-party stores. *Id.* ¶ 116. Publishers must sign the Steam Distribution Agreement ("SDA") and agree to the rules in the Steamworks Documentation to distribute a game on Steam. *Id.* ¶¶ 72-74. The SDA and Steamworks Documentation include MFN restrictions on Publishers' activities on other stores for games also available on Steam. *Id.* ¶¶ 127-32, 135. Publishers cannot offer a price on another store lower than the price on Steam, including as part of a temporary sale, or exclusive content that is not yet available on Steam. *Id.* ¶¶ 77, 80. The existence of these limitations is supported by Valve's own written guidelines and the admissions of its employees, among other sources. *Id.* ¶¶ 135, 147.

Publishers cannot negotiate with other stores to provide something to attract customers from Steam (like lower retail prices or exclusive content) in exchange for distribution terms more beneficial than those they receive from Valve. *Id.* ¶ 119. Without such offerings, stores cannot gain a sufficient user base to challenge Steam and in turn attract additional Publishers. Publishers are left without viable options to avoid Steam while distributing their PC games, and therefore must comply with Valve's contractual restrictions. *Id.* ¶ 138.

**Second,** Valve uses its system of authentication codes, known as Steam keys, to enforce the pricing and marketing restrictions described above and to limit the quantity of games available from third-party stores. *Id.* ¶ 10, 14. Valve has entrenched Steam keys as the industry standard for distributing authorized, licensed copies of PC games, making them "a practical necessity for Publishers." *Id.* ¶ 155. Steam keys are used to beta test new games, provide access to members of the media, provide demonstrations to possible investors and distributors, and sell copies on third-party stores. *Id.* ¶¶ 11, 67, 70. As a practical matter, media, investors, and distributors will not accept other ways to distribute a game copy. *Id.* ¶ 70.

Valve previously allowed Publishers to generate Steam keys for their games, but Valve changed the policy. *Id.* ¶ 163. Valve must now approve all Steam key requests, at its sole discretion and without clear guidelines; Valve may delay or deny keys for Publishers who violate its pricing and marketing restrictions or otherwise are perceived to have acted against its interests. *Id.* Steam keys also allow Valve to track and limit the number of Steam-enabled games sold on third-party

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC
-3-
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1   stores. *Id.* ¶¶ 16, 162. A Valve employee explained in a message to Publishers that Valve will deny

2   requests when it assumes, based on quantity, the Publisher is "asking for more keys because you're

3   offering cheaper options off Steam," which Valve does not allow. *Id.* ¶ 164.

4   　　　　**Third,** Valve controls Publishers through the Steam review system and algorithms that

5   affect a game's visibility on Steam. *Id.* ¶¶ 180, 187-96. Valve encouraged users to submit negative

6   reviews as punishment for a Publisher entering a temporary exclusive (a promotional deal available

7   only on one store) with a competitor. *Id.* ¶ 182. These meritless comments can have a devastating

8   effect on a game's overall score, visibility on Steam, and accordingly sales. *Id.* ¶¶ 187-88.

9   　　　　Valve also decided to only count user reviews for copies purchased directly on Steam, and

10  not purchases made through an authorized Steam key outlet, towards a game's overall score. *Id.*

11  ¶¶ 189-91. This methodology discourages Publishers from promoting Steam key sales; neither the

12  quantity nor quality of reviews by Steam key purchasers help the game's overall Steam score and

13  visibility on Steam. *Id.*

14  　　　　Given these restraints, Valve does not "have to compete with other storefronts on price,

15  revenue sharing rates, promotional activity, and/or other benefits for Publishers." *Id.* ¶ 200. Valve

16  charges a commission rate of 30% of the sales price of a PC game or add-on content, until a $10

17  million revenue threshold is met. *Id.* ¶ 48. Steam's own data shows that nearly all games (96%)

18  have less than $1 million in total sales, so Valve knows they will never reach the lower commission

19  threshold. *Id.* ¶ 218. The 30% rate is not connected to the cost Valve incurs to maintain Steam and

20  distribute games, including Steamworks features and bandwidth consumed by the purchaser to

21  download the game. *Id.* ¶ 202. Potential competitors in PC game distribution have stated that "it

22  does not cost 30% to distribute games" and "stores charging 30 per cent are marking up their costs

23  by 300 to 400 per cent." *Id.* ¶¶ 205, 209.

24  　　　　Competition "would force Valve to lower its commission rate to one supported by its costs

25  plus a reasonable profit." *Id.* ¶ 214. Dark Catt and the proposed Publisher class have been directly

26  injured by Valve's conduct by paying a higher commission than they would have to pay if Valve

27  did not impose its pricing and marketing restrictions, output restraint, and other anticompetitive

28

1    conduct. *Id*. ¶¶ 22, 112-13.

2    **III.    LEGAL STANDARD**

3          A complaint must include "a short and plain statement of the claim showing that the pleader

4    is entitled to relief." Fed. R. Civ. P. 8(a). This requires "only enough facts to state a claim to relief

5    that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007). "When there

6    are well-pleaded factual allegations, a court should assume their veracity and then determine

7    whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679

8    (2009). A complaint is facially plausible when it includes factual content that "allows the court to

9    draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663.

10   Facial plausibility "is not akin to a 'probability requirement.'" *Id.* at 678 (citation omitted).

11         While *Twombly* acknowledged that "antitrust discovery can be expensive," it rejected

12   "heightened fact pleading of specifics." 550 U.S. at 558, 570; *see also id*. at 569 n.14. *Iqbal*

13   confirmed that the same pleading standard applies in all civil cases; courts should be no more

14   aggressive in dismissing antitrust claims than other types of claims. 556 U.S. at 684; *see also*

15   *Beech-Nut Nutrition Corp. v. Gerber Prods. Co.*, 69 F. App'x 350, 351 (9th Cir. 2003) (antitrust

16   claims have "no special pleading rule requiring greater factual specificity").

17   **IV.    ARGUMENT**

18         **A.   Dark Catt Sufficiently Alleges Exclusionary Conduct**

19         Dark Catt sufficiently alleges Valve has market power in a relevant antitrust market—

20   Valve does not contest this. Valve's conduct, and its combined effect, must be analyzed in the

21   context of its monopoly power. *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966)

22   (finding defendant's "monopoly was achieved in large part by unlawful and exclusionary

23   practices," including "restrictive agreements that pre-empted for each company a segment of the

24   market" and "[p]ricing practices that contained competitors"); *United States v. Am. Tobacco Co.*,

25   221 U.S. 106, 181-83 (1911) (finding § 2 violation after examining acts "devised in order to

26   monopolize the trade" including "recurring stipulations, whose legality, isolately viewed, we are

27   not considering, by which numbers of persons . . . were required to bind themselves").

28

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC
-5-
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

Valve's Motion argues over the facts, not the plausibility of Dark Catt's allegations. Valve also relies on the Court's Order on its first motion to dismiss, but the Court was not then considering the Amended Complaint's allegations.

### 1. Dark Catt Pleads that Valve's Pricing and Marketing Restraints Form an Anticompetitive MFN

Dark Catt pleads in factual detail how Valve's SDA and Steamworks Documentation impose an MFN on pricing and availability in the market for PC game distribution. Dark Catt alleges that Valve's SDA and Steamworks Documentation prevent Publishers from offering lower prices or earlier availability for their games or downloadable content ("DLC") on another store when the game or DLC will also be available on Steam. Am. Compl. ¶ 80.

This is not Dark Catt's novel interpretation of the SDA and Steamworks Documentation. Valve itself has confirmed that it understands and enforces the contracts in this way. When a Publisher inquired about offering its game "at a lower price to take advantage of the lower commission rates" on another store, Valve "replied that they would remove [the game] from Steam if I allowed it to be sold as a lower price anywhere, even from my own website without Steam keys and without Steam's DRM [digital rights management]." *Id*. ¶ 147.[2]

The Steamworks Documentation directs Publishers to "reach out to us via the Developer Support tool if you want to talk through a specific scenario" to "avoid a situation where customers get a worse offer on the Steam store." *Id*. ¶ 135. Another Publisher sought clarification of Valve's "pricing policy" through the Developer Support tool, as instructed to ensure compliance with the MFN. *Id*. ¶ 148. Though the Publisher was specifically asking about selling "a non-Steam variant of a game" at a different price than the price on Steam, Valve responded that "[s]elling the game off Steam at a lower price wouldn't be considered giving Steam users a fair deal." *Id*.

Dark Catt itself "was banned from Steam" shortly after "offer[ing] its game for a temporary

---

[2] Valve implies the Court should give this allegation *less* credence because the Publisher brought a similar antitrust lawsuit against Valve. *Wolfire Games, LLC v. Valve Corp.*, No. 2:21-cv-563-JCC (W.D. Wash. filed Apr. 27, 2021). Yet it then wants the Court to credit the truth of a comment by an unnamed "reader" of the blog post that conflicts with factual allegations in both the Amended Complaint and *Wolfire* complaint. Mot. at 14.

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-6-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

lower price" on a third-party store. *Id.* ¶ 149.[3] And Valve has removed other games or Publishers for violating its MFN, trading the additional revenues it would receive from sales commissions for the benefit of enforcing its MFN and maintaining its monopoly. *Id.* ¶ 151. Valve's response to these factual allegations is to try to minimize its own admissions and conduct.

The terms of Valve's SDA and Steamworks Documentation corroborate the existence of the pricing MFN. Valve's contractual terms provide, for example:

- "Company is free to offer special and unique promotional content through other distribution channels, provided that ***material parity*** is maintained between Steam Account Owners and users of other distribution channels who make a ***comparable investment*** in the Application and the associated DLC." *Id.* ¶ 131 (emphasis added).

- "We ask you to ***treat Steam customers no worse*** than customers buying Steam keys outside of Steam." *Id.* ¶ 135 (emphasis added).

- "You should use keys to sell your game on other stores in a ***similar way*** to how you sell your game on Steam. It is important that you ***don't give Steam customers a worse deal***." *Id.* (emphasis added).

- "Keep in mind that the perceived price in the bundle/subscription ***should be a price you are willing to run the game at a standalone price or discount on Steam***." *Id.* (emphasis added).

Industry participants understand that phrases such as "material parity," "comparable investment," and "don't give Steam customers a worse deal," refer to price, consistent with common usage. *Id.* ¶ 136. Actual pricing in the market shows that Publishers abide by Valve's MFN, consistently setting the same pricing across stores, even for those not selling Steam keys. *Id.* ¶ 146.

The MFN also operates by preventing Publishers from offering temporary exclusives on a third-party store for any game or add-on content that is available on Steam. *Id.* ¶¶ 80, 124, 141. The SDA provides, for example:

---

[3] Valve improperly tries to generate a factual dispute by faulting Dark Catt for not alleging "because of." Mot. at 14. This is a strained misreading of a plausible allegation, and the reasonable inference is that Dark Catt was banned, *inter alia,* because of the lower price it offered elsewhere, in violation of the MFN.

- "Company shall submit the Applications to Steam for release **no later than the first commercial release** of each Application or Localized Version . . . . Thereafter, Company shall submit to Steam any Localized Versions and Application Updates (in beta and final form) when available, but **in no event later than they are provided to any other third party** for commercial release." *Id.* ¶ 128 (emphasis added).

- "If Company distributes the Application through any other (non-Steam) distribution channel, and if Company distributes any material DLC for the Application through that other channel, it will deliver the DLC to Valve **at the same time such that Steam Account Owners will receive comparable DLC** with customers acquiring the Application through other channels." *Id.* ¶ 131 (emphasis added).

Despite its employees' admissions, its conduct toward Dark Catt, and the ordinary meaning of its contractual language, Valve argues that there is no explicit MFN in the SDA. Mot. at 12, 15. First, Valve is wrong factually, as Dark Catt's allegations make clear. Second, an MFN does not have to be explicit to be anticompetitive and unlawful. *See Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 609-12 (N.D. Cal. 2020) (discussing contractual provisions that were "basically most-favored nation ('MFN') clauses" and denying motion to dismiss); *see also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326-27 (1961) (examining summary judgment record for "practical effect" of contract rather than only "specific agreements" in the contract related to dealing with a competitor).

Moreover, economic analyses show that these types of MFNs can increase prices, including on third-party stores. For instance, Amazon previously imposed an MFN preventing third parties from selling their products on another store at a lower price. When Amazon removed the MFN creating the "price floor," product prices dropped on both Amazon and competitor site eBay when eBay's commission rate was lower than Amazon's rate. Am. Compl. ¶ 120. Products with greater differences in commissions saw larger price drops. *Id.*

Valve's MFN similarly keeps prices elevated by discouraging selective discounting on third-party stores, preventing Publishers from benefiting from lower commission rates by taking

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-8-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

home more money from each sale even at a lower retail price. *Id.* ¶ 215. The Publisher must extend the lower price to Steam, which sets a price floor across the market like the Amazon MFN referenced above. *Id.* Notably, the MFN does not help Valve control costs from a supplier and keep down prices to customers, as with a typical, often procompetitive MFN. *Id.* ¶¶ 117-18. Valve's MFN prevents prices from falling below the Steam price by controlling the terms of a transaction between a Publisher and a customer on a third-party store. *Id.* Publishers cannot take advantage of lower commissions or more favorable distribution terms on other stores by offering a lower retail price to customers to try to increase sales and revenues outside of Steam. *Id.*

To the extent there is any ambiguity in Valve's own contractual language, Valve cannot hide behind it nor ask the Court to resolve the ambiguity in Valve's favor and against the Amended Complaint's factual allegations. *See id.* ¶¶ 77, 118-19, 132, 135-36. The operation and impact of the MFN are factual disputes that cannot be resolved on a motion to dismiss. *See United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 674 (E.D. Mich. 2011) (denying motion to dismiss where plaintiffs explained how MFNs could exclude entry and competition in relevant market; "a factual inquiry and, ultimately, a balancing of anticompetitive and procompetitive effects must be made but not at the pleading stage").

Valve misconstrues Dark Catt's factual allegations regarding the limited presence of "exclusives" in the industry. *See* Mot. at 16. Dark Catt alleges that Epic uses exclusives in an attempt to compete with Valve but the strategy has not been successful, and other stores do not use exclusives to sell third-party games. *See* Am. Compl. ¶¶ 242-43. These allegations are in the very paragraphs Valve cites to claim that exclusives are common. Mot. at 16 (citing Am. Compl. ¶¶ 243 ("Other potential Steam competitors do not have the financial resources and clout that Epic does and so are unable to make an offer of an exclusive that would be attractive to a Publisher. Accordingly, exclusives remain a rare promotional tool in the PC game distribution market."), 245 (describing how EA attempted to self-distribute its own games, not third-party games, but "was unable to break through Valve's anticompetitive tactics in the PC game distribution market and returned its games to Steam in 2020"); 140 (not mentioning exclusives)). That is, Valve's citations

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC
-9-
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1    to the Amended Complaint say nothing about exclusives as a common marketing tactic in PC game

2    distribution except that Epic (alone among stores selling third-party games) has unsuccessfully

3    attempted to compete with Valve using them.[4]

4           Valve's remaining quarrels with Dark Catt's allegations either argue the facts or assert the

5    facts are not "of any consequence." Mot. at 12. Valve seeks a quantum of proof possible only after

6    fulsome discovery, upending Rule 8 and *Twombly*. *See Twombly*, 550 U.S. at 556; *see also Est. of*

7    *Kekona v. Alaska Airlines, Inc.*, 2018 WL 1317826, at *2 (W.D. Wash. Mar. 14, 2018)

8    (Coughenour, J.) ("some latitude may be appropriate where a plausible claim may be indicated

9    'based on what is known'" when "'information needed may be in control of [the] defendants'"

10   (quoting *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012))).

11          Nor does Valve contend these factual allegations are legal conclusions that need not be

12   accepted as true; it impermissibly asks the Court to accept its own explanations instead. *See Khoja*

13   *v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("If defendants are permitted to

14   present their own version of the facts at the pleading stage . . . it becomes near impossible" for a

15   plaintiff to demonstrate a plausible claim for relief); *Anderson News, LLC v. Am. Media, Inc.*, 680

16   F.3d 162, 185 (2d Cir. 2012) ("A court ruling on . . . a [Rule 12(b)(6)] motion may not properly

17   dismiss a complaint that states a plausible version of the events merely because the court finds a

18   different version more plausible.").

19          As examples, Valve disputes Dark Catt's allegations showing the effect of the MFN in the

20   industry: flat pricing at the Steam price. It argues that one news article "cannot plausibly support

21   the claim that Valve's contractual provisions reflect anticompetitive conduct." Mot. at 15. One

22   news article may not state a complex antitrust claim (nor is it intended to), but it does corroborate

23   Dark Catt's extensive factual allegations. Valve's bald assertion that the article shows "healthy

24   competition" from rivals is not premised on anything in the article, whether properly incorporated

25   by reference or not. *Id.* It is a rewrite.

26   ───────────────

27        [4] Valve's citations to the original Complaint do not support its arguments either and are meaningless, as the original Complaint has "ceased to exist." *Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1008
28   (9th Cir. 2015).

Valve also quibbles with a tweet from Epic Games CEO Tim Sweeney explaining the effect of Valve's MFN on his company's competing store. Mot. at 13. Valve's factual argument already violates *Twombly*, but Valve goes on to reframe Mr. Sweeney's statement as something "Valve can do (instead of what it has done)." *Id*. This labored parsing of Mr. Sweeney's words rejects their plain meaning and the reasonable inferences that must be drawn in favor of Dark Catt's allegations. Valve also ignores *Twombly* in asking the Court to accept a tweet by some random Twitter user as a *fact* that *negates* Dark Catt's allegations. *Id*. The random tweet is an extrinsic statement not incorporated into the Amended Complaint, which cites only Mr. Sweeney's tweet, and cannot be used in place of or supposedly to outweigh Dark Catt's well-pleaded allegations.

Lastly, Valve's citation to *Musical Instruments* is unrelated to Dark Catt's allegations. That case involved the pleading standard for a conspiracy under Sherman Act § 1, including "'who is alleged to have conspired with whom, what exactly they agreed to, and how the alleged conspiracy was organized and carried out.'" *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1190 (9th Cir. 2015) (quoting district court opinion). The pleading standard for an agreement to fix prices has no bearing on the sufficiency of Dark Catt's allegations that Valve unilaterally abuses its monopoly power to prevent lower prices on other stores.

## 2. Dark Catt Adequately Explains the Role of Steam Keys in Valve's Scheme

Valve's Motion first addresses Steam keys as if they stand apart from and are unconnected to Dark Catt's other allegations of Valve's conduct. Mot. at 7-11. Valve's arguments improperly compartmentalize Dark Catt's allegations without viewing "their alleged aggregated anticompetitive effect." *Free Freehand Corp. v. Adobe Sys.*, 852 F. Supp. 2d 1171, 1184 (N.D. Cal. 2012); *see City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect").

Valve then tries to paint Steam keys as a benevolent service Valve offers to Publishers, despite Dark Catt's well-pleaded allegations showing that Steam keys are anything but an altruistic offer—they serve multiple functions in Valve's monopolization scheme. Valve uses Steam keys

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-11-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1   to enforce its pricing and marketing restrictions, prevent potential competitors from gaining

2   traction in the market, keep customers on the Steam platform, and limit sales on third-party stores

3   selling Steam keys. Am. Compl. ¶¶ 14-16.

4              a.      **Publishers Must Be on Steam to Access the Market**

5          Dark Catt alleges that Publishers have no feasible way to reach customers without using

6   Steam. *Id.* ¶ 56. Publishers can distribute through physical retail stores, digital stores, or their own

7   websites. *Id.* ¶¶ 54, 57, 59. Physical stores are largely distributing digital tokens, *e.g.*, Steam keys,

8   that the consumer must redeem on a digital store, removing physical stores as a separate

9   competitive distribution route. *Id.* ¶¶ 54, 60. Other digital stores are retailing Steam keys, meaning

10  Publishers must transact with Valve to get Steam keys to sell. *Id.* ¶ 55. Additionally, a few stores

11  only take games that have a proven success record on Steam, again requiring Publishers to transact

12  with Valve as a prerequisite to access the market. *Id.* ¶ 59.

13         The few digital stores that are not solely retailing Steam keys either distribute only their

14  own games, meaning they are not a distribution option for other Publishers, or make games

15  available without any anti-piracy and copyright protections, meaning Publishers cannot ensure

16  legitimate sales and effectively monetize their games. *Id.* Lastly, most Publishers lack the

17  resources to self-distribute their games via their own digital storefront. *Id.* ¶ 57. As a result,

18  Publishers have no hope of reaching PC game customers without going through Valve for direct

19  sales on Steam and Steam key sales on third-party stores. *Id.* ¶¶ 55-56, 171.

20         In theory, a Publisher could choose not to be on Steam or request Steam keys. But

21  realistically, as explained above, to do so is choosing not to participate in the market. *Id.* ¶¶ 155,

22  157. In that case, the Publisher also could not provide access to its game to larger publishers,

23  investors, and the media to gain distribution or publicity outside of Steam—these entities require

24  a Steam key. *Id.* ¶¶ 70, 171-72. To survive, Publishers therefore depend on Steam, unable to pursue

25  other opportunities without using Steam as a starting point. Publishers follow Valve's restrictive

26  terms because losing access to Steam is an existential threat. The Amended Complaint's Steam

27  key allegations cannot be severed from Valve's overall course of conduct but must be assessed "as

28

1   part of a larger, allegedly monopolistic scheme." *Am. Nat'l Mfg. v. Select Comfort Corp.*, 2016

2   WL 9450472, at *3 (C.D. Cal. Sept. 28, 2016).

3       For these reasons, Publishers are locked in to selling their games on Steam and cannot

4   simply "sell non-Steam-enabled versions of their games anywhere," as Valve asserts. Mot. at 8;

5   *see also id.* at 9 (asserting Publishers "can make any efforts off of Steam to sell additional games");

6   *id.* at 11 (asserting "developers can sell whatever quantities of games for non-Steam platforms they

7   want"). Valve's unsupported contentions directly contradict the well-pleaded allegations in the

8   Amended Complaint. Valve's factual "denials are not adequate grounds" to dismiss a complaint;

9   "rather, they speak to the merits and the need for further factual development through discovery."

10  *Fed. Trade Comm'n v. Surescripts, LLC*, 424 F. Supp. 3d 92, 103-04 (D.D.C. 2020); *see T-Scan*

11  *Corp. v. Alfresco Software Americas, Inc.*, 2011 WL 13234271, at *2 (W.D. Wash. June 24, 2011)

12  (Coughenour, J.) ("A motion to dismiss under rule 12(b)(6) is not a forum in which to litigate the

13  merits of the underlying allegations.").

14      Publishers need to sell on Steam to succeed. Efforts to distribute independently of Steam

15  have been largely unsuccessful. For example, EA distributed its already popular games exclusively

16  through its own store for a period, but could not overcome Steam's monopoly power and returned

17  its games to Steam in late 2019. Am. Compl. ¶ 64. Even if a few Publishers attempt to distribute

18  through other stores not dependent on Steam keys, "the test of whether a monopolist forecloses

19  competition 'is not total foreclosure, but whether the challenged practices bar a substantial number

20  of rivals or severely restrict the market's ambit.'" *Surescripts, LLC*, 424 F. Supp. 3d at 101

21  (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)) (denying motion

22  to dismiss). Valve meets this test.

23          **b.   Valve Uses Steam Keys to Enforce its Pricing and Marketing**
                   **Restrictions**

24

25      Valve's assertion that "Dark Catt alleges no facts that Valve . . . regulates what [Publishers]

26  do with" Steam keys is also incorrect. Mot. at 8. Dark Catt *does* allege Valve regulates Steam keys.

27  ***First***, Publishers cannot sell Steam keys for a lower price on another store than the price offered

28

on Steam. Am. Compl. ¶¶ 75, 77, 118, 135-36. **Second**, Publishers cannot get approval for more Steam keys than the volume of their actual sales on Steam. *Id.* ¶¶ 162-67. These restrictions help build and fortify both a price floor, preventing third-party stores from competing on price, and an output restraint, ensuring the majority of PC game sales continue to be made on Steam. Valve previously did not require Publishers to get its permission; they could generate their own Steam keys. *Id.* ¶ 163. This policy change provides Valve greater control over Publishers' activities outside of Steam in service of its monopoly. *Id.* ¶¶ 163-66. **Third**, Valve does not publish its guidelines for awarding Steam keys, leaving decisions to its secret whim. *Id*. ¶¶ 163, 169.

Prior to banning Dark Catt, Valve substantially delayed granting it Steam keys to sell on a third-party store (a Steam authorized retailer) because Dark Catt planned to offer its game for a lower price on the third-party store. *Id*. ¶¶ 69, 172. Valve cut Dark Catt off from the broader PC game distribution market; Dark Catt could not sell on Steam or via Steam keys, or provide Steam keys to other publishers interested in trialing the game for potential investment or distribution. *Id.* ¶ 172. Valve similarly delayed granting Steam keys to another studio seeking to sell on the same third-party store at a temporary discount, although the game had been available on Steam for years. *Id.* ¶ 174. Valve cut another Publisher off from all access to Steam and Steam keys for allegedly offering lower pricing elsewhere. *Id*. ¶ 176.

### c.    Valve Benefits Financially from Offering Steam Keys

Valve argues that, although purchasers of Steam keys are immediately directed back to Steam to redeem the key and play the game, this is not "by any wrongful conduct by Valve." Mot. at 9. This asserts a legal conclusion (whether Valve's conduct is "wrongful") without considering Valve's overall conduct and the "actual market realities" explained in the Amended Complaint. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 466 (1992). Dark Catt does not allege that Steam keys are independently anticompetitive simply because they direct purchasers back to Steam, as Valve implies. Mot. at 8-9. Publishers' dependence on Steam to reach game customers, including through Steam keys, is very much because of Valve's wrongful conduct: imposing an MFN, regulating Steam keys, and controlling the review system and store recommendation

1    algorithms.

2         Dark Catt explains how Valve is compensated for providing "free" Steam keys to

3    Publishers, generating value to Valve independent of any alleged freeriding and fraud control

4    rationales. Am. Compl. ¶ 154. Even if they initially purchased a game elsewhere through a Steam

5    key, Valve benefits from keeping gamers in the Steam ecosystem to complete a purchase using

6    their Steam account, play the game, and purchase add-on content. *Id*. ¶¶ 156-61. Valve is

7    compensated through the network benefits of keeping gamers on its site and commissions earned

8    on those gamers' subsequent in-game or DLC purchases. *Id*. ¶¶ 158-61. Valve's ability to profit

9    from Steam key sales refutes Valve's argument that its output limitations are simply a legitimate

10   business justification. Mot. at 8, 10. Regardless, "merely postulat[ing] 'a valid business purpose'"

11   is insufficient on a motion to dismiss as "the calculation of procompetitive benefits net of

12   anticompetitive harms does not easily lend itself to a pleading standard." *Viamedia, Inc. v.*

13   *Comcast Corp.*, 951 F.3d 429, 461-63 (7th Cir. 2020), *cert. denied sub nom*, *Comcast Corp. v.*

14   *Viamedia, Inc.*, 141 S. Ct. 2877 (2021); *see also REX - Real Est. Exch. Inc. v. Zillow Inc.*, 2021

15   WL 3930694, at *5 & n.5 (W.D. Wash. Sept. 2, 2021).

16        Valve's argument that Dark Catt "fails to state a claim that it was injured when Steam Keys

17   enabled Valve to make post-games sales of DLC or in-game purchases" is incorrect and

18   inconsequential. Mot. at 9. None of Dark Catt's counts are so limited—premised only on Valve's

19   Steam key restrictions—nor do they claim injury only from supracompetitive commissions on

20   sales of DLC or in-game purchases. Even if Dark Catt did not allege injury specifically from

21   Valve's post-game sales of DLC or in-game purchases, the conclusion that Dark Catt therefore

22   fails to state a claim does not follow, factually or legally.

23        The same is true for Valve's arguments about its data collection. Valve suggests Dark

24   Catt's factual allegations on user data must alone "state a claim for anticompetitive conduct." *Id*.

25   at 10. This impermissibly compartmentalizes Dark Catt's allegations, as Valve recognizes in

26   stating its argument is focused on "Dark Catt's few words" instead of the entire Amended

27   Complaint. *Id*. Valve's citations to the Amended Complaint do not show that Valve uses Steam

28

1   keys to "know which distributors of their product . . . are making legitimate sales," the supposed

2   valid business reason. *Id.* (citing Am. Compl. ¶¶ 57 (credit card fraud as a barrier to entry), 69

3   (mentioning "unauthorized and unlicensed Steam key resellers" but no efforts by Valve to stop

4   them or use of Steam keys to ensure legitimate sales), 175 (discussing Valve's purge of fake and

5   legitimate games but no relation to legitimate sales or Steam keys)). Valve's alleged business

6   rationale is not factually supported by the Amended Complaint and is improper on a Rule 12(b)(6)

7   motion.

8               **d.       Dark Catt Does Not Allege a Duty to Deal Theory**

9         Valve tries to recast Dark Catt's allegations related to Steam keys as a refusal to deal under

10   *Aspen Skiing*, or as an attempt to impose a general duty on Valve to help its competitors. Mot. at

11   10 (citing *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986)); *id.* at

12   11 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) and *Aerotec*

13   *Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016)). Neither is true. Dark Catt does

14   not allege that Valve has refused to provide a rival with a requested product or service, or to deal

15   with a rival on more favorable terms. *See Aspen Skiing*, 472 U.S. at 608-11. Instead, Valve is

16   required to compete using a "superior product, a well-run business, or luck" rather than

17   exclusionary practices made successful with its market power. *Id.* at 604.

18         Valve's citation to *Olympia Equipment* is inapt. As an initial matter, the case was decided

19   after a jury trial, which "lasted more than six weeks and produced the usual mountain of testimony

20   and exhibits." *Olympia Equip.*, 797 F.2d at 372. That is, the court had a full record of the conduct,

21   business justifications, and effect on the market to determine if the defendant engaged in an

22   "exclusionary scheme." *Id.* at 378. Additionally, Valve's quoted portion starts with the premise

23   that the firm has "lawful monopoly power," a legal conclusion not supported here, and omits the

24   court's discussion of the "difference between positive and negative duties" imposed on a

25   monopolist. *Id.* at 375-76. Dark Catt does not seek to impose on Valve an affirmative duty to

26   provide Steam keys to Publishers or help rival stores gain market share. Dark Catt seeks to stop

27   Valve's pricing and output restrictions, and to enforce Valve's duty to refrain from exclusionary

28

1   conduct that harms competition.

2       Similarly, *Aspen Skiing* came after a full jury trial, and *Aerotec* evaluated a summary

3   judgment record. *See Aspen Skiing*, 472 U.S. at 608; *Aerotec*, 836 F.3d at 1183. Neither says

4   anything about plausibly pleading a monopolization claim. As with *Olympia Equipment*'s

5   distinction between positive and negative duties, the Supreme Court and Ninth Circuit undertook

6   detailed analyses of the factual records to distinguish "between practices which tend to exclude or

7   restrict competition on the one hand, and the success of a business which reflects only a superior

8   product, a well-run business, or luck, on the other." *Aspen Skiing*, 472 U.S. at 604. Valve's conduct

9   is alleged here to fall in the former—the "exclude or restrict competition"—category.

10          **3.   Dark Catt Alleges Valve Uses the Review System as Part of Its Scheme**

11      Valve again focuses on one of Valve's enforcement tools as if Dark Catt must allege that

12  the existence of the review system alone is a standalone antitrust violation. Valve improperly

13  reframes Dark Catt's allegations surrounding Valve's control of the game review system and store

14  algorithms as claims that Valve must censor comments, delete reviews, and refrain from

15  commenting on a competitor's goods. Mot. at 17-18. This is incorrect. Dark Catt alleges that Valve

16  uses the review system and control of visibility and promotion on Steam to keep Publishers in

17  check and reinforce its other exclusionary conduct. *E.g.*, Am. Compl. ¶¶ 178-80. This "entire

18  factual context is considered" in determining if Dark Catt has stated a claim. *Park v. Thompson*,

19  851 F.3d 910, 928 (9th Cir. 2017).

20      Valve uses the review system to "keep[] Publishers compliant with Valve's price parity

21  and marketing restrictions MFN." Am. Compl. ¶ 180. The effects of being review bombed are

22  devastating on a game's sales and visibility on Steam. *Id.* ¶¶ 180, 182, 187. With a lower user

23  rating, games receive less promotion on Steam due to the algorithms Valve designed. *Id.* ¶¶ 189-

24  91. With fewer ways to surface in search results, recommendations, and trending categories to

25  attract prospective game buyers, Publishers are left with "fewer sales and lower revenue." *Id.*

26  ¶ 188. Publishers are therefore loath to test Valve's restrictions and risk punishment.

27      Valve's Motion ignores the other benefit of the review system to Valve's monopolization

28

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC
-17-
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

scheme: only games purchased directly on Steam, rather than through a Steam key on a third-party store, count for the overall Steam score. *Id*. ¶ 189. This further discourages Publishers from selling on third-party stores. *Id*. ¶ 190. The Steam score aggregates the percentage of positive reviews *and* total number of reviews, incentivizing Publishers to accumulate quantity as well as quality. *Id*. Third-party sales do not benefit Publishers through visibility on Steam; if they did, they would create a virtuous cycle of more visibility and better rankings, more sales given the visibility, more reviews from those sales, and therefore more visibility. *Id*. ¶ 191. Publishers cannot hope to compete through independent publicity activities, incentivizing Publishers to encourage Steam sales rather than third-party sales. *Id*. ¶¶ 190-91.

Valve's lengthy quotations from an article cited in the Amended Complaint and arguments over individual examples do not undermine Dark Catt's allegations. Valve does not contend that the outside facts it points to are incorporated into the Amended Complaint, nor could it. A defendant may seek to incorporate a document "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (citing *Ritchie*, 342 F.3d at 908-09).

And Valve cannot prevail on its Motion by arguing the facts. For example, Valve defends its decision to publicly criticize a temporary exclusive offering on Epic Games Store, resulting in negative reviews that "destroy[ed] the marketability of the Publisher's back catalogue in retaliation," Am. Compl. ¶ 182, as valid because "the developer's decision harmed Valve's customers." Mot. at 18. With "no substantiated basis in the record to credit a defendant's counterallegations," the Court must "properly refrain from any conjecture" as to which facts will ultimately be proven. *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013). In short, Valve's factual disputes are "ill suited for the pleadings stage." *Surescripts, LLC*, 424 F. Supp. 3d at 104.

Valve cites *NCAA v. Alston* to argue its review system "is a business decision not subject

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC
-18-
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1   to antitrust law." Mot. at 18. *Alston* was decided "[a]fter amassing a vast record and conducting an

2   exhaustive trial" and in fact resulted in a finding that the NCAA's business decisions violated

3   antitrust law. *NCAA v. Alston*, 141 S. Ct. 2141, 2147 (2021). The district court, rather than giving

4   the NCAA "wide berth," Mot. at 18, determined that the challenged restraints "'produce significant

5   anticompetitive effects in the relevant market'" and completed the rule of reason analysis to

6   examine the NCAA's procompetitive justifications and the plaintiffs' proffered "substantially less

7   restrictive alternative rules." *Id.* at 2152 (quoting district court opinion). The Supreme Court

8   affirmed the district court's decision finding some of the NCAA's restraints to be unlawful. Dark

9   Catt's Amended Complaint is similarly sufficient to allow it an opportunity to prove its claims on

10  the merits; Valve can argue its supposed procompetitive reasons, if proven, at an appropriate later

11  stage of the case.

**B.  Dark Catt Alleges Antitrust Injury Caused by Valve's Exclusionary Conduct**

13      Dark Catt pleads facts showing that the commission Valve charges Publishers is higher

14  than it would be if not propped up by Valve's anticompetitive conduct in PC game distribution.

15  These facts include the rates charged by Valve's would-be competitors; commentary from industry

16  participants; Valve's declining costs; and Valve's enormous profits, among others.

**1.  Dark Catt Plausibly Alleges a Supracompetitive Commission**

18      Dark Catt alleges that it and similarly situated Publishers were injured by paying higher

19  fees to Valve than they would have paid if Valve was not engaged in the exclusionary conduct

20  described above. Am. Compl. ¶¶ 2, 113, 119, 122. Stores compete for Publishers through sales

21  commissions and promotional opportunities provided to Publishers; stores can then compete for

22  game buyers through lower retail prices and/or greater availability of games or DLC. *Id.* ¶¶ 9, 23,

23  206, 216. By restraining how Publishers price and promote their games on other stores—Valve's

24  would-be competitors—Valve cuts off tools those stores could use to enter the market, grow their

25  presence, and otherwise compete once there. *Id.* ¶ 138. This is not organic competition; it is

26  exclusionary conduct. Game purchasers have less incentive to go to a third-party store if the price

27  is the same as on Steam, the games and add-on content are the same, they use their Steam account

28

to redeem a Steam key, and they play the game on Steam. *Id.* ¶¶ 156-57.

Valve's restrictions create a vicious cycle that prevents any real competition from driving down its commission rate. Publishers are dependent on Valve for access to the market, so they must comply with Valve's restrictive terms. *Id.* ¶ 155. Under those terms, Publishers cannot offer lower pricing or earlier availability of new content to other stores for better distribution terms. Stores consequently cannot attract customers by offering lower retail prices or greater availability of games. *Id.* ¶ 200. Without these procompetitive levers, stores cannot attract a sufficient user base to continue to build innovative features to attract customers away from Steam and offer competitive distribution terms to Publishers. *Id.* ¶¶ 200, 215-16, 221, 229. Without a sufficient user base through other stores, Publishers remain reliant on Valve for PC game distribution and cannot afford to violate Valve's restrictive terms. Consumers continue to purchase games directly from Valve or via Steam keys. Valve faces no competitive threat to its inflated commission rate.

As further evidence that the commission rate is supracompetitive, Dark Catt provides comparisons to other stores attempting to compete with Valve and related industries:

- Discord's store charged 10%, noting that "it does not cost 30% to distribute games in 2018" and it could build and run "amazing developer tools" taking only 10%. *Id.* ¶ 205.

- Epic's store charges 12%, concluding this was "sufficient to cover its costs of distribution and allow for further innovation and investment"; it "still makes a profit of 5 percent to 7 percent" despite lacking the scale of Steam. *Id.* ¶¶ 207-08.

- Ubisoft self-distributes its games through its Uplay store, so it pays no commission. While it releases some games only on its own store and Epic Games Store, Ubisoft continues to distribute some games on Steam "due to Steam's control of the PC gaming ecosystem." A Ubisoft executive noted that Valve's commission is "unrealistic" and "doesn't reflect where the world is today in terms of game distribution." *Id.* ¶ 210.

- Indie Games Store charged 20%, Humble Bundle charges either 25% or 5% depending on distribution method, Microsoft charges 12%, and Itch.io charges a default of 10%, but Publishers can set their own revenue share percentage. *Id.* ¶ 228.

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC
-20-
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

- Google and Apple app stores each charge 15% for the first $1 million in revenues for mobile app sales. *Id.* ¶ 230.[5]

- Microsoft charges 15% or 0% for mobile app sales on its store, depending on the payment platform used. *Id.* ¶ 232.

- Commissions charged by other online retailers selling third-party products (Amazon, eBay, Etsy, Walmart, and Poshmark) range from 5% to 20%. *Id.* ¶ 233.

Though Valve lowered its commission rate for the highest-selling games to keep "their large audiences" and "positive network effects," the lowered commissions have no relationship to Valve's costs. *Id.* ¶¶ 219-23. This is an admission that the rate was too high previously. Valve made the change "just before the Epic Store went live" and as a response to the emerging competitor "offer[ing] a better deal to developers." *Id.* ¶ 217.

Valve's costs also cannot support the reasonableness of Valve's commission. The costs of running a content delivery network in 2017 reportedly were approximately 0.2 cents per gigabyte and dropped to 0.07 cents by 2020. *Id.* ¶ 165. Valve charges far more than these data costs, plus the costs of payment processing and operating costs, by taking 30% of every sale. In comparison, Epic Games Store's costs are around 2.5% to 3.5% for payment processing, less than 1.5% for content delivery network costs, 1% to 2% for variable operating and customer support costs, and negligible fixed costs to develop and support the platform, for a total of 5% to 7%. *Id.* ¶ 209. Simply stated, if not for Valve's anticompetitive conduct, competition would force down its commission to its marginal cost plus a reasonable return.

Valve again fails to shoehorn the Amended Complaint into *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013). Dark Catt does not allege that Valve had "zero market share" when it was charging the same 30% commission. Mot. at 20. Valve seeks to weave together bits of allegations with farfetched inferences drawn against Dark Catt to claim that Dark Catt has not alleged supracompetitive pricing. This violates the basic principle of a Rule 12(b)(6) motion: "All

---

[5] Valve's CEO boasted that his company is "tremendously profitable" and "more profitable per employee than Google or Apple." *Id.* ¶ 46.

1    allegations of material fact are taken as true and construed in the light most favorable to the non-

2    moving party." *William O. Gilley Enters. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009).

3        The Amended Complaint does not include factual allegations about the structure of the PC

4    game distribution market in 2004, Valve's commission then, or Valve's market presence, as Valve

5    attempts to create by mashing up sentences and italicizing verbs. Mot. at 20-21. Dark Catt's

6    allegations that Valve had at least 50% to 70% market power dating back to 2011 and has made

7    "billions of dollars in revenue" from Steam likewise say nothing about a commission it charged at

8    some hypothetical point when it did not have market power. *Id*. at 21. In fact, Dark Catt does not

9    allege that Valve ever lacked market power. Dark Catt's focus on conduct that "occurred in 2017

10   or later," *id*., is to be expected given the class period begins in April 2017. Am. Compl. ¶¶ 2, 256.

11   It says nothing about Publishers' antitrust injury or Valve's conduct at an earlier time.

12       Nor has Dark Catt alleged that Valve's anticompetitive conduct has ended, allowing prices

13   to fall to a competitive level. In *Somers*, the court analyzed Apple's prices before, during, and

14   "even after Apple's alleged monopoly ended." *Somers*, 729 F.3d at 964. There was no change in

15   the price after "the emergence of a large seller such as Amazon" or "after Apple began selling

16   Fairplay-free music," *i.e.*, after Apple removed the software encryption that supposedly allowed it

17   to charge supracompetitive prices. *Id.* at 958, 964. Moreover, "Somers alleged in contradictory

18   fashion that the prices for iTS music remained the same since Apple entered the market in 2003,

19   . . . *and after Apple's share declined*." *Id*. at 962-63 (emphasis added). By contrast, Dark Catt

20   alleges that Valve's conduct to build and maintain a monopoly is ongoing. Am. Compl. ¶ 2.

21       Dark Catt's allegations are further distinguishable from *Somers*. Valve does not set prices

22   to consumers as Apple did in determining the generally applicable price for digital song

23   downloads. *Somers*, 729 F.3d at 964. Rather, Valve sets a standard commission rate for Publishers

24   that applies to the game price the Publisher chooses. Valve contractually prevents Publishers from

25   setting a lower retail price on another storefront—preventing the type of price competition that

26   Somers alleged. That is, Valve's pricing and marketing restrictions have prevented the "presence

27   of a competitor" and "increased competition" that would "generally lower[] prices." *Id.* Valve's

28

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-22-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

consistent commission rate therefore does not "render[] implausible," *id.*, Dark Catt's allegations that Valve's restrictions on Publishers excluded competitors and allowed it to charge a commission rate higher than the one that would prevail in a competitive market. Additionally, as explained, Valve's costs have plummeted in recent years, though it continues to charge the 30% commission.

Dark Catt plainly alleges that sophisticated, well-funded companies have been unable to overcome Valve's anticompetitive practices to gain share and provide a competitive restraint on Valve. Dark Catt and all other Publishers who sold their PC games on Steam suffered antitrust injury as a result. Am. Compl. ¶¶ 234-48, 251-53. That Valve's 30% fee is above the competitive rate and injured Publishers is a plausible inference to be drawn from the failure of these potential rivals to make inroads into Valve's market power and force down its supracompetitive fee.

### 2. Dark Catt Alleges Injury from Lost Promotional and Investment Opportunities

Dark Catt does not need to allege "non-price harms" to adequately plead antitrust injury given its allegations of a supracompetitive commission. But it has done so, separately establishing antitrust injury. Because of Valve's MFN, Publishers lose promotional and investment opportunities that would allow them to increase sales volumes and game quality and innovation.

For example, without Valve's restraints, Publishers would be able to pursue exclusives with other stores, which could "generat[e] customer attention and potentially significant revenue for the Publisher." *Id.* ¶ 125. Publishers could also receive better distribution terms including upfront payments (in exchange for a lower price or exclusive content for a competing store) to invest in development resources to increase the quality, innovation, and number of games they can offer to consumers. *Id.* ¶ 224. All of these in turn would increase sales.

Valve also uses Steam keys to artificially restrict supply of Steam-based games available for sale on other stores, *id.* ¶¶ 154, 162, "just as any other monopolist reduces output below the competitive level to charge a supracompetitive price." *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 140 (C.D. Cal. 2007). Publishers' limited ability to sell on third-party stores reduces output in the market and total revenues to Publishers. Valve's control over Steam keys also

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-23-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

frustrates Publishers' ability to seek investments. Investors and distributors require Steam keys to evaluate a game; they will not accept other forms of access, such as the raw executable files, for fear of nondisclosure agreement or intellectual property violations. Am. Compl. ¶ 70.

Valve's arguments about non-price injuries rely on facts and sources not properly before the Court. Mot. at 23-24 (citing original Complaint and articles not incorporated by reference into the Amended Complaint). Even taken at face value, Valve's version of events does not undermine the allegations of antitrust injury suffered by Publishers arising from reduced quality, output, or innovation. The quote from a Microsoft executive says nothing about the quality of PC games; the number of games available on Steam in 2007 compared to 2021 says nothing about the number or quality of games that would exist without Valve's exclusionary conduct; and the industry publication calling Valve "innovative" says nothing about the innovation Publishers (and competing stores) would achieve without Valve's constraints. *Id*. Lastly, Valve confuses Dark Catt's allegations about harm to competition generally and those "not party to this lawsuit," with the antitrust injury it and similarly situated Publishers suffered. Am. Compl. ¶¶ 9, 23-24.

## V.   CONCLUSION

Dark Catt respectfully requests that Valve's Motion to Dismiss the Amended Complaint be denied.[6]

---

[6] If the Court grants Valve's Motion, Dark Catt respectfully requests leave to amend. Depending on the basis, Dark Catt may add, *inter alia*, data showing the MFN's effect on retail game pricing across stores. The similarity of retail prices—the price floor—is evidence of Publishers being dissuaded from lowering their game prices on other stores due to Valve's MFN and enforcement tools.

Dated:  March 11, 2022

By: *s/ Stephanie L. Jensen*

Stephanie L. Jensen, WSBA #42042
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Telephone: (206) 883-2500
Facsimile:  (206) 883-2699
Email: sjensen@wsgr.com

Kenneth R. O'Rourke (*pro hac vice*)
Scott A. Sher (*pro hac vice*)
Allison B. Smith (*pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
1700 K Street, NW, Suite 500
Washington, DC  20006
Telephone: (202) 973-8800
Facsimile:  (202) 973-8899
Email: korourke@wsgr.com
Email: ssher@wsgr.com
Email: allison.smith@wsgr.com

W. Joseph Bruckner (*pro hac vice*)
Joseph C. Bourne (*pro hac vice*)
Leona B. Ajavon (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
Email: wjbruckner@locklaw.com
Email: jcbourne@locklaw.com
Email: lbajavon@locklaw.com

*Attorneys for Plaintiffs Dark Catt Studios*
*Holdings, Inc. and Dark Catt Studios*
*Interactive LLC, and Putative Class*

OPPOSITION TO MOTION TO DISMISS
No. 2:21-CV-00872-JCC

-25-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

# CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2022, I electronically filed the foregoing with the Clerk of the Court via email to the following address:  filing@wawd.uscourts.gov and copied all counsel of record at the following email addresses:

| CM/ECF Participants | Email Addresses |
| --- | --- |
| Alicia Cobb | aliciacobb@quinnemanuel.com<br>alicia-cobb-8505@ecf.pacerpro.com<br>rosepantley@quinnemanuel.com |
| Allison B Smith | allison.smith@wsgr.com<br>nicole.robinson@wsgr.com |
| Charles B Casper | ccasper@mmwr.com<br>chuck-casper-6564@ecf.pacerpro.com |
| Gavin William Skok | gskok@foxrothschild.com<br>crbrooks@foxrothschild.com |
| Joseph C Bourne | jcbourne@locklaw.com<br>jpgramlich@locklaw.com<br>lgn-jcbourne@ecf.courtdrive.com |
| Kenneth R O'Rourke | korourke@wsgr.com<br>nicole.robinson@wsgr.com |
| Laura P. Hansen | lhansen@foxrothschild.com<br>mtenorino@foxrothschild.com |
| Leona Bridget Ajavon | lbajavon@locklaw.com<br>dmstanek@locklaw.com<br>lgn-lbajavon@ecf.courtdrive.com |
| Scott A Sher | ssher@wsgr.com<br>salhijaz@wsgr.com |
| Stephanie Lynn Jensen | sjensen@wsgr.com<br>rcarter@wsgr.com<br>ysheard@wsgr.com |
| William Joseph Bruckner | wjbruckner@locklaw.com<br>emsipe@locklaw.com<br>lgn-wjbruckner@ecf.courtdrive.com |

Dated: March 11, 2022

By: *s/ Stephanie L. Jensen*
Stephanie L. Jensen, WSBA #42042
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Telephone: (206) 883-2500
Facsimile:  (206) 883-2699
Email: sjensen@wsgr.com

CERTIFICATE OF SERVICE
No. 2:21-CV-00872-JCC

-1-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500